**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA TUCSON**

| | |
|---|---|
| KEIRON BAILEY | Case No.: CV-23-00557-TUC-AMM |
| Plaintiff, | COMPLAINT FOR COMPENSATORY DAMAGES and PUNITIVE DAMAGES |
| v. | |
| UNIVERSITY OF ARIZONA; ARIZONA BOARD OF REGENTS; ROBERT ROBBINS; DIANE BRENNAN; LIESL FOLKS; ANDREA ROMERO; REGINA DEIL-AMEN; ROBERT Q. BERRY; and MELANIE BERTRAND; in their official and individual capacities | 1. RETALIATION TITLE VII 2. RETALIATION TITLE IX 3. FREEDOM OF SPEECH 4. DENIAL OF PROCESS 5. CONSPIRACY TO VIOLATE RIGHTS |
| | JURY TRIAL DEMANDED |
| | Judge: Date Action filed: |
| Defendants | |

Plaintiff complains of Defendants and for causes of action alleges:

## <u>COMPLAINT AND JURY DEMAND</u>

Plaintiff KEIRON BAILEY hereby files the following complaint for discrimination and retaliation and violations of his constitutional rights in violation of Title VII, 42 U.S.C. § 2000e-2; 42 U.S.C. § 1983; 20 U.S.C. § 1681; 18 U.S.C. § 241; the Fourteenth Amendment to the U.S. Constitution; Arizona Revised Statute § 41-1464.A; Arizona Revised Statute §15-1864C; Arizona Revised Statute § 13-2907-01; Arizona Board of Regents Rule 1-119C(4); Arizona Board of Regents Rule 6-914D; and Arizona Constitution Article 2 Section 4 against DEFENDANTS as captioned above.

1

**INTRODUCTION**

**"I believe in radical transparency" and "individual managers can't be making isolated decisions" as stated by Defendant and former UA Provost Dr. Liesl Folks, 3rd February 2023, to Plaintiff Dr. Bailey, Defendant Ms. Brennan and Dr. Leila Hudson, and previously the UA response to OCR investigation 08-19-2084 in which "the University assured OCR that it is committed to a culture of compliance."**

1. Dr. Keiron Bailey is a nationally recognized expert in Geographic Information Science studies and participatory systems including the Structured Public Involvement he co-innovated. He was employed at the University of Arizona since August 20033, first as Assistant Professor in the Department of Geography and Regional Development, earning promotion to the rank of Associate Professor with tenure in 2009, then transferring to the EDL program in the College of Education as Associate Professor with tenure between August 2020 and May 2023. He was dismissed from this post by former Provost Dr. Folks in May 2023 and following his Appeal of Dismissal was appointed to Research, Innovation and Impact in August 2023.

2. Dr. Bailey is an internationally-recognized researcher who has published more than sixty-five peer reviewed articles in national and international scholarly journals and a well-reviewed book; secured research funding from the National Science Foundation and other granting agencies including Federal Highway Administration and Federal Transit Administration and Arizona Board of Regents TRIF programs, as Primary Investigator and Co-Investigator; planned, developed, supported and implemented community-based

collaborative research, partnerships and programming and student development opportunities with community stakeholders such as the Summer GIS Academy; authored and co-authored numerous grant proposals, reports, delivered invited talks and workshops to researchers and planning professionals in more than twenty-five countries; directly supervised staff, consultants, undergraduate and graduate students; collaborated on outreach, research and grants with numerous faculty at UA, ASU and other institutions; served as reviewer for multiple national and international grant agencies. He has served on more than thirty graduate student committees and performed in various department and Faculty Senate service roles. He has designed, hosted and delivered more than three hundred public meetings for real-world projects in collaboration with Federal, State and local governments, private contractors and citizen groups with outstanding quality evaluations.

