96. On 12th November 2019 Dr. Bailey sent certified mails to President Robbins, General Counsel Ms. Todd Johnson and the Board under Rule 6-914 detailing the criminal nature of this harassment and its facilitation via systems intended to protect employees from harassment as well as from damaging consequences for reporting these violations. These letters itemized the policy violations and sought safeguarding for all employees as well reduction of risk via transfer of reporting.

97. There was no response to any of these complaints from any of the UA officers to whom these were sent.

98. In December 2019 Dr. Bailey received a letter from the Board's General Counsel acknowledging wrongful conduct pursuant to his Rule 6-914 disclosure. Dr. Bailey was informed he was entitled to seek legal reddress. The Board proposed no safeguarding actions and no correction for the abuse. The Board encouraged Dr. Bailey to continue to work with Dr. Romero to secure transfer.

99. During 2018-2019 Dr. Bailey approached eight different units on campus, seeking a transfer of reporting to reduce retaliation risk to himself and to the institution. During this time he auditioned on a number of occasions with interviews and faculty meetings but each time transfer was denied because of issues of "fit." He spent considerable time and effort seeking in good faith to resolve a situation not of his making but was frustrated and deceived while doing so. The inordinate time he needed to invest in this intensive but fruitless effort degraded his normal high productivity.

100. During this time both Dr. Bailey and his family experienced diminished amenity in their home. The redefintion of UA's "work" to include such invasive and destructive violatory harassment into the sacred space of their home at night caused Dr. Bailey and his family sleepless nights and ongoing stress. Dr. Bailey and his family believed UA defendants posed public as well as personal risk because of their misconduct and that the limits to their lawbreaking in the name of the State were not being controlled by means of UA policy and Board Rules.

101. The evident corruption of the mechanisms of oversight and safeguarding and indulgence of violation by administrators also became an increasing concern during the daytime. Dr. Bailey stated that he would not attend Faculty Meetings to avoid conflict with the abuser of his family and the enablers including former Provost Dr. Comrie who had returned to an appointment in SGDE. Drs. Liverman and Romero agreed. Dr. Bailey's professional care in proactively avoiding conflict and reducing workplace risk despite having no role in triggering this risk was not reciprocated by limitations on the conduct or liberty of the abuser and his allies as demonstrated by his ongoing abusive misconduct and later complaints from others.

102. Dr. Bailey was eligible to apply for promotion to Full Professor in 2017. The harassment and its validation by the Dean and his enablers in SGDE, including the actions of former Provost Dr. Comrie, caused him to believe no fair evaluation would be delivered. He therefore delayed this application until after his transfer to another College.

103. In December 2019 Dr. Bailey met with Dr. Liverman and Dr. Romero to discuss his efforts to transfer and establish ongoing risk reduction measures to avoid the damaging and unnecessary consequences of retaliation.

104. In early 2020 Dr. Bailey learned from a former woman faculty member in his department of her own retaliatory dismissal following complaints about Dean Jones and his friends.  The pattern of violation of policies, evasion of accountability, and denial of safeguarding leading to the termination of employee was similar to the situation his wife experienced.  Dr. Bailey learned that Dean Jones was the author of her dismissal.  Late submission of grades was provided as a reason for dismissal despite hundreds of faculty over a period of years submitting grades after the 48-hour deadline specified by UA policy without sanction.

105. Dr. Bailey informed Drs. Folks and Romero in writing of this new discovery and the ongoing risk posed by Dean Jones.  There was no response.

106. In January 2020 Dr. Bailey was appointed by Dr. Romero to the University's Fostering A Respectful Workplace (FARW) Taskforce.  Dr. Bailey at first saw this as an opportunity to address the numerous concerns shared by he and others at UA and deliver improvement via stronger compliance.

107. At the first meeting Dr. Bailey asked participants if they believed his Board complaint was relevant to the Taskforce mission and a large majority agreed.  He asked if members wanted to see it and almost everyone raised their hand.  Dr. Bailey then presented this report to the Committee by email.

108. At the next meeting Dr. Bailey polled instructor members of FARW about late submission of grades.  Almost half of the approximately thirty instructors acknowledged they had done so and nobody stated that they had experienced consequence for such late submission.

109. A number of FARW participants wrote Dr. Bailey in private thanking him for taking a courageous stand against harassers and abusers of office and sharing their own stories of violations and coverup as well as ongoing fear of unchecked abuse of office by the perpetrators.  Several described losing faith in internal processes because of their experiences of coverup of malfeasant actions, a failure to act and a failure to safeguard from further abuse and retaliation.

110. Dr. Bailey was called by Dr. Romero on his cellphone to discuss participation in FARW.  Dr. Bailey had anticipated administrative discomfort with these complaints despite the importance of the information to campus safety and its congruence with the Taskforce mission as well as the awareness of Board, OGC and President Robbins.  Dr. Bailey informed Dr. Romero that the Board had issued a wrongful conduct verdict and she expressed surprise, asking him to repeat.

111. Dr. Romero's earlier enthusiasm to engage Dr. Bailey in discussion and process vanished.  After this conversation Dr. Romero never talked with Dr. Bailey again despite receiving a number of emails and notifications of abuse of process under her aegis as Vice Provost for Faculty Affairs.

112. Dr. Bailey was sent a written admonishment by the FARW Coordinator, appointed by Dr. Romero, stipulating that matters of grievance should not be shared with the FARW Committee.