3. Dr. Bailey has taught seventy-seven classes at UA with consistently strong teaching evaluations and numerous post-graduation student testimonials to the real-world effectiveness of his classes. Dr. Bailey has spent the past year fighting off discrimination, harassment and targeting from multiple supervisors, going through complaint processes with the Arizona Board of Regents, the Department of Education's Office for Civil Rights ("OCR"), the Equal Employment Opportunity Commission ("EEOC"), and the National Science Foundation's Office of Equity and Civil Rights ("NSF OECR") to try to seek correction of the pattern of harassment of women that he reported and accountability for the retaliatory abuse he has suffered; and dealing with a

coordinated and planned campaign of retaliation from his superiors at UA that included performance review targeting, denial of normal recourse, denial of service, denial of promotion, ongoing false and defamatory characterization as "threat," multiple non-procedural three-week office exclusions premised on manufactured "threat" without UA PD support and characterized by HR as "not disciplinary," ejection from Faculty Senate meeting after summarizing the violations experienced by his family member and co-complainants, an office lock change enacted during the first three-week exclusion and performed without Facilities Management awareness; subjected to fraudulent UA PD callout by HR in front of President Robbins without cause and with the intent to harass and intimidate; enduring an immediate campus and all-facilities exclusion order issued by Dr. Folks and Ms. Brennan without required UA PD support and on the false premise of "disruption," followed by a pretextual dismissal served eight days later by Dr. Folks and enacted without cause being provided and using an old address that had been updated in UA official systems months prior.

4. Instead of protecting and supporting Dr. Bailey by following its own harassment handling and retaliation policies and relevant Board rules, UA subjected Dr. Bailey to a carefully-orchestrated and pre-planned litany of discrimination, and retaliation by removal from his workplace and normal access to systems and facilities; failed to respect its own and Board policies on harassment and retaliation against him and women co-complainants; denied him promotion; delivered deliberate indifference then false testimony about OIE conformance in the egregious and damaging harassment of his wife,

delivered repeated coercion regarding his well-known civil rights complaints, excluded

him from office and campus for almost half of the Spring 2023 semester, and then

dismissed him pretextually while covering up evidence of the administrative role,

appointments, applications and job talks of publicly-funded officers colluding to violate

his rights including Drs. Berry and Deil-Amen by means of orchestrated, repeated and

ongoing violations of public records law.

## JURISDICTION AND VENUE

5. This Court has original jurisdiction over Plaintiff's federal claims under 29 U.S.C. §

626, 28 U.S.C. § 1343, and 28 U.S.C. § 1331.

6. The Court has supplemental jurisdiction over Plaintiff's state law claims under 28

U.S.C.§ 1367.

7. Pursuant to 28 U.S.C. § 1391(b), venue lies in the District of Arizona as the events

giving rise to this action occurred in Tucson and Pima County, Arizona.

## PARTIES

8. Plaintiff Keiron Bailey is a resident of Pima County, Arizona, and was an employee of

the University of Arizona from Aug 2003 until May 2023 and then again in August 2023.

9. Defendant University of Arizona ("UA") was at all relevant times and continues to be

a public educational institution in Pima County, Arizona, organized and existing under

the laws of the State of Arizona.

10. UA receives federal funding and is therefore subject to Title IX of the Educational

Amendments of 1972, 20 U.S.C. §1681(a).

11. Arizona Board of Regents is the governing body of UA.

12. Defendant UA and Defendant Board of Regents are hereinafter collectively referred to as "the UA Defendants."

13. At all material times since July 1, 2017, Defendant Robert Robbins M.D, in his official capacity, worked within Pima County, State of Arizona, and was an agent and/or employee of UA, acting or failing to act within the scope, course, and authority of his employment and his employer.

14. At all material times since July 1, 2017, Robert Robbins was the President of UA ("President Robbins").

15. Dr. Liesl Folks served as the Provost of the University of Arizona from July 2019 until May 2023 and also held a Professor post in Electrical and Computer Engineering in the College of Engineering ("Dr. Folks"). She continues to hold this post as well as now the post of Vice President for Semiconductor Strategy.

16. Dr. Andrea Romero has served as the Vice Provost for Academic Affairs (VPFA) since January 2019 ("Dr. Romero.") She holds the post of Professor of Family Studies in the College of Agriculture and Life Sciences.

17. Dr. Robert Q. Berry was appointed as Dean of the College of Education at UA in July 2022 ("Dean Berry"). He holds the post of Professor in the College of Education.

18. Dr. Regina Deil-Amen is Professor in Higher Education in the College of Education ("Dr. Deil-Amen"). She was the Head of the Educational Policy Studies and Practice (EPSP) department from 2018 to 2023. In July 2023 she was appointed Associate Dean

for Faculty Affairs in the College of Education, and at one point between July 2022 and February 2023 she was announced as Associate Vice Provost for Faculty Affairs with a start date stated by Dr. Deil-Amen as 1 July 2023.