113. The FARW taskforce wound down during the early covid period and the final output was steered by administrative representatives into a limited Powerpoint slide output process despite a number of participants expressing their disappointment that such a committee that could have had useful impact in safer workplace was being run as a sham.  FARW members shared their disappointment with Dr. Bailey that more could not be done because of administrative resistance to addressing the core issues of risk, harassment and discrimination.

114. In June 2020 Dr. Bailey and two women, former UA employees both of whom were nonrenewed following their own complaints against Dean Jones, filed a complaint with OCR (08-20-2275) about discrimination and criminal harassment and retaliations they had experienced and the damages consequent to these violations.

115. Dr. Bailey informed former Provost Dr. Folks, Dr. Romero, Ms. Todd Johnson and President Robbins of this filing via their official emails.  There was no response.

116. Dr. Bailey informed all SGDE faculty on the faculty mailing list of his concerns regarding TITLE IX violations and the criminal conduct of his Dean and the damaging effect this harassment and its coverup had on his family.  He restated UA and Board policy on harassment reporting and retaliation as well as State Law on Harassment by Electronic Communication and the Board's wrongful conduct acknowledgment.  Dr.

Bailey used similar verbiage used by Dr. Liverman, Department Head who had expressed outrage at the civil rights violations inflicted on Mr. George Floyd and circulated to all faculty one day prior.

117. Dr. Bailey was removed immediately from this mailing list for "inappropriate" use of the list. Dr. Liverman stated she "took advice" prior to enacting this removal.

118. In summer 2020 Dr. Bailey had interviewed with Dean Johnson and former Head of EDL Dr. Jill Koyama for a transfer to the College of Education and he had provided extensive documentation including more than fifty undergraduate papers with his comments and grading. Dr. Koyama stated that she appreciated the quality of this work.

119. In summer 2020 the UHAP policy was subject to revision. Dr. Folks sent an email to campus in which she stated several problems that the Provost's office would address, one of which was what she termed unfounded allegations circulated by email.

120. In August 2020 Dr. Bailey was transferred to the EDL department in the College of Education, initially under the management of Dean Bruce Johnson and Dr. Kris Bosworth who was then Head of EDL.

121. Dr. Bailey anticipated denial of promotion as one form of retaliation for his complaints. Prior to signing the transfer, he raised this concern with Dr. Romero and she responded in writing "You should have no problem with that." He signed the transfer on this basis.

122. In August 2020 Dr. Bailey and his co-complainants were notified by OCR that their complaints were referred to EEOC. Dr. Bailey called Ms. Pat Miner and asked about the

timeframe for jurisdiction.  Ms. Miner clarified that such complaints must be made within 180 days of the events.  This complaint remains uninvestigated and unactioned because of this timeout.  UA's deliberate indifference contributed to this timeout.

123. Dr. Bailey wrote OCR in anticipation of further violations including retaliations delivered against himself as the result of failure to act to restore compliance under civil rights laws.  There was no response.

124. Dr. Bailey started teaching in this new role in EDL in January 2021.

125. In April 2021 during a scheduled accreditation forum, Dr. Bailey complained to the accreditation officers of Higher Learning Commission (HLC) of the harassment, discrimination and retaliation enacted against the women co-complainants as well as the ongoing lack of process and safeguarding.  More than one hundred attended this meeting via Zoom including numerous UA administrators.

126. Reviewer Dr. Das acknowledged that TITLE IX concerns were under HLC accreditation purview and invited Dr. Bailey to share his concerns in writing.  Dr. Bailey presented his concerns and those of a number of women including his co-complainants and other victims to HLC.

127. Dr. Bailey worked under Dean Jones for the period 2015-2020.  Deans are subject to Five Year Reviews.  Later in 2021 Dr. Bailey presented a Five Year Review for Dean Jones to former Provost Dr. Folks in which he stated that such an abusive manager who was the acknowledged author of wrongful conduct by his own Board did not warrant his publicly-funded and powerful executive appointment.  Dr. Bailey also reiterated his long-

running and well-documented concerns that Dean Jones was a "TITLE IX time bomb"
and that women on campus needed to form their own collectives to ensure their safety
from his known and facilitated abuse. There was no response.

128. In August 2021 Dr. Melanie Bertrand was hired and EDL faculty were informed she
was to became the Head of the EDL Department effective January 2022 after Dr.
Bosworth stepped down.

129. Like many students, staff and faculty at UA, Dr. Bailey had great respect for the
professionalism and integrity of Dr. Thomas Meixner of Hydrology with whom he had
collaborated. On a number of occasions between 2020 and 2022 Dr. Bailey talked with
Dr. Meixner about the harassment of his family and his ongoing compliance concerns at
UA. Although Dr. Meixner stated that he believed in UA's mission and regarded himself
as a dedicated and loyal researcher, Dr. Meixner found this shocking and he did not
understand why safeguarding was not performed according to UA and Board policies.
He asked if Dr. Bailey had informed VPFA Dr. Romero. Dr. Bailey stated he had
informed three Provosts, two VPFA's, the OGC, President Robbins, the Board, the HLC
accreditors, OCR, EEOC, and DoJ Civil Rights Division. Dr. Meixner was deeply
disturbed by this. He agreed that the timing, location, type of harassment and coverup
were egregious and said if this were directed against his family he would probably follow
a similar course of action.