19. Dr. Melanie Bertrand joined UA in August 2021 as Associate Professor in the Educational Leadership and Policy (EDL) department in the College of Education ("Dr. Bertrand"). She served as Head of the EDL program from January 2022 until April 2023. Dr. Bailey reported to Dr. Bertrand in EDL prior to Dr. Deil-Amen assuming role of manager when EDL was moved under EPSP purview.

20. Ms. Diane Brennan is Associate Vice President of Human Resources ("Ms. Brennan"). Her CV also lists the tile of Senior Leadership Advisor – Internal Leadership and Executive Coach.

## APPLICABLE LAW AND POLICY

21. Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 (a), states that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...

22. Title IX is implemented through the Code of Federal Regulations. See 34 C.F.R. Part 106.

23 C.F.R. § 106.8(b) provides:

...A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part.

24. In Gebser v. Lago Vista Independent School District, 524 U.S. 274 (1988), the United States Supreme Court recognized that a recipient of federal educational funds intentionally violates Title IX, and is subject to a private damages action, where the recipient is "deliberately indifferent" to known acts of teacher-student discrimination.

25. In Davis v. Monroe County Board of Education, 526 U.S. 629 (1999), the Supreme Court extended the private damages action recognized in Gebser to cases where the harasser is a student, rather than a teacher.

26. Davis held that a complainant may prevail in a private Title IX damages action against a school district in cases of student-on-student harassment where the funding recipient is:

a) deliberately indifferent to sexual harassment of which the recipient has actual knowledge, and

8b) the harassment is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.

27. In Jackson v. Birmingham Board of Education, 544 U.S. 167 (2005), the Supreme Court held that retaliation against a person who complains about sex discrimination is itself a form of discrimination "on the basis of sex" forbidden by Title IX.

28. The First Amendment to the United States Constitution provides that Congress shall make no law "abridging the freedom of speech." U.S. Const. amend. I.

29. In Tinker v. Des Moines Independent Community School District, 393 U.S. 503 (1969), the Supreme Court held that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."

30. In Healy v. James, 408 U.S. 169 (1972), the Supreme Court held that the First Amendment applies with the same force at public universities as at other educational institutions.

31. The Fifth Amendment to the U.S. Constitution provides that "No person shall be...deprived of life, liberty, or property, without due process of law...." U.S. Const. Amend. V.9

32. The Fourteenth Amendment to the U.S. Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

33. Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 et seq., states that it shall be an unlawful employment practice for an employer:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

34. 42 U.S.C. § 2000e-2 Unlawful Employment Practices

35. Under Title VII, 42 U.S.C. § 2000e-2, the term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person.

36. Under Title VII, 42 U.S.C. § 2000e, the term "employee" means an individual employed by an employer.

37. Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a), provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

38. 18 U.S.C. § 241 Conspiracy Against Rights. "Section 241 makes it unlawful for two or more persons to agree to injure, threaten, or intimidate a person in the United States in the free exercise or enjoyment of any right or privilege secured by the Constitution or laws of the United States or because of him or her having exercised such a right."

39. § 106.71 Procedures. The procedural provisions applicable to title VI of the Civil Rights Act of 1964 are hereby adopted and incorporated herein by reference. These procedures may be found at 34 CFR §106.71

(a) Retaliation prohibited. No recipient or other person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by title IX or this part, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this part. Intimidation, threats, coercion, or discrimination, including charges against an individual for code of conduct violations that do not involve sex discrimination or sexual harassment, but arise out of the same facts or circumstances as a report or complaint of sex discrimination, or a report or formal complaint of sexual harassment, for the purpose of interfering with any right or privilege secured by title IX or this part, constitutes retaliation.

40. ARS § 41-1464.A   Other unlawful employment practices; opposition to unlawful practices; filing of charges; participation in proceedings; notices and advertisements for employment

"A. It is an unlawful employment practice for an employer to discriminate against any of the employer's employees or applicants for employment, for an employment agency or joint labor-management committee controlling apprenticeship or other training or retraining programs, including on-the-job training programs, to discriminate against any individual or for a labor organization to discriminate against any member or applicant for membership because the employee, the member, the applicant or the individual in an apprenticeship or other training or retraining program has opposed any practice that is an unlawful employment practice under this article or has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under article 6 of this chapter."

41. ARS § 15-1864C Students Right to Speak in a Public Forum

"C. A person who is lawfully present on a university or community college campus may engage in expressive activity, including a protest or demonstration, in any area where the person is lawfully present. Individual conduct that materially and substantially infringes on the rights of other persons to engage in or listen to expressive activity is not allowed and is subject to sanction."