130. In early 2022 EDL faculty were informed that EDL would be integrated into the
EPSP department. EPSP Head Dr. Deil-Amen was to assume responsibility for certain

management tasks while Dr. Bertrand continued to manage EDL's daily operations and shared in these other responsibilities.

131. Dr. Bailey had not talked with or met Dr.Deil-Amen prior to her assumption of purview in 2022 over the EDL unit where he worked.

132. Dr. Bailey informed the incoming faculty in his unit (Drs. Demps, Nguyen and Bertrand) so they were aware of the criminal harassment of his family and the lack of safeguarding and civil rights compliance at UA.

133. In April 2022 Dr. Bailey attended the interviews for the post of Dean of the College of Education.   Four finalists delivered job talks.  Dr. Bailey asked the same civil rights and policy safeguarding questions of each of the four candidates.  Three candidates demonstrated knowledge and awareness of mandated reporting in their responses.  Dr. Berry did not.

134. Dr. Deil-Amen was a candidate for the Deanship and was not selected.

135. Each of their job talks was recorded on Zoom and a reaction form was provided for faculty and staff to provide feedback.  These links were shared with CoE faculty as Vision Talk recordings together with the reaction forms eliciting survey data on each of the candidates by Ms. Rachel Barton of the College of Education in an email to the Coe-biz listserv dated 28th April 2022.

136. Several public records requests were made by different individuals for the CV's, application letters and job talks of finalists for the post of Dean of College of Education

in 2022.  These were each returned with the claim that "The University does not possess any records responsive to your request." (PR 2023-0090 and others).

137. In the official response to these requests, each time Public Records Coordinator Ms. Kim Fassel stated on behalf of the Board that "In providing this information to you, your public records request is fulfilled and closed in accordance with Arizona public records laws."

138. A member of the public sought assistance from the Arizona legislature following the first denial of possession of responsive records in the belief that UA was violating its obligations under public records law.  She received a response from Ms. Paula Gates at the Board of Regents that stated "We have shared your message with the university for their review.  I understand they have responded that the university has no responsive records for one request as the university used a search firm to conduct the search for the college of education post you referenced."

139. A public records request was made for the application materials of all job finalists in the College of Education during 2022-2023.   There were at least nine people who interviewed for such posts in the College of Education during this period.

140. This request was returned with the claim that "The University does not possess any records responsive to your request."

141. In the official response to this request, Public Records Coordinator Ms. Kim Fassl stated on behalf of the Board that "In providing this information to you, your public records request is fulfilled and closed in accordance with Arizona public records laws."

142. Dr. Robert Q Berry was selected and began his appointment in July 2022.

143. Dr. Bailey filed his application for promotion to Full Professor in July 2022.

144. Dr. Bailey learned of severe sexual harassment from a former SBS graduate student that was enacted by a report of Dean Jones. She stated she did not dare to complain because she would get fired. Dr. Bailey presented this to Drs. Folks and Romero. There was no response.

145. In July 2022 Dr. Bailey received his 2021 Annual Performance Review from Dr. Deil-Amen. This review was delivered months later than normal, during non-contract time, and the review was targeted to deliver unwarranted low evaluation. Features of this review included total omission of 75 percent of his teaching from consideration, the selective use of only negative comments from one class without consideration of positive comments, wilful denial of research expectations as stated earlier by Dr. Deil-Amen to Dr. Bailey, personal commentary on Dr. Bailey's intelligence, and his "negative impact on workplace climate."

146. Prior to this review Dr. Bailey had received eighteen previous Annual Performance Reviews at UA which contained Meets or Exceeds Expectations or Truly Exceptional in all categories of Teaching, Research and Service.

147. Dr. Deil-Amen stated in writing that she did not agree with Dr. Bailey's appointment before it was enacted and that the Dean did not have full information. Dr. Deil-Amen was not involved in administrating this transfer, which was performed by

VPFA Dr. Romero, former Dean of Education Dr. Bruce Johnson, and Dr. Koyama, then-Head of EDL in August 2020.

148. Dr. Bailey met with Dr. Deil-Amen in July 2022 and expressed his concerns about the content of this review as well as the stated motivation. Dr. Deil-Amen acknowledged his point about her earlier statement of research expectations and changed the narrative in the review. She did not change the research review category accordingly.

149. Dr. Deil-Amen raised what she termed a problem that Dr. Bailey had a "hidden agenda" that was outside of, and in opposition to, his workplace duties. Dr. Bailey reminded Dr. Deil-Amen that compliance was everyone's job and that every employee at UA was mandated to respect and conform to civil rights protection rules by means of relevant UA policies and Board Rules including UA200, UHAP 7.01 and Board Rule 1-119 as stated in the terms of appointment.

150. Dr. Bailey stated to Dr. Deil-Amen that he believed this coercion was premised on his well-known civil rights complaints and protests of discrimination that constituted protected activity under 34.CFR § 106.71 and that such an "agenda" was therefore his and everyone's job. Dr. Bailey stated that his commitment to upholding civil rights was not in the least hidden because by this time almost every administrator and colleague and many on campus and outside as well as the accreditation body and civil rights agencies were aware.