42. ARS § 13-2907.01 False reporting to law enforcement agencies

"It is unlawful for a person to knowingly make to a law enforcement agency of either this state or a political subdivision of this state a false, fraudulent or unfounded report or statement or to knowingly misrepresent a fact for the purpose of interfering with the orderly operation of a law enforcement agency or misleading a peace officer."

43. Arizona Board of Regents Rule 1-119 Non-discrimination and anti-harassment

"C. 4. Retaliation.  Retaliation in the context of non-discrimination and anti-harassment occurs when an adverse action is taken against an individual for engaging in protected activity. Protected activity consists of: (1) opposing conduct reasonably believed to constitute discrimination, including harassment, which violates an employment or education discrimination statute or which board or university policy prohibits; or (2) filing a complaint about such practice; or (3) testifying, assisting, or participating in any manner in an investigation or other proceeding related to a discrimination complaint. Adverse actions that are reasonably likely to deter a complaining individual or others from engaging in protected activity are prohibited."

44. Arizona Board of Regents Rule 6-914.  Protection of employees from reprisal for whistleblowing

Section D: "No adverse personnel action may be taken against a university employee in knowing retaliation for any lawful disclosure of information on a matter of public concern to a public body, including a designated university officer, which information the employee in good faith believes evidences: (1) a violation of any law, (2) mismanagement, (3) gross waste or misappropriation of public funds, (4) a substantial and specific danger to public health and safety; or (5) an abuse of authority, collectively referred to herein as alleged wrongful conduct.

"No supervisor, director, chair, dean, department head, or any other employee with authority to make or materially influence significant personnel decisions shall take or

recommend an adverse personnel action against an employee in knowing retaliation for disclosing alleged wrongful conduct to a public body. Any employee found to have so violated this Policy shall be disciplined, up to and including termination, in accordance with existing university rules, policies, and procedures."

## FACTUAL ALLEGATIONS

45. Dr. Keiron Bailey is Associate Professor in Research, Innovation and Impact since August 2023.  Previously Dr. Bailey was an employee of UA between August 2003 and May 2023.

46. Dr. Bailey's professional record and educational achievements are impressive.

47. Dr. Bailey holds a doctorate degree in Geography from University of Kentucky, a Master of Arts degree in Geography from University of Hawai'i, Bachelor of Engineering degrees and Geography and Mechanical Engineering from University of Birmingham.

48. Dr. Bailey's work has been acknowledged by research awards from bodies including the Transportation Research Board and Southeastern Division of the Association of American Geographers.

49. Dr. Bailey's work has been repeatedly referenced in trade publications and media as well as over 1,000 times in peer review research articles.

50. While pursuing his doctorate at University of Kentucky, Dr. Bailey twice won the Southeastern Division of the Association of American Geographers PhD Student award.

51. In addition to his academic credentials, Dr. Bailey has more than twenty five years of experience working directly with transportation, planning, GIS and resource management professionals.

52. Prior to his work at UA, Dr. Bailey worked as a Visiting Professor at Tokyo Jogakkan University, and as Teaching Assistant at University of Kentucky and University of Hawai'i where he taught GIS labs and classes as well as Geography classes.

53. During and after his undergraduate degrees, Dr. Bailey had worked in the commercial aviation industry and then the oil exploration business.

54. Throughout his career, Dr. Bailey has authored and co-authored numerous scholarly articles, a book, a number of book chapters, and professional and refereed reports in his area of expertise.

55. Dr. Bailey is well-known within his academic community, and regularly attends events and speaks at national and international conferences and delivers workshops, seminars and invited presentations on the Structured Public Involvement method he innovated as well as on Geographic Information Science more broadly.

56. In addition to his duties at UA, Dr. Bailey has participated in numerous committees both within and outside of UA ranging from Graduate Student Orientations for the College of Social and Behavioral Sciences, to University Undergraduate Council to the GIS Certificate and Geographic Information Science and Technology (GIS-T) Programs.

57. Dr. Bailey also serves as a referee and mentor for students at UA including numerous Honors student and scholarship winners.  He has supported an unusually large number of Outstanding Student nominees at undergraduate level with letters of support and directed studies.  He has provided several hundreds of students with professional support in the form of postgraduation references for employment and scholarship opportunities.  He has received numerous unsolicited testimonials from students years after their graduation thanking him for the quality of his classes, his ongoing support for their professional development and his assistance in realizing their goals.