151. Dr. Bailey asked if there was anything other than these civil rights complaints that she wanted to address. Dr. Deil-Amen stated that Dr. Bailey "inhabited the black skin"

and that this was problematic for his workplace conduct. Dr. Deil-Amen did not define what she meant by "inhabiting the black skin" nor did she support this statement with reference to any UA policy or Board Rule.

152. Dr. Bailey admires and takes inspiration from the iconic stand of athletes Tommie Smith, Peter Norman and John Carlos. He regularly wears a shirt depicting their famous stand for civil rights on the 1968 Olympic 200m victory podium. He also uses this picture as his Zoom background and has their picture on his office door. This is the only imagery he displays and uses at UA and he has done so for years.

153. It is well known in the community that Dr. Bailey has followed the example of these athletes in image and deed for many years in many locations to protest discrimination including publicly protesting the threatened exclusion of aboriginal athlete Cathy Freeman by the Australian team manager Mr. Tunstall from the 1994 Commonwealth Games on the basis of her display of the aboriginal flag as well as having their poster on his bedroom wall when younger. He routinely wears this same T-shirt to high school and college track meets and Faculty Senate meetings as well as in the office and around campus. Dr. Bailey's presentation of this famous civil rights imagery is frequently lauded by those he meets on and off campus.

154. Many other UA faculty in College of Education and across campus use and display civil rights imagery on apparel, Zoom backgrounds, office doors and in other locations on campus including noticeboards. They do so with approval and without discipline.

155. UA has no dress code for faculty

156. Between 2022 and 2023 Dr. Bailey's use of civil rights imagery, specifically and only the display of the image of Tommie Smith, Peter Norman and John Carlos, was used as a platform to support the adverse actions administered by Dr. Deil-Amen and validated by Dean Berry, Dr. Folks and Ms. Brennan, and manifested in racist stereotyping using skin color that violates State law, unwarranted negative performance review and baseless coercion during meetings as well as appearing in OGC-authored legal response to his allegations.

157. In contradiction to Dr. Deil-Amen and the OGC's position on Dr. Bailey's daily and long-running display of this iconic civil rights imagery, President Robbins made no comment despite having seen Dr. Bailey wearing this T-shirt in person numerous times including during Faculty Senate meetings and meetings in his office.  Mr. Dudas also observed this imagery and made no comment.

158. Dr. Bailey expressed concern to his EDL Head Dr. Bertrand about being targeted in a coordinated way for his protected activity and having managers enlisted to deliver these retaliations via coercion from the Head of EPSP or Provost's office.  Dr. Bertrand failed to engage with his concerns and stated "Good luck with that."

159. Before filing his response to the 2021 APR, Dr. Bailey sought feedback on this review from multiple senior faculty outside the College of Education. They noted abnormal process and concern for targeting and retaliation.

160. Dr. Bailey appealed this review under UHAP 3.2.03 (rev June 2022) by writing a summary of targeting aspects and requesting corrective measures per policy.  He sent this

to Drs. Folks and Romero on 12th August.  There was no response.

161. UHAP 3.2.03 states: "The administrator reviewing the appeal will consider the facts in support of the appeal and develop any additional facts deemed necessary. The decision on the appeal will be completed in writing within 30 days, with copies provided to the faculty member and the unit or other immediate administrative head involved in the initial annual performance review. This decision is final and not subject to further appeal."

162. On 14th September Dr. Bailey met with new Dean Robert Q. Berry for a scheduled management meeting.  Dr. Bailey presented his situation, explained his concerns, noted that he was being targeted by his manager Dr. Deil-Amen, and requested that Dr. Berry familiarize himself with relevant UA and Board Rules including 1-119.  During this conversation Dean Berry stated that he was new in the Dean's post, that he was not aware of the details of Dr. Bailey's transfer but only that he had heard some things.  Dean Berry stated he had read Dr. Bailey's 2021 APR which Dr. Bailey stated he believed was targeted and retaliatory.  Dean Berry then demonstrated his profound unease with this situation by stating "Whoa.. this is big, right!" and then "I'm not sure I want to see that" when Dr. Bailey offered to provide background information about transfer.

163. Dr. Bailey specifically asked Dean Berry to reconsider Dr. Deil-Amen's role in his management because of the targeting concerns.  This is normal procedure at UA in cases where there is COI or a manager is believed to be invested in targeting.  This COI relief has been performed on numerous occasions.  Dr. Bailey had such a review re-performed

in 2019 at the direction of Dr. Romero. A former EPSP Head stated that he had performed such COI relief and gave examples. Numerous other faculty stated this was normal practice and they had such experience.

164. Dr. Bailey had anticipated that newly-hired Dean Berry would be pressured by the administration to violate his rights and that over time he would be enlisted to deliver his unlawful removal. Dr. Bailey explained to Dean Berry in writing his concerns about Dean Berry's enlistment in knowing violation of his rights including by means of administrative coercion using College resource allocations under Provost's purview or coercions directed at his own Deanship. Dr. Bailey suggested that Dean Berry take two weeks to review the applicable UA policies and Board Rules before meeting again and gave specific policy references. Dean Berry stated he would do so.

165. Dr. Bailey sent a reminder two weeks later. Dean Berry sent an acknowledgment of receipt to Dr. Bailey's followup but he never addressed these concerns despite his statement of "you deserve a response" on 14th September. Then he failed to respond to a number of followup emails sent by Dr. Bailey over the next eight months.