### History of Civil Rights Complaints and concerns with campus safety

58. Between 2004 and 2023 Dr. Bailey had demonstrated his commitment to make UA campus safer for students, staff and faculty by numerous actions including reporting concerns raised by staff and students who were too worried about retaliation to make their comp;aints while safeguarding their anonymity in the hope that timely information would enable a safer campus as well as seek UA PD intervention in situations that presented risk.

59. In the light of the appalling crimes enacted against former student-athlete Ms. Baillie Gibson by Coach Carter of UA, some of which were discharged in his campus office and that resulted in the eventual incarceration of Coach Carter, Dr. Bailey had grown increasingly concerned with UA risk management and civil rights violation reporting systems.  He was particularly concerned with risk reporting that was subject to denial of process by Conflicts of Interest (COI), as implemented in gaslighting of complainants,

mischaracterization of clear risk, and evident coverup during earlier complaint handling

in Ms.Gibson's case as well as those of other student-athletes, students, and staff.

60. Beginning prior to 2010, Dr. Bailey raised process and workplace concerns and

provided written, concrete and constructive suggestions to former Presidents Shelton and

Weaver-Hart and President Robbins as well as former Interim Provost Goldberg for more

reliable workplace and campus risk management systems, such as implementing an

ombud appointed by a mechanism outside of administration control and influence and

free of conflicts of interest and commitment, to canvass, survey, report on and

communicate safety and workplace risk concerns in a timely way with the goal of

identifying issues before they escalated in ways damaging to everyone.

61. In 2015 Dr. Bailey stated in response to the survey that he declined to provide a Five

Year Review commentary on Dean Jones on the grounds of Dean Jones' known and

damaging capacity for abuse of office and retaliation.  Dr. Bailey suggested UA follow a

model of externally-appointed auditors for senior administration reviews where the

administrators held significant power over the employees from whom these evaluations

were being requested.  There was no response.

62. Dr. Bailey's concern with, and commitment to, campus safety and compliance was

well-known and well-demonstrated by 2017.

63. Over a period of years, he reported these same concerns and suggestions numerous

times in response to surveys conducted by administration during searches for Provosts,

Deans and other officers, including the search for Dean of the College of Education in 2022. There was no response from any administrator to any of these submissions.

64. In December 2017 Dr. Bailey's Dean, Dean Jones, invaded their home by electronic communication at 1am on a Sunday morning as Dr. Bailey and his family were sleeping and he delivered a series of professional and personal threats to his wife Dr. C including threats to terminate her employment, to terminate the employment of co-workers, and to discharge lethal self-harm. This event was shocking, deeply violatory, frightening and profoundly distressing for all of his family. Dr. Bailey thought there had been a death in the family when he was woken by his wife in a condition of terror, speechless and crying. This event initiated a profound fear of UA's management and their propensity to violate a woman in her family home at 1am in the name of "work."

65. Dr. Bailey and his wife immediately reported this severe harassment to President Robbins via his official web contact form, and to the former Provost Dr. Comrie, and Dr. Burd by email.

66. Dean Jones followed up with further texts and call attempts following these complaints. Dr. Comrie was immediately notified of his followup.

67. During the complaint followup meeting for Dr. C with former Provost Dr. Comrie, the first question that former Provost Dr. Comrie asked Dr. C was "Was he drunk?"

68. A letter of apology was authored by Dean Jones and sent to Dr. C with Drs. Burd and Comrie copied. This took place without the required mandated harassment reporting and safeguarding being performed by the three senior UA officers, Drs. Burd, Comrie and

Miller and without OIE or other compliance actions. The harasser took charge of his own complaint handling process and colluded with these other officers to classify this grossly violatory harassment as UA's "work."

69. At this time Dr. Bailey worked in the School of Geography, Development and Environment (SGDE) in the College of Social and Behavioral Sciences (SBS) under the management of Dean Jones as well as higher ranking Full Professors including the Deans' domestic partner Dr. Marston and his friends Drs. Comrie and Liverman.

70. Dr. Comrie stepped down from the Provost post in February 2018 and returned to a position as Full Professor in SGDE. Later Dr. Comrie was appointed to the Board of Regents position of Chief Academic Officer.