166. On 23rd September Dr. Bailey filed a complaint with OCR (08-22-2345) naming Drs. Folks, Romero and Deil-Amen as well as OGC for retaliation against his civil rights complaints. Dr. Bailey informed OCR he had not named Dean Berry as an author of violation at that moment and that he had given Dean Berry the opportunity and information needed to make an informed management decision to respect UA and Board policies on targeting civil rights complaints. In this complaint and his conversation

with Dean Berry Dr. Bailey accurately anticipated the sequence of escalating retaliatory actions that were intended to deliver his removal from his tenured post.

167. On 23rd September Dr. Bailey filed a complaint with the Department of Justice Civil Rights Division and the National Science Foundation OECR that included the numerous unactioned harassments and stated his concern that a number of officers at UA were engaged a conspiracy to violate rights by retaliating against him for raising these complaints.  Dr. Bailey simultaneously copied this complaint to Dean Berry and former Provost Dr. Folks.  There was no response from any of these administrators.

168. Between 23rd and 30th September Dr. Bailey and a number of women victims of unactioned discrimination and harassment at UA filed complaints with the Department of Education and Department of Justice Civil Rights Division about the numerous acts of discrimination, harassment, retaliation and the orchestrated coverup.

169. Dr. Bailey emailed Dean Berry reminding him of the previous agreement to meet again after researching policies and absorbing the information provided.  Dean Berry acknowledged the email but never responded to this again, nor did he address any of the concerns raised nor did he set up another appointment to discuss any of these concerns. He never met with Dr. Bailey again.

170. Dr. Bailey exercised professionalism by not assuming Dean Berry was part of a conspiracy to violate rights without evidence and providing guidance with respect to UA and Board policies to the new Dean.  This and all similar reminders of policy and EEO

law provided by Dr. Bailey to management constitute protected activity according to EEOC.

171. In October 2022 it became clear that Dean Berry was deliberately refusing to address Dr. Bailey's concerns. Board Rule 6-914 E(2) prohibits: "An employment-related act or decision or a failure to take appropriate action by a supervisor or higher level authority which affects an employee negatively."

172. Dr. Bailey named Dean Berry to his OCR complaint (08-22-2345) following his failure to respond and deliver safeguarding from management retaliation enacted under his purview and with his knowledge. Dr. Bailey informed Dean Berry that his actions were referred to OCR.

173. On 5th October 2022 Dr. Bailey's friend and colleague Dr. Thomas Meixner was murdered in his campus office. In the weeks that followed, UA and the larger community expressed anger, outrage and frustration at UA's lack of response to notifications of this risk that included numerous death threats sent to faculty and staff over a period of months prior. Dr. Bailey joined the hundreds of people who expressed their outrage at this predictable and unnecessary lethal event by complaining to administration about negligent risk handling.

174. The General Faculty Committee on Campus Safety for All was commissioned by Chair of Faculty Senate Dr. Hudson in October 2022 to investigate the events leading up to the murder of Dr. Meixner and identify problem areas. The Committee's interim

report found that among other key issues one major concern across campus was "institutional neglect of a known chronic problem of distrust."

175. The General Faculty Committee on Campus Safety for All resigned en masse before completing a final report in February 2023 stating their concerns about management stonewalling and for retaliation of "hard" and "soft" forms.  AZPM reported that "Members chose to conclude the investigation due to fears of retribution and the inability to engage in in-depth discussions with relevant units and noting that the committee concludes its letter by saying, "there are no indications that any steps will be made to address the concerns outlined in the Interim Report…They raise meaningful concerns regarding the University leadership's attitudes toward safety, organizational culture, stakeholders, and accountability."

176. The Pax report subsequently commissioned by President Robbins found numerous safeguarding failures and called Dr. Meixner's death "foreseeable."  One of the concerns elaborated in this report was fear of administrative retaliation against complainants, even those receiving death threats, creating a chilling climate for students, staff and faculty that inhibited campus safety.

177. Dr. Folks sent Dr. Bailey a "Professional Communications Directive" requiring that he limit his communications to matters related to work at hand.  Dr. Bailey responded that he was finally appreciative of the opportunity to discuss the definition and nature of the "work" of the University of Arizona with Dr. Folks after two years and three months of silence on her part despite his previous communications.  Dr. Bailey noted that the

severe harassment of his family was the topic he had raised repeatedly without UA response over a period of several years. Dr. Bailey again stated he desired to resolve the legal and policy contradictions in the prevailing definition of UA's "work." He asked Dr. Folks to clarify why the sex-based terms of harassment and threats to employment and persons as used against his wife in their home at 1am on a Sunday by Dean Jones constituted UA's validated "work" yet were acknowledged by the Board as wrongful conduct under Rule 6-914 and without correction. There was no response.

178. On 13th October Dr. Bailey sent Dr. Bertrand an email explaining his concerns about the management of Dean Berry and Dr. Deil-Amen, the targeted review, denial of recourse, the abnormal pattern of management and the concern about conspiracy to violate rights including the cooptation of Dean Berry into discharging these violations.

179. On 14th October Dr. Bertrand responded and stated: "Thanks very much for getting back to me. I appreciate it. Take care."

180. On 19th October Dr. Bailey and Dr. Matthew Abraham, another well-known civil rights complainant at UA, met remotely with Ms. Helena Rodrigues, President of HR and Ms. Diane Brennan, Associate Vice President of HR. Both Dr. Abraham and Dr. Bailey had direct experience with filing Rule 6-914 "whistleblower" complaints and they desired to address concerns with the handling of complaints via this channel of last recourse including lack of documentation of complaint handling channels and COI handling.