71. Dr. Bailey was deeply concerned with the criminality of this action and the noncompliance that clearly facilitated and condoned it. Dr. Bailey sought to resolve COI and risk via a transfer of reporting away from the harasser and his enablers. He requested this transfer in the complaint sent to President Robbins hours after the event and repeated this numerous times afterwards to then–Vice Provost for Faculty Affairs (VPFA) Dr. Tom Miller, then-Provost Dr. Comrie, then-Interim Provost Dr. Goldberg, and then VPFA Dr. Romero (from February 2019) and former Provost Dr. Folks (from July 2019).

72. Dr. Bailey met with Dr. Miller on several occasions to follow up on transfer and safeguarding. Dr. Miller changed the title of his email from Harassment of My Family to Your Concerns about Your Annual Review. Dr. Bailey immediately responded and called out this gaslighting. Dr. Bailey stated to Dr. Miller that the problem was the

Dean's severe criminal misconduct and that the concerns extended far beyond the review process.

73. Dr. Miller then used the same classification of this harassment as "work" that had been used by Drs. Comrie, Burd and Jones himself, at the same time acknowledging this "work" was "distressing," to deny Dr. Bailey's transfer request.

74. Dr. Bailey informed his Department Head Dr. Staeheli and Acting Head Dr. Liverman by email of the harassment, its damaging consequences for him and his family, and his goal of securing transfer to reduce retaliation risk.

75. At the 2018 School graduation ceremony Dr. Liverman stated to Dr. Bailey "It's a shame about the drink," referring to Dr. Jones' alcohol abuse problem and his widely-known misconduct that was known to many on campus including administrators.

76. In April 2018 Dr. Bailey wrote Ms. Vaillancourt of HR and former Interim Provost Dr. Goldberg reiterating his desire for transfer and concerns about his Dean's actions as well as the validation of the egregious harassment as "work."

77. In April 2018 Ms. Allison Vaillancourt of HR met with Dr. Bailey and referring to his email to President Robbins she stated "I wish you hadn't done that." Dr. Bailey stated he wished Dean Jones had not committed criminal harassment of his family in their home at 1am and that this unlawful conduct was not validated by as "work" by complaint handlers. Dr. Bailey did not hear from Ms. Vaillancourt again. In 2019 she left the UA.

78. Dr. Bailey wrote President Robbins about his concerns. There was no response.

79. Dr. Bailey wrote former Interim Provost Dr. Goldberg with the same concerns and request. He did not respond to Dr. Bailey. VPFA Dr. Miller stated to Dr. Bailey that he could approach other units to seek transfer of reporting. Dr. Bailey was informed that his community engagement work was praised by Dr. Thomas Meixner. Dr. Mexiner had already told Dr. Bailey the same because they had co-authored grant proposals in the past.

80. Dr. C was deeply frightened not only by the abusive and terroristic invasion of her home by this drunken and abusive and dangerous man but also by his power to cloak himself in his State-funded appointment to coverup and deny safeguarding by colluding with his enablers to subvert harassment handling procedures and reinforce his malevolent abusive power by characterizing his criminality as "work." She worked in continual fear of interacting with Dean Jones and his enablers for the remainder of her time at UA. This constant stress affected her life at home and her relationship with Dr. Bailey. She experienced ongoing episodic terror before driving to work, fear at workplace meetings involving the harasser, as well as sleep disturbance and loss of amenity in her home.

81. In October 2018 Dr. Bailey completed a UA Harassment Training module. This was a component of required Harassment Training for UA employees and consisted of a set of slides summarizing TITLE VII law and responsibilities to report discrimination and harassment as well as not engage in retaliation against complainants e.g. in this module President Robbins' image appeared next to the text stating "We do not tolerate any form of discrimination or harassment" (slide #1), "discrimination and harassment are against

the law," "employees who engage in discrimination and harassment will be subject to discipline" (slide #2), "Liability for Our Institution: How *you* deal with discrimination and harassment issues will be considered our *institution's response*" (slide #3, emphasis in original), "Supervisor responsibilites…Avoid retaliating against anyone who has made a good-faith complaint" (slide #4).

82. This training module also addressed institutional liability by stating: "Documenting employee actions.  Employment actions that you take today could be called into question weeks, months, or maybe even years from now.  Even though these actions seem perfectly reasonable now, they could look vastly different if circumstances change unforeseeably in the future.  Proper documentation of your actions will also help you make better decisions, ensure clear communication with the employees you supervise, and perhaps make the difference between costly litigation for our institution and no litigation at all" (slide #16).