181. Ms. Brennan stated that UA took sexual harassment very seriously.  Dr. Bailey indicated his disbelief of this claim considering the repeated events.  Dr. Bailey again presented the graduate student's account of severe sexual harassment and highlighted this involved Dean Jones' friend and occurred under the purview of Dean Jones.

182. Ms. Brennan stated that if the graduate student was a current student action should be taken.  Dr. Bailey pointed out that the posted sexual harassment policy on HR's own website specifically contained no statute of limitation on mandated reporting or safeguarding response.  Ms. Brennan stated that Dr. Bailey knew the policies better than some of her own HR employees.

183. Neither Ms. Rodrigues nor Ms. Brennan addressed or responded to this harassment report.  The student was never contacted by OIE or any other UA officer.

184. Dr. Bailey stated that according to UHAP, the regulations governing faculty appointments, that HR had no purview over faculty appointment.  Ms. Brennan acknowledged that HR have no purview.  Nevertheless Ms. Brennan attended a number of subsequent meetings, assented to the adverse actions administered by Dr. Folks verbally and in writing, and participated actively in numerous violations of Dr. Bailey's rights.

185. Ms. Brennan invited Dr. Bailey to share the relevant documents although these had all been sent between 2017 and 2020 to numerous UA officers including President Robbins and the OGC as well as Ms. Vaillancourt who worked for HR at the time. Dr. Bailey did not understand how HR were not aware of these complaints at this point but

he sent the numerous emails as well as the certified mails, his previous Rule 6-914

complaint, the original harassment complaints, and the corrupt responses from UA admin

in 2017.  Dr. Bailey again stated his belief to HR that UA was engaged in collusion to

violate rights.

186. In October 2022 Dr. Bailey was informed by Dr. Bertrand that he would not

continue to serve on EDL Faculty Search Committees.  Dr. Bertrand informed him that

this decision was taken by Dr. Deil-Amen on the grounds of his "lack of expertise."

187. This action contradicted Dr. Bailey's ongoing and effective service in this capacity

since his appointment in the College of Education as well as his former Department

Head's note of thanks for his service in this role, which included the search for, interview

and hiring of Drs. Bertrand, Nguyen, Demps and Mruczek to the EDL program in 2021.

This also contradicted Dr. Bailey's long-established role in this capacity in his previous

department in which he had participated in numerous successful searches and been

recognized for the quality of his work in doing so.

188. In October 2022 Dr. Bailey put himself forward as a candidate for the College

Safety Committee on the basis of his demonstrated and known record of working for a

safer campus.  Dean Berry had stated at the College Council that relevant experience

would be privileged in making selections for this committee.  Dr. Bailey also noted his

previous experience in safety protocols and risk management operations in the

commercial aviation and oil exploration industries.  He was not appointed to this

committee.

47

189. On 26th October Dr. Bailey signed a letter to the administration protesting the exclusion of a disabled black student from the Student Center and the deployment of the police against this student by an administrator.  Several hundred faculty, staff and students signed this letter but many preferred to remain anonymous for fear of retaliation.

190. The origin of the police callout against this student was subject to public controversy.  President Robbins denied that this callout was made by Ms. Maribel Alvarez but student groups alleged otherwise.

191. In October 2022 Dr. Bailey attended Active Shooter Training in the College of Education.  UA PD officers presented the session.  During the post-presentation discussion, Dr. Bailey stated to a UA PD officer that he was very concerned about risks of administration deliberate indifference to both civil rights and public safety matters.  He informed UA PD that he had raised concerns with the Department of Justice and the officer stated "We need people like yourself" because of issues with the "chain of command."  This officer concurred with Dr. Bailey's concern with OGC advice and administration control over UA PD actions and inactions.

192. On 10th November 2022 the Foundation for Individual Rights and Expression (FIRE) published a letter to UA stating that "Records show the University of Arizona appears to be manipulating the academic freedom grievance process by excluding professors critical of the institution from the relevant review committee. Three U of A professors, Drs. Matthew Abraham, Wei Hua Lin, and Keith Maggert, were excluded

from the ballot to become members of the Committee on Academic Freedom and Tenure based on rumors that they're "problematic" and have "hidden agendas."

193. The use of the words "problematic" and "hidden agenda" were used by various administrators to describe Dr. Bailey before and after this while enacting adverse actions against him. These same characterizations were also used against a number of other faculty who filed complaints and were subjected to retaliation for protected activity.

194. In November OGC officer Mr. Art Lee, writing to the Foundation for Individual Rights and Expression (FIRE) on behalf of UA in response to the allegations of retaliation and violation of academic freedom and shared governance presented by Drs. Abraham, Maggert and Lin, and previously featured in national media, stated that: "To conclude, the University of Arizona is committed to academic freedom and shared governance as set out in applicable law, policies, and procedures. It always has been and will continue to be so committed."

195. In Dec 2022 Dean Berry notified Dr. Bailey in writing of his denial of Dr. Bailey's Application for Promotion.

196. Dr. Bailey reminded Dean Berry of the Niemoller principle and that as Dean he had responsibilities to perform safeguarding from managers engaged in targeting and retaliation including under Board Rules 1-119 and 6-914. There was no response.