83. Dr. Miller stepped down from the VPFA post in October 2018.

84. Dr. Andrea Romero assumed the post of Vice Provost for Faculty Affairs in 2019. Dr. Bailey met with Dr. Romero and presented the situation to her and requested assistance in resolving the risky situation without the need for punitive actions or enforcements.  She informed Dr. Bailey she would work with him and contact a specific Head to lay the groundwork for his approach.  The next Head he met with questioned why he was seeking such a post and when this approach was rebuffed, Dr. Romero acknowledged she had not explained the situation despite earlier stating to Dr. Bailey she

would do so.  She apologized to Dr. Bailey.  He noted that the lack of practical support to enact this transfer caused unnecessary risk for everyone as well as being deceitful and damaging to him.

85. Dr. Bailey persisted in these good faith yet onerous risk-reduction efforts on his own recognizance despite the lack of full support and required practical action to deliver the transfer from the purview of the abuser who invaded his home and harassed his family member at 1am, nor with the Dean's domestic partner, who held a Full Professor appointment in his unit and thereby also exercised purview over him, and the Dean's friends including the former Provost Dr. Comrie and Dr. Liverman.

86. Following the 2019 SBS Graduation Ceremony Dr. Bailey learned that Dean Jones had indulged and encouraged drunken misconduct by students, and that several women staff members were traumatized by his actions in egging on their disruptive and disturbing behavior at this function.  Several women staff told this to Dr. Bailey and noted their fear of Dean Jones' well-known retaliatory impulses.

87. Dr. Bailey reported the concerns of these women staff to administration in writing including the widely-known risk posed by this Dean's pattern of behavior.  There was no response.

88. Dr. Bailey has a known and demonstrated commitment to campus safety including on two occasions immediately reporting death threats issued by students to campus community members and seeking safeguarding from UA administration (2004) and administration and UA PD (2018).  In 2018 Dr. Bailey stated in writing that he was

worried that such threats were not being addressed with adequate measures and the staff member and Associate Dean of SBS agreed with him.  Nothing further was done to protect students or staff despite these efforts but fortunately on those two occasions the students did not enact their threats despite in one case possessing a police record of which UA PD were already aware and causing widespread fear and distress among other students.

89. Dr. Bailey wrote the administration to express his deep concern about the lack of safeguarding.

90. By mid-2019 it became clear to Dr. Bailey that UA had no intention either of protecting and safeguarding his wife and other women on campus, nor of holding Dean Jones accountable in spite of his known history of alcohol abuse while working, widespread concern among women staff and faculty about his misconduct, and the pattern of discriminatory and harassing actions that dated back years including a sanction for sexual harassment at his previous institution the University of Kentucky and a pattern of behavior at UA that even continued after these complaints.  Dr. Bailey developed hypervigiliance with respect to UA and Board policies as a result of these flagrant violations and he spent considerable time researching, learning and documenting these policies and Rules and requesting compliance.

91. For the same reasons Dr. Bailey was developing the concern that the Office of General Counsel were aware of the actions and inactions of administration.  At a meeting

with Dr. Romero he asked her if she consulted with the Office of General Counsel and she acknowledged meeting with OGC each time after meeting with him.

92. At this time UA had stated to OCR during investigation of complaint 08-19-2084, dated 24th July 2019: "Additionally, the University assured OCR that it is committed to a culture of compliance."

93. Dr. C was informed of nonrenewal in October 2019 and her last day of work at UA was in January 2020. She spent fifteen months unemployed.

94. In June 2019 Dr. Bailey sent emails to President Robbins, Interim Provost Goldberg and VPFA Romero detailing his concerns about risk and the stress he was experiencing, setting out hostile environment, targeted performance review by the Dean's enablers and partner in SGDE, damages to mental health from workplace-triggered stress and need for transfer to be secured. There was no response to these emails from President Robbins or Interim Provost Goldberg.

95. Dr. Liesl Folks was appointed as Provost at UA in July 2019. She made a brief phone call to Dr. Bailey from a number flagged as "RESTRICTED" during which Dr. Bailey reiterated his concerns including the ongoing and uncorrected danger posed by Dean Jones as well as risk of retaliation against himself. Dr. Bailey wrote Dr. Folks on 15 August 2019 expressing his concerns about hostile working environment and the uncorrected risk presented by Dean Jones to women. There was no further communication of any kind from Dr. Folks until October 2022.