197. In December 2022 the UA announced that it was seeking accreditation from the Western Association of Schools and Colleges (WSCUC). A review was scheduled that included written comments from community members as well as campus forums.

198. A number of faculty and staff, including Dr. Bailey, presented their written concerns to WSCUC about the prevalence of civil rights violations at UA, the chilled climate and the widespread retaliations enacted against complainants. Several faculty referred to the mode of operation at UA as the "Michigan State" model.

199. One of these complaints transmitted to WSCUC raised coordinated administration targeting against complainants. This complaint stated "..I would like to document how a pattern of administrative retaliation has emerged over a five-year period targeting whistleblowers and other complainants at the UArizona. The University is directly flouting and undermining the protections afforded civil rights complainants under 18 U.S.C, § 241 and 34 C.F.R. § 106.71."

200. On 11th January Dean Berry sent an email to College of Education employees stating "It has become well-known in our community that we are "Truly Wonderful and Getting Better." "

201. In January 2023 the WSCUC accreditation panelists visited UA and hosted a series of forums including a faculty forum. Dr. Bailey attended the faculty forum and during the open commentary session he summarized his concerns about specific civil rights violations against women at UA, the unlawful harassment of his family, and the overall climate of noncompliance.

202. In late January Dr. Bailey learned from several of his colleagues in EDL during conversations in the College of Education building that he was to be "moved." Dr. Bailey was not informed by anyone of what this meant or why he was to be "moved."

203. On 31st January Dr. Bailey sent Dean Berry an email titled "ABoR Rule 6-914 Section 2 responsibilities and questions you can answer for EEOC civil rights investigation" in which he again reminded Dean Berry of his responsibility under this Rule, enumerated violations of policy by other officers including Dr. Deil-Amen and asked what he would do to address these violations. There was no response.

204. On 3rd February Dr. Bailey was directed to attend a meeting with Dr. Folks and Ms. Brennan. Dr. Leila Hudson, Chair of Faculty Senate, attended as witness.

205. Dr. Bailey was required to attend this meeting in person in the administration tower. This meeting was not held remotely, as all the numerous other such meetings were, despite these officers stating their concerns about the "threats" they alleged Dr. Bailey presented. UA records all meetings hosted on its Zoom platform and participants are reminded and required to acknowledge this when a meeting begins.

206. Dr. Folks stated "I believe in radical transparency." Dr. Folks then stated that she preferred the meeting was not recorded and when Dr. Bailey asked why, she stated "We can be more candid."

207. Dr. Folks with Ms. Brennan's assent presented the following assertions:

(I)     that the severe harassment of Dr. Bailey's wife could not be "relitigated," when it had not been litigated

(II)    that the Provost's office engaged in close cooperation with the OGC and HR and that this was "good practice"

(III)    that Dr. Bailey's numerous complaints to the three Provosts, two Vice Provosts for

Faculty Affairs, UA Compliance Officer, OGC and President Robbins between

2017 and 2021 had been either "lost in communication" or actioned "beyond

satisfaction."  She did not specify which ones were lost and which had been

actioned in this way.

(IV)    that civil rights complaints can only be filed outside of working hours of 9am to

5pm and not from UA systems, despite faculty having no defined working hours.

(V)    Dr. Bailey was directly warned by Dr. Folks to "think about your career"

208. Dr. Folks with Ms. Brennan's assent stated that Dr. Bailey's colleagues had

expressed concerns about his "threatening communications."  Dr. Bailey asked for an

example of such a communication and Dr. Folks refused to provide one.  She stated "It's

unclear what your threats mean" despite later premising severe adverse actions on this

concept in collaboration with Ms. Brennan.

209. Dr. Bailey refused to agree with the false characterization that he represented a

"threat" to any person or that he needed to take measures of his own volition to resolve

these "concerns" which he regarded as unsupported and defamatory without

exemplification.

210. Dr. Bailey asked Dr. Folks and Ms. Brennan about the post of Associate Vice

Provost for Faculty Affairs and who held this post.  Dr. Folks asked if he meant the

VPFA post held by Dr. Andrea Romero.  Dr. Bailey stated not and reiterated the title of

this post as it appeared in formal UA documentation.  Dr. Folks and Ms. Brennan denied

such a post existed.

211. Dr. Hudson's contemporaneous notes taken as witness during the meeting stated:

"Debate ensued about whether the process was "management" and "robust

communication" in and across departments or "collusion." Similar wording in responses

was indication of good management, not collusion, asserted Dr. Folks. "Individual

managers can't be making isolated decisions."

212. Dr. Bailey believed that the juxtaposition of unwarranted negative performance

review, denial of normal recourse, false and defamatory characterization of Dr. Bailey as

a "threat" and the direct connection of the destruction of his career prospects with Dr.

Bailey's well-known civil rights complaints, in a meeting the administrators did not want

recorded and for actions which HR officer Ms. Brennan had directly acknowledged no

purview under UHAP rules, was another part of a clearly pre-planned pathway intended

to deliver his retaliatory removal as well as damage his reputation.  He reported these

concerns to a number of Faculty Senators over the following weeks.

213. After this meeting, Dr. Folks called Dr. Hudson and stated the meeting was "risky."

214. Dr. Hudson was informed she was not to share the meeting notes.

215. Despite believing the content of this meeting including the civil rights complaint

conditioning and warning regarding his career to be unlawful Dr. Bailey followed the

directive of Dr. Folks so he transmitted civil rights complaints before 9am or after 5pm

and from non-UA systems.  Dr. Bailey stated to the DoJ that he was filing such

complaints after 5.01pm for this reason. Despite diligent searching and his expertise in

UA policies and Board Rules that Ms. Brennan of HR had acknowledged was "better

than some of our employees," Dr. Bailey was unable to find a specification of the

approved times or venues for filing civil rights complaints in UHAP or any other

regulations.

216. On 6th February early in the morning Dr. Bailey was issued with a three-week office

exclusion order by Dr. Folks with Ms. Brennan copied. Dr. Bailey received this and

acknowledged. Dr. Bailey stated his disagreement with the premise of "threat" and

raised his concern about the lack of policy, process and rule support for this action.

217. Dr. Bailey obeyed this office exclusion order under written protest.

218. Dr. Bailey emailed UA PD to request police reports or actions against him. UA PD

responded and confirmed Dr. Bailey had no record, no arrests, no citations and there was

no violation of the threat statute but stated "administrative definitions may differ."

219. At the Faculty Senate meeting on 6th February 2023, President Robbins called on the

Committee to make "a larger effort" and engage in "more in-depth discussions with the

TAMT Committee, with UAPD, with Office of General Counsel, and others who have

in-depth knowledge about the safety on the campus."

220. Dr. Bailey made numerous efforts to engage in risk management processes and

administrative compliance including directly with General Counsel and UA PD but

without result except numerous further violations of policy and Rules.

221. Dr. Bailey sent the following email to Dr. Folks and Ms. Brennan and copied this to the OGC.

"Dr. Folks, Ms.Brennan, following up on Friday's meeting I have some questions.

1. What is my pathway to participate in the forthcoming EPSP Academic Program Review visit scheduled for Feb 16th and 17th?  Dr.Deil-Amen stated this is an important event and warrants full faculty participation.

   I was reminded by Dr. Folks of the importance of "engagement" with unit duties, with which principle I agree.  However my capacity to engage and perform is being materially affected by a series of selective adverse actions which include e.g. Dr. Deil-Amen's denial of my ongoing search committee participation in spite of previous satisfactory performance of these duties (per previous APR and Head and colleague commentary) as well as this current selective exclusion from my office with which I do not agree.  My compliance with this directive is under protest.  I would like to know under what UA or Board policy I am being excluded from my office for a period of three weeks by what Dr. Folks termed a directive.  Nobody else in my department is subject to this exclusion from office.  No threat assessment has been performed or communicated.  No formal complaint has been filed about me or reported to me via established mechanisms.  Therefore this action has the hallmarks of selective adverse action.  A policy should be provided and cited in each case when taking such adverse actions to ensure that civil rights are properly protected.

2. What is the formal pathway to determine what constitutes a "threat" as stated to

   me and on which my exclusion is premised by Dr. Folks?

   The destructive actions of Mr. Dervish and Dean Jones in violating law were

   anticipatable based on communications of specific threats that violated law and

   concerns relayed by many students and faculty to UA admin over a long period of

   time. However these were not considered "threats" warranting campus exclusion

   until much later in the case of Mr. Dervish and not at all in the case of Dean

   Jones.

   During our meeting Dr. Folks stated that "it's unclear what your threats

   mean." What "threats" are these? If the statements or communications are so

   unclear, how do they constitute "threats"? When I asked Dr. Folks to be specific

   about what constituted a threat she refused to define the term.

   This is important because of a lack of clarity and widespread community concern

   about how UA defines and handles "threats" e.g. as stated in the Faculty Senate

   Campus Safety Committee report that received widespread publicity.

3. Please clarify, what is the UA or Board policy supporting Dr. Folks' statement that

   civil rights complaints interfere with work and cannot be transmitted during work

   time which was specified as 9am to 5pm in our discussion?

   I see no such employer-specified limitation in e.g. Board 1-119, or 6-914 or any

   other UA policy. If this represents a problem warranting management action

   including Dr. Folks' commentary and directive issued to me on Friday 3.2.23, then

such reference should be provided.

4. Where was the harassment perpetrated by Dean Jones and multiply validated under UA aegis "litigated" as stated by Dr. Folks on Friday?

In 2019 I filed a disclosure under Protection Rule 6-914 to the Board of Regents following deliberate indifference by multiple officers at UA to a series of communications. The Board responded, acknowledged wrongful conduct and reminded me that we were entitled to seek legal reddress for the wrongful conduct. Until this time we have not done so.

5. What is the status of the post of Associate Vice Provost for Faculty Affairs and who will assume this office?

At the meeting on Friday I asked Dr. Folks about the post of Associate Vice Provost for Faculty Affairs. I was informed that no such post existed and that maybe I meant the established position of Vice Provost for Faculty Affairs held by Dr. Romero. I stated that was not what I meant, but no further information was provided.

At the EPSP Faculty Meeting on Monday morning 2.6, Dr. Deil-Amen stated that she had been notified of success in her application for the post of Associate Vice Provost for Faculty Affairs, that other candidates had been sent rejection notices, and that her start date is scheduled for July 1st 2023. Colleagues asked her why this had not been announced, in light of their stated awareness that she would assume the post for almost a year. She stated "I don't know."