In the Self-Study guide for EPSP on p.136 the post is referenced in the text and the document states that a College of Education faculty member holds the post. These accounts and documents are contradictory.  This is relevant to my unresolved complaints about review targeting and coercion e.g. August 12th 2022 and many more concerns with how this has been handled e.g. Dr. Deil-Amen's claim to me in writing in October that she had not coordinated this review with Dr. Romero and other similar evidence.

At our meeting Dr. Folks confirmed that units do not operate independently and that close connection is maintained with the UA General Counsel's office.  Dr. Folks stated this was a normal practice and that was why e.g. similar language appears in various communications to different faculty.  Ms. Brennan did not contradict this.

These actions above, as well as those of Dr. Deil-Amen and Dean Berry, are therefore known to and approved by the UA General Counsel's office.  I have copied the UA General Counsel accordingly so that we may establish clarity on the matters above. I attended this meeting with Dr. Leila Hudson in her capacity as Chair of the Faculty Senate and therefore she is copied with these questions. Thank you for your attention to these questions."

222. There was no response by any UA administrator or official including Dean Berry, Provost's office, HR or OGC to any of these questions at this time, or ever.

223. Dr. Bailey shared this information with Faculty Senatee Committee of 11 (C-11)

and was invited to address the C-11 meeting remotely on 17th February. During this same time, another faculty member read the email above and stated "Wow! I'm speechless."

224. At the February College Council Meeting Dean Berry announced that Dr. Deil-Amen would assume the post of Associate Dean for Faculty Affairs in the College of Education.

225. On 17th February the Academic Program Review team held meetings with EPSP faculty on campus as part of their formal Academic Program Review. Dr. Bailey had been listed as an attendee for the Associate Professor's forum.

226. Dr. Bailey had asked Dr. Folks, Dr. Deil-Amen and OGC in writing if there was an alternative pathway for participation e.g. remote attendance, as normally practiced for faculty meetings and business. There was no response from anyone at UA.

227. After this but before the review team visit, Dr. Deil-Amen sent an email to all EPSP faculty stating that faculty who were present could contribute. Dr. Bailey was thereby deliberately denied participation in the EPSP Academic Program Review because the exclusion covered the scheduled review period 16th-17th February.

228. Dr. Bailey contacted the Chair of the Academic Program Review team Dr. Lori Patten Davis and made clear his concerns about abuse of civil rights in the form of retaliation by Dr. Folks, Dr. Deil-Amen and Dean Berry and his calculated exclusion from the Academic Program Review forum. Dr. Patten Davis stated "FYI. I just wanted to confirm I received this information which I will treat confidentially. Thank you for

sharing your experiences."

229. The EPSP Self-Study document (p.136) that was authored and approved by the EPSP faculty under Dr.Deil-Amen's supervision and was presented to external accreditation reviewers including Dr. Patton Davis as part of formal EPSP department review contained a personnel inventory stating that a member of the College of Education held the post of Associate Vice Provost for Faculty Affairs.

230. At a subsequent faculty meeting that Dr. Bailey attended remotely, Dr. Deil-Amen was asked a number of questions by faculty about her promotion to the post of Associate Vice Provost for Faculty Affairs.  Faculty asked why this promotion, which had been known to many of them for up to nine months, was not yet announced.  Dr. Deil-Amen stated her appointment to this post was due to begin on 1st July but there was a problem.

231. Several public records requests were made by different individuals for the names of the finalists for the post of Associate Vice Provost for Faculty Affairs.  These were each returned with the claim that "The University does not possess any records responsive to your request." (PR 2023-0090 and others).

232. In the official response to these requests, each time Public Records Coordinator Ms. Kim Fassel stated on behalf of the Board that "In providing this information to you, your public records request is fulfilled and closed in accordance with Arizona public records laws."

233. On 22nd February Dr. Bailey attended a followup meeting with Dr. Folks and Ms. Brennan conducted remotely.  Dr. Bailey was again informed that his "threatening

communications" were a concerned for his "colleagues."

234. Dr. Bailey again asked for definition and exemplification of the "threat" that was reportedly alleged by colleagues but that was contradicted by UA PD's declared findings. Dr. Folks and Ms. Brennan gave the example of civil rights code being posted by Dr. Bailey in a chat window. Dr. Bailey stated that the code he posted, 34.CFR § 106.71 was the Federal code governing prohibition of retaliation against civil rights complaints and that Dr. Deil-Amen had thanked him for this posting during the meeting. Dr. Bailey had anticipated this type of abuse and he retained the contemporary screenshot of this chat exchange in August 2022.

235. Awareness of and respect for this Federal code is required for all UA employees. This awareness is implemented by HR themselves as a component of the mandated UA harassment training. This code underpins UA policies and Board Rules including 1-119 and this code is specifically cited in the training module. Dr. Bailey as well as thousands on campus are required to complete these trainings and refreshers and Dr. Bailey had done so most recently in October 2022. Approval of these modules and the training requirements are performed by HR.

236. Other than the civil rights code posting in the chat window, no definition or example was provided of "threat" by numerous UA administrators or the OGC despite multiple written and verbal requests presented by Dr. Bailey in numerous emails and meetings.

237. Dr. Bailey continued documenting the evident contradictions in the origins and nature of the false, defamatory and damaging "threat" concept as it evolved over time

from Drs. Folks, Deil-Amen and Bertrand, before it completely vanished without explanation as soon as the former Provost Dr. Folks stepped down from her duties in May.

238. Dr. Bailey again noted his concerns about targeting and violation of process and noted the lack of rule or policy support for the exclusion order.

239. Ms. Brennan stated to Dr. Bailey that the three week office exclusion was "not disciplinary."

240. On 27th February Dr. Bailey attended the Faculty Senate meeting remotely and delivered a two-minute open session presentation on the civil rights violations enacted against his family and other women co-complainants as well as the administration coverup .

241. Following this presentation, Dr. Bailey was ejected from the meeting.  This ejection did not occur at the direction or with the permission of Faculty Senate representatives. The official minutes state that "Chair Hudson stated Keiron Bailey was expelled from the meeting by a host or co-host and requested that it be on the record."

242. During remarks, Faculty Senate Secretary Ms. Tessa Dysart stated her desire to move forward and not "relitigate" previous claims.  She did not identify the cases she was referencing.  The juxtaposition of this statement to Dr. Bailey's commentary and his ejection was notable.  The specific legal language used by Ms. Dysart mirrored the misrepresentation that was presented in identical terminology by Dr. Folks and Ms.Brennan in the meeting on 3rd February and only by these officers.

243. Early in March, Dr. Gary Rhoades wrote to administration to voice concerns about the "toxic culture" at UA and shared his concerns with numerous faculty. "President Robbins, Provost Folks, Faculty Senate, Safety for All Committee, College of Education colleagues, and all, It is an indicator of the toxic culture of a place when a General Faculty Committee on University Safety for All disbands in protest & out of fear of administrative retaliation, & after having been publicly demeaned, gaslighted before the Faculty Senate by a president encouraging it to connect further with administrative offices, & then stonewalled by those offices. It is further gaslighting and confirmation of the problem when a public response to the committee's resignation comes from the university's Chief of Staff, Jon Dudas, not the President (see the link below) and is sent to the press not the committee and the university community. This continues to be an administrative exercise in how ***not*** to handle such situations."

244. Many faculty shared these concerns e.g. "I fully endorse Dr. Gary Rhoades's letter. The lack of transparency and engagement with the UArizona is unprecedented in my academic career at several university communities across the country…I have never felt as marginalized as a faculty member or even student as I have at Uarizona."

245. Following discussion, members of the Faculty Senate and C-11 drafted a letter to administration regarding "what appears to be coordinated retaliation that includes the Office of the President."

246. Following Dr. Bailey's intake interview with EEOC, a charge of discrimination (retaliation) was filed against UA on 16th March.

247. After Spring Break, the three-week office exclusion had expired. Dr. Bailey returned to his office and discovered that his key no longer worked in his office lock although it did work in two other corridor doors as before. Video and picture evidence taken at that moment demonstrates from lock wear patterns that Dr. Bailey's office was the only one in the corridor that had the lock changed.

248. Dr. Bailey immediately called Facilities and when the locksmith arrived he noted that the lock had been changed to a high-security Medeco type. Dr. Bailey pointed out the lack of conformance to lock change policy and the locksmith called his manager at Facilities, who was also not able to locate a record of the lock change. During this conversation, an assistant rushed down the corridor to inform Dr. Bailey and the locksmith that the lock was changed. The departmental assistant had a key number that the locksmith did not have. This is outside of normal lock change policy and practice at UA in which all changes must be authorized and recorded by Facilities.

249. Dr. Bailey wrote Facilities later that week to raise these concerns and was later informed that, despite what he was told on the spot by both the locksmith and his manager in Facilities, that a "mistake" had been made. Dr. Bailey was issued a new key but there was additional delay in processing forms and he was unable to return to his office for another week.

250. Dr. Bailey again wrote OGC to ask for rule or policy support and note that the actions being taken against him were delivered without and had been categorized by HR as "nondisciplinary."

251. Ms. Jennifer Bailey of the OGC responded to Dr. Bailey on 23rd March. This was the first and only communication Dr. Bailey received from OGC despite raising a number of previous complaints and concerns directly with OGC since 2019.  Ms. Bailey stated that Ms. Todd Johnson had directed her to respond as follows:

"The Office of the General Counsel serves the University by providing legal advice to administrators. As such, we do not make decisions on behalf of the University, nor can we share the content of our advice, as it is attorney-client privileged. It appears that you are aware of and utilizing established resources, both internally and externally, to address your concerns, and we suggest that you continue to do so as you believe is necessary."

252. Dr. Bailey again emailed Ms. Laura Todd Johnson, Lead Counsel.  He raised again his concerns with OGC's role in administrative actions and itemized numerous violations of UA harassment and retaliation policies and Rules against him and others by multiple officers.  He raised Dr. Folks and Ms. Brennan's point that Provost's office and HR close cooperation was "good practice" and stated this was only "good practice" if the guidance and advice facilitated compliance by the HR and Provost's officers and Deans and Heads receiving this guidance and advice.

253. Dr. Bailey again stated again his concern about a "Michigan State" model of collusion to violate rights and that he believed UA defendants were engaging in conspiracy to violate rights.  He questioned the quality of the legal advice that was being followed in this case where the Board had acknowledged in writing wrongful conduct by UA officers but multiple UA administrators at the same time had termed these unlawful

actions "work" and failed to act to address the known risk.  Dr. Bailey noted that he had

substantial experience in professional environments, that he had worked in different

countries and for different employers and during this time he had never heard of a three-

week office exclusion order that was not disciplinary.  There was no response from OGC.

254. On 29th March the Faculty Senate passed a limited Vote of No Confidence in

President Robbins, Provost Dr. Folks, Police Chief Ms. Balafas and CFO Ms. Rulney.

Many Faculty Senate members called for a global vote of no confidence during their

presentations at this meeting.

255. Following this vote President Robbins stated publicly his desire to work closely

with faculty and other community members to rebuild trust after Dr. Meixner's murder.

256. In a media article from 4th April President Robbins was also quoted as follows:  "If

you receive threats, I hope people would feel comfortable contacting (the University of

Arizona Police Department), but I understand if you don't," Robbins said, before reciting

his personal phone number twice. "If you've got a problem and you don't think you're

getting resolution to that problem, text me or call me. If I can't help solve it I will try and

find some resolution."  Robbins said the university wants to hear about all instances of

intimidation or retaliation on campus, and it doesn't have to be as serious as a death

threat. "It can be more subtle and indirect — slow-walking grant proposals, not funding

things, not getting promotions," he said. "There's a whole list of things that fall into

retaliation."

257. Dr. Bailey made numerous attempts to obtain this number from the media outlet where this was published to ask President Robbins to make good on his public commitment, but he was not successful.  The journalist who reported the story was unable to produce the number referenced in the coverage.

258. The following week a faculty member received an email sent by Dean of Students Kendall Washington-White in which administration revealed plans to remove what were termed "problematic" faculty after the end of the semester to "avoid chaos."  Several faculty who had engaged in civil rights activism and protest were named.  Ms. Helena Rodrigues, President of HR, was specifically appreciated for her "partnership" in these plans, despite HR having no purview over faculty appointment.  Mr. Jon Dudas, Senior Vice President and Chief of Staff of the University, was copied on this message and was clearly involved in the planning of these actions before this message was sent.  This message stated:

"Good Morning Friends, I had a conversation with Jon Dudas this week regarding the Cultural and Resource Centers including the behavior of the staff and other colleagues who are problematic [Faculty member A], [Faculty Member B], and others.  Jon Dudas and I agree that if we release employees from the University, we will wait until after the end of the Spring semester (at the end of May or June). The rationale is that if we make any removals, it will give people another opportunity to create chaos.  Of course, [Employee C] will continue to work with [Employee D] regarding the Centers' staff.  Helena, I appreciate your partnership.  Regarding [Employee E], I'm unsure about him –

is he aligned with the Center Directors? If not, I would move forward regarding his

employment. If so, I think we do the same at the end of the May or June. "

259. The official UA webpage defines Mr. Dudas' duties as follows: "In this role, he is

the primary liaison for the Arizona Board of Regents, Arizona's other public universities,

and directly facilitates the many governance practices at the University."

260. At that time Ms. Kendall Washington-White's official UA web page displayed by

the Provost's office stated she held a PhD.  Local media subsequently reported that this

representation of her credentials was false with one headline stating "U of Arizona

website falsely said dean of students has doctorate."  After public and social media

uproar, these UA pages were subsequently modified to state that Ms. Washington-White

holds a Master's degree.

261. UA employment offers contain the following stipulation based on Board Rules:

"Misrepresentation of your qualifications may be grounds for offer

withdrawal or employment dismissal."

262. A named faculty member [B above] raised this secret administration plan to remove

her with Faculty Senate and met with Faculty Senate representatives meeting to discuss

this email and her shock that the President's office were aware of this carefully-

coordinated removal plan directed at her and other named faculty members who were

known civil rights protesters.  She stated to the Faculty Senate members and other

faculty: "This level of intimidation and retaliation is unacceptable. And the fact that this

is going on in full awareness of the President's Office? Wow! Unbelievable."

263. During Faculty Senate followup on this matter, Dr. Bailey pointed out to these Faculty Senate members that UA defendants were following an identical course of action against him with the clear purpose of unlawful retaliatory removal. This email was sent to the Department of Justice Civil Rights Division by several faculty members concerned about conspiracy to violate rights.

264. The Coalition of Black Students and Allies (COBA) called for the resignation of Kendall Washington-White and drew attention to her "abuses of power and intimidation" and her role in enforcing what they termed "a culture of fear and silence throughout the institution."

265. Faculty member [B] subsequently reported her concerns about selective retaliation as well as denial of legal counsel during a hearing with the SBS Dean Dr. Poloni-Staudinger to the Faculty Senate Committee of Eleven who raised the case with administration.

266. Dr. Bailey's case was stated by a Faculty Senate member as a second such example of such concerning administration collusion to retaliate.

267. On 14th April, Dr. Deil-Amen stated: "Keiron, I would be more than pleased to speak with President Robbins. If he wants to discuss the three-week order, he will need to speak with the person who ordered that after meeting with you, and that was Provost Folks."

268. Dr. Bailey was contacted by his former EDL Head, Dr. Bertrand, out of the blue. She stated that she was concerned about being deposed or charged in a civil rights suit

and that she was involved in this performance review, and that she believed that Dr. Bailey's 2021 performance review was fair. This contradicted her position in 2022 when Dr. Bailey had raised his concerns with Dr. Bertrand about Dr. Deil-Amen's review and exemplified the targeting and stated his concerns about organized retaliation by admin via Dr. Deil-Amen but Dr. Bertrand had not acknowledged any role in this process and led Dr. Bailey to believe that Dr. Deil-Amen was the sole author of the targeted review.

269. Dr. Bertrand stated that she felt "physically threatened" by Dr. Bailey. This was the first time Dr. Bailey had been presented with Dr. Bertrand's concern. Dr. Bertrand produced to Dr. Bailey no example or evidence of such threat, nor of any specific action or statement that led her believe so, nor of any specific action or statement allegedly made against others that led her to believe so.

270. Dr. Bailey has never been notified of an OIE investigation into his actions. UA OIE policy requires the alleged perpetrator be informed.

271. Dr. Bailey has never been notified of an OIE or equivalent investigation in his career prior to working at UA.

272. Dr. Bertrand's statement contradicted her long-term behavior and conduct around Dr. Bailey in the office area. The previous week Dr. Bertrand had invited all faculty including Dr. Bailey to a social event at her house. Dr. Bailey had attended several previous EDL social events that Dr. Bertrand had organized and to which she had invited attendance. Since her appointment in August 2021 she had regularly stopped to converse

with him about student and program matters in the shared office corridor.  She had

voiced no concern to Dr. Bailey until this email.

273. In his response to Dr. Bertrand, Dr. Bailey pointed out that Dr. Deil-Amen was not

regarded as "fair" by all because she had been the subject of formal graduate student

complaints for her capricious and abusive behavior as doctoral Committee Chair.  Dr.

Bailey was aware of this because one of these students had been his longtime neighbor.

Dr. Bailey again explained why there was major risk from UA noncompliance and stated

that he agreed with Dr. Bertrand in that he did not have a favorable impression of

administrators who discharged and validated the criminal harassment of his family.  He

added he was disappointed to learn that Dr. Bertrand had not been forthright with him

about her role in his evaluation and stated he wished for a better campus for all.  He

stated the best way to avoid any legal concerns was to respect the law.

274. On 17th and 20th April Dr. Bailey again emailed President Robbins detailing his

concerns about retaliatory management.  He copied the second email to the EEOC

investigator.  There was no response from President Robbins but the EEOC investigator

responded to this same email and requested Dr. Bailey load the evidence into the EEOC

portal.

275. On 22nd April Dr. Bailey received an email from Dr. Folks and Ms. Brennan that

was sent at noon on Saturday, outside of UA work scope and in contradiction to the UA

system-advised and flagged practice of delaying sending of emails to working hours after

8am on weekdays to reduce workplace stress intrusion on family time.  This email stated

that he was subjected to a further three week office exclusion on the grounds of his anger, outbursts and what Dr. Folks termed "threats of legal action."

276. Again no rule or policy was cited in support of this adverse action and no specific threat or example of threatening behavior was provided. Dr. Bailey had not spoken to anyone in the college for almost three months and had not said a word during any Faculty meeting or other function since his first office exclusion started on 6th February. Other than with Dr. Deil-Amen, the only exchange with any faculty member was in writing with Dr. Bertrand following Dr. Bertrand's email in which she initiated the contact with him.

277. In this email, Dr. Folks with Ms. Brennan's assent wrote: "If you need to come into your office for any reason, you must coordinate it with Rachel Barton beforehand."

278. Dr. Bailey received a 2022 annual performance review in the UAVitae system that contained the EPSP Department Committee evaluation. This text contained categories of Meets Expectations and Needs Improvement. The original review committee text made no reference to threats or negative impact on workplace climate or any other synonymous allegations as presented repeatedly by Dr. Deil-Amen, Dr. Folks and Ms. Brennan. At some point over the following month this review was then substantially modified and added to by Dr. Deil-Amen to deliver a review that rated his performance "Unsatisfactory" in all categories. Dr. Deil-Amen again employed numerous selective and targeted criteria to deliver unwarranted low evaluation, for example low enrolment in some of Dr. Bailey's classes. Dr. Bailey captured enrolment statistics from the UA

72

system for classes taught by other instructors in the College of Education showing that a number of them also had the same or fewer students enrolled.

279. On 25th April Dr. Bailey met with incoming Interim Head of EPSP, Dr. Rhoades to discuss teaching and adaptation plans at an off-campus cafe. Dr. Rhoades had asked if the prevailing exclusion was a campus exclusion and Dr. Bailey stated it was not, repeating the words of the former Provost and Ms. Brennan that it was an office exclusion. During this meeting Dr. Rhoades did not make any statement regarding any perception of "threat" from Dr. Bailey. He stated he did not agree with nonprocedural exclusions being directed at Dr. Bailey and that he believed in due process. Dr. Rhoades stated he could not understand why a manager who had stated in writing that she did not agree with his appointment before it was enacted was left in charge of Dr. Bailey and that COI relief processes existed and had been used by himself and others in the College of Education previously. Dr. Bailey informed Dr. Rhoades that the administration was collectively invested in his unlawful removal and they had not responded to his numerous requests for such process and that Dr. Deil-Amen's announced promotion to the post of Associate Vice Provost for Faculty Affairs was compromised by Dr. Bailey's complaints and EEOC investigation, leading to false testimony and coordinated public records lawbreaking to cover up the evidence of her appointment. Dr. Bailey pointed out that this post was contained in the official EPSP Self-Study guide.

280. Dr. Bailey again raised the COI problem and requested review by managers outside the College of Education. Dr. Deil-Amen addressed this request and asked for a list of

73

nominees.  Dr. Bailey considered some faculty and sent a list of four to her as requested.

Dr. Deil-Amen then immediately denied this request despite having initiated it.

281. Dr. Bailey realized that the accelerating pattern of retaliation, involving coordinated,

nonprocedural and total exclusion from the workplace, rapidly deteriorating performance

review using the same information, and the continued failure by all managers to exercise

good faith or follow policies including UA200, UHAP 7.01, Board Rules 1-119 and 6-

914, was intended to deliver his pretextual removal by the end of the semester.  He stated

this to Faculty Senators and some expressed doubt that administration would take such

action.  Dr. Bailey pointed out the litany of policy and Rule violations and the large

investment in lawbreaking across multiple UA offices and asked these Senators where

they thought the malfeasance would stop.  They had no answer.

282. On 28th April Dr. Folks and Ms. Brennan again required a meeting with Dr. Bailey.

Dr. Hudson was an audio witness and Dr. Bailey had another witness during the Zoom

meeting.  Dr. Folks with Ms. Brennan's assent stated at the meeting and then in writing

that "This [the office exclusion order] is not a UA PD process."

283. At a Faculty Meeting later in April Dr. Bertrand announced that she was stepping

down from her role as Head of EDL with immediate effect and with no replacement

named.  This is a very unusual move prior to the end of a semester and it took faculty by

surprise.  Dr. Bertrand stated she could not talk about this matter.

284. On 28th April Dr. Bailey received a formal denial of promotion from the former

Provost Dr. Folks.

285. On 1st May President Robbins announced a series of management changes including that Dr. Folks was stepping down from the post of Provost and that UA PD Chief Ms. Paula Balafas was stepping down with immediate effect.  President Robbins announced that HR would report directly to him.

286. President Robbins stated in this communication that "Building on the strong foundation it has established in recent years within Business Affairs, Human Resources will continue to engage colleagues across the University's campuses and within its colleges to foster a culture consistent with our shared values."

287. Dr. Bailey stated he would not attend a performance review meeting with Dr. Deil-Amen until he had spoken with President Robbins.  Dr. Bailey had stated this in several emails to President Robbins but without response to that moment.

288. Dr. Folks issued an order to meet with Dr. Deil-Amen.  Dean Berry was absent from these events despite being Dr. Deil-Amen's manager and being aware of Dr. Bailey's targeting concerns for months prior.

289. Dr. Bailey attended a performance review meeting with Dr. Deil-Amen.  He clarified to Dr. Deil-Amen he would not sign what was clearly an unwarranted and retaliatory review that had suddenly and inexplicably deteriorated from the previous categories of Meets Expectations and Needs Improvement, to multiple "Unsatisfactory" ratings warranting a Performance Improvement Plan under UHAP policy and opening the pathway for dismissal of a tenured faculty member.  The intent to enlist Dr. Bailey in his

own unlawful removal via this abusive process was clear.  Dr. Bailey reiterated his

revulsion at the coercion as well as his refusal to sign the fraudulent document.

290. Dr. Bailey again contested the "threat" concept being used against him and sourced

by his "colleagues." Dr. Deil-Amen suggested he talk to the Provost's office about the

origin of this concept.  Dr. Folks and Ms. Brennan had repeatedly asserted that the source

of this concern was his "colleagues."  With the exception of Dr. Bertrand's email, none

of his colleagues had ever communicated such concerns to Dr. Bailey.

291. Dr. Bailey re-stated to Dr. Deil-Amen he would not sign any review authored by her

and would await the result of discussions with President Robbins.

292. Directly following this meeting Dr. Deil-Amen emailed Dr. Folks and Ms. Brennan

with the following: "Provost Folks,  I met with Dr. Bailey this morning.  At this meeting,

he verbalized that he has chosen not to respond to the annual review documents in any

way until he meets with President Robbins because he believes this review is part of a

targeted effort to remove him. He is currently waiting for a response from President

Robbins regarding this and we, therefore, did not discuss any of the content of the annual

performance review, including my evaluation and the peer review committee's comments

and ratings.  Dr. Bailey has formally requested that the review and department head

evaluation for both this year and last year be conducted by "managers" outside the

current College of Education, including removal of Dean Berry from the process as well.

I asked Dr. Bailey if he had a preference for any particular person to perform that review,

and he has not identified a specific preference at this point. Now that I have relayed Dr.
Bailey's request, I will await further direction on how we should proceed."

292. Dr. Bailey stated "Regina is correct about that. However, the Provost's impending
removal does not erase or change the catalog of retaliatory actions and damages that I am
experiencing. I will discuss these with President Robbins, as stated in my 6-914, with the
focus on restoring compliance."

293. Dr. Folks then wrote to Dr. Bailey: "Dear Keiron, The process for APRs is set out
in UHAP policy 3.2.01, and the meeting with your department head on Monday, May
1st was a required part of the process. I have asked Dr. Deil-Amen to finalize your APR
and issue it to you via email, so that you have the final written evaluation. Per UHAP
policy, you may provide comments to the written APR, and must sign the document and
return it to your department head, Dr. Deil-Amen, within 10 calendar days of the
meeting, i.e., by May 11, 2023. You may not delay the APR process merely because you
have a disagreement with some people or because you wish to speak with the President.
I note that Section 3.2.03 provides a mechanism for appeal, which you are entitled to
utilize. Regards, Liesl"

294. This reference to UHAP appeal policy contrasts with the total failure by both Dr.
Folks and Dr. Romero to address or even acknowledge Dr. Bailey's appeal of the 2021
APR presented on 12th August 2022 under the same policy being cited here.

295. Ms. Brennan was again cc:d on this email despite HR having no role in APR
process and with Ms. Brennan herself having acknowledged that HR have no purview

over faculty appointment on 19th October 2022.

296. On 1st May Dr. Bailey filed a complaint under Board Rule 6-914 with designated

public bodies President Robbins and the Board of Regents alleging abuse of office by Dr.

Folks, Ms. Brennan, Dean Berry, Drs. Deil-Amen and Romero.  Dr. Bailey copied this

complaint to the DoJ Civil Rights Division, the Department of Education and NSF

OECR.

297. This complaint was forwarded by the Board to Mr. Henderson at UA.  Mr.

Henderson forwarded this complaint to a subject of complaint, Dr. Folks.  Board Rule 6-

914 contains no public specification of how such complaints should be handled nor are

there COI provisions for those reporting the Provost or direct reports in the Provost's

office who are vulnerable to direct retaliation from those officers named.

298. Dr. Folks recused herself from handling this complaint.  She did not recuse herself

from further management actions with respect to Dr. Bailey.

299. Dr. Bailey reported this to Faculty Senate members.  One of the Faculty Senate

members stated "Even [President] Robbins knew that 6-914 complaints don't go to Liesl

when I talked to him one on one a few weeks ago.  Maybe the only thing that will get

their attention is a lawsuit?  Unbelievable."  Another faculty member stated "He sent it to

someone named in the complaint? Wtf??"

300. At this time, President Robbins had not responded to any of Dr. Bailey's numerous

written communications that included emails to both of his official UA email addresses

"rcr@arizona.edu" and "president@arizona.edu" as well as the earlier certified mail, nor

had President Robbins responded to outreach from a member of Faculty Senate who possessed his personal cellphone number despite his publicized invitation for UA employees to use his personal number to report any form of retaliations as stated to the press two weeks prior.

301. On 4th May Dr. Bailey attended the Staff Safety Forum hosted by President Robbins and Mr. Patterson in the Music Auditorium.  He screenshot the announcement of the Staff Safety forum noting the forum was an "open" forum with a scheduled open mic session to address President Robbins.

302. Dr. Bailey attended and during the Open Session, he took the mic and addressed President Robbins on the stage, raising staff safety concerns that he had relayed without acknowledgment in 2018 and on other occasions as well as re-proposing solutions he had raised before including an ombud to identify employee concerns in an environment free from coercion and retaliation.  President Robbins stated that he thought this was a good idea.

303. Following his delivery several others also presented.  President Robbins immediately came over with his assistant Ms. Castro to where Dr. Bailey was sitting and they each introduced themselves and began scheduling a meeting with Dr. Bailey.

304. Ms. Brennan accosted Dr. Bailey while President Robbins was talking with Dr. Bailey.  She knowingly and falsely asserted that Dr. Bailey was obligated to inform Ms. Barton in the College of Education office prior to attending this event.  Dr. Bailey reminded her of her own written and verbal clarification statement issued six days earlier

in which she and Dr. Folks stated with emphasis that the prevailing office exclusion order was not a campus exclusion order and should not be represented as such. President Robbins waved away Ms. Brennan and continued to discuss meeting times.

305. Dr. Bailey knew the policy and had never represented the exclusion order as anything except an office exclusion as stated by HR and the Provost. According to Google Map the location of the music auditorium is seven hundred meters from Dr. Bailey's office in the College of Education from which he was excluded.

306. Dr. Bailey left the forum with other participants in a normal and orderly way however he was then subjected to a formal UA PD stop. He cooperated with Officer Stevenson and after confirming his identity and address he determined that he was not being subjected to arrest, citation, warning or other violation. He asked who called out the police and was informed that HR originated the callout.

307. The formal UA PD summary posted online revealed that the callout was logged at 12.55pm, as Dr. Bailey was addressing the forum. The code used was 6101 "miscellaneous" and not a code used for a trespass or public order callout.

308. The same afternoon Dr. Bailey wrote UA PD Chief Brei and Chief Sommerfield, summarized the callout and expressed his concern about abuse of UA PD by administrators vested in an agenda of retaliation. There was no response.

309. Dr. Bailey wrote Chief Brei again on 12th May to follow up, and again on 18th May with new information and copied this second email to Mr. Henderson and Dr. Hudson.

There was no response to these from UA PD, Mr. Henderson, or anyone in UA administration.

310. A public records request for the UA PD callout was made and the report was obtained in October. The reason given to UA PD by HR for this callout was that Dr. Bailey was "not welcome" at the forum. This reason has no legal basis under State law nor under UA HR or Provost's authority as stated to Dr. Bailey by these officers.

311. UA PD stated in their report that HR should clarify in writing the geographic extent of the exclusion order. Dr. Folks and Ms. Brennan had already done so to Dr. Bailey with witnesses during the 28th April meeting and followed up in writing. It is not clear why UA administrators chose not to share this information with UA PD before enacting the callout nor why Ms. Brennan knowingly and falsely stated to Dr. Bailey he needed Ms. Barton's permission to attend this forum being held seven hundred meters from his office and not under College of Education purview.

312. The HR officer who called out UA PD chose to remain anonymous by requesting anonymity despite the normal redactions being performed. It is not clear why a senior UA administrator discharging the official business of the State by formally involving law enforcement took such precautions to remain anonymous.

313. The UA PD report stated that "The [HR] representative informed me that there were additional concerns coming from the Bailey's office about his presence at the Spring 2023 UA Commencement."

314. Dr. Bailey had no intention of attending the Commencement. He had made no statement to anyone at UA or any other person regarding an intention to attend the Commencement. He did not attend or attempt to attend the Commencement. He was unaware of such "concerns" from his office until he obtained a copy of the UA PD report months later. In the report UA PD noted "There were no specific concerns regarding this."

315. On 8th May Dr. Bailey attended a meeting with President Robbins and Mr. Craig Henderson. Dr. Hudson, Chair of Faculty Senate, attended as a witness. President Robbins discussed potential other appointment units including Research Innovation and Impact and expressed appreciation for the valuable work Dr. Bailey had delivered for UA.

316. President Robbins apologized to Dr. Bailey for the abuses he had endured. He stated that he had read all Dr. Bailey's emails and that these were a tour de force. He also stated that he should have intervened two years ago. Dr. Bailey agreed.

317. President Robbins stated he was surprised that Dr. Bailey still wanted to work at UA. Dr. Bailey had already complained to EEOC that the tactics being used to make his workplace intolerable and deny functionality including denial of promotion, denial of service, nonprocedural office lock change, multiple lengthy office exclusions without reference to policy or rule, and unsupported defamation as "threat" etc. were consistent with constructive dismissal. Nevertheless Dr. Bailey reiterated his ongoing desire to deliver his quality research, teaching and service, as he had done for twenty years at UA.

318. Dr. Bailey presented his Appeal of Denial of Promotion and another document outlining his ongoing concerns that included the abusive actions of HR and the Provost and requesting that President Robbins assume his management under UHAP faculty management policy.  President Robbins asked Dr. Bailey what he thought might happen next and Dr. Bailey stated that he expected a Notice of Dismissal from the Provost the following week.

319. Dr. Bailey presented a list of concerns and actions under President Robbins' purview regarding management of faculty and requested President Robbins assume management responsibility given the evident targeting and removal agenda being pursued by Drs. Folks, Berry and Deil-Amen.  There was no response to this request.

320. Dr. Bailey re-presented printed copies of the complaints he had transmitted in writing to President Robbins between 2017 and 2020.  There was no response to these.

321. On 8th May Chair of Faculty Senate Dr. Hudson sent an email to all faculty sharing the steps taken by Faculty Senate in developing a cross-campus list of desiderata for a new Provost.  This list reflected input from constituencies across campus and contained the following points: "3. Of unimpeachable integrity.  4. Transparent—Many of us feel this has not been the case in the past, and it caused enormous issues."

322. On 10th May Dr. Folks sent an email to Dr. Bailey and which she copied to Ms. Brennan.  She issued Dr. Bailey with an immediate leave-campus-and-all-UA-facilities order on the stated grounds of "disruption."  Dr. Folks required an immediate response.

323. Dr. Bailey acknowledged it and, as before, complied, despite believing this exclusion order again to be selective, targeted, unsupported, nonprocedural and unlawful.

324. Dr. Bailey again wrote UA PD requesting their required conformance via the notification of campus exclusion that UA PD are required to deliver under UA policy. There was no response.

325. Dr. Bailey took screenshots of the Campus Exclusion web pages maintained by UA PD.  His name did not appear on this site when he was served the campus-and-all-facilities exclusion order by Dr. Folks and Ms. Brennan nor did his name appear on this list at any time subsequently.

326. The UA video of the Staff Safety Forum was obtained in response to a public records request and this video covers the scheduled hour.  From the video evidence as well as audio recording it is evident that neither President Robbins nor his Safety Chief Mr. Patterson nor any of the other approximately fifty attendees experienced or reported "disruption" or any other issue warranting UA PD callout at this forum.  The forum proceeded normally and in accord with published schedule and all participants took their turns at the mic during open session before the forum concluded as scheduled.

327. On 11th May Dr. Bailey emailed Ms. Todd Johnson in OGC raising his concern about HR abuse of UA PD in service of retaliation and informing her that civil rights bodies were notified.  There was no response.

328. Dr. Bailey had already stated in writing on a number of occasions between 2020 and 2023 to Dr. Folks, President Robbins, Ms. Todd Johnson of OGC, as well as the OCR,

EEOC and DoJ, that he believed that the OGC was following the "Michigan State" model of operation in which publicly-funded legal compliance apparatus including the Office of General Counsel as well as UA PD was repurposed to facilitate and coverup lawbreaking and intimidate and harass a complainant rather than delivering required compliance via legitimate advice and counsel to administrators and ensuring respect for policies, Rules and State laws by all.  He reiterated this concern to Faculty Senate.

329. On 11th May Dr. Bailey attended remotely the College of Education Council Meeting presided over by Dean Berry.  At this meeting Dr. Nolan Cabrera voiced concerns with faculty performance review evaluations where there were large divergences between faculty committee evaluations and the final Department Head reviews.  Final authority is vested in Department Heads however normal practice is to respect such Committee evaluations.  Dr. Cabrera demonstrated significant unease with such processes involving unnamed faculty and stated he wanted Heads to document in writing reasons for such divergence and place this reasoning in the official record.

330. The College of Education policy on Annual Reviews was modified on 14th November 2023, one hundred and eighty days after Dr. Bailey's dismissal, with the following requirement: "If a department head disagrees with the departmental review committee's ratings, a rationale should be provided. Comments can also include a discussion about goals, assignments, and expectations for the upcoming year."

331. Dr. Bailey raised with Faculty Senate and the C-11 the extraprocedural office and then campus exclusion orders, the abuse of UA PD without cause under law and with the

purpose of harassing and intimidating the complainant, the nonprocedural office lock change, the ejection from Faculty Senate and the pretextual dismissal.  Several expressed horror and outrage at the catalog of violations and one Senator suggested the situation was beyond Faculty Senate and that he believed Dr. Bailey needed an attorney.

332. On 12th May a faculty member with President Robbins' personal number relayed the following text to him: "President Robbins, I would appreciate your attention to the actions of Dr. Folks and Ms. Brennan.  There is malicious abuse of UA PD and now a full campus exclusion order that neither the Provost nor HR has authority to issue without TMT/UA PD action and policy support.  Their actions place the institution at risk.  I raised my concerns about their actions at Monday's meeting and your prompt attention would be appreciated.  Thanks."  She confirmed "sent."

333. There was no response.

334. After the campus exclusion order expired, and having established this UA PD callout lacked legal basis following UA PD's refusal to respond, on 15th May Dr. Bailey, went to the UA PD station, and asked if he was subject to a UA PD exclusion order to which the responding officer said "If you were, you would know about it."

335. Dr. Bailey filed a report of fraudulent callout of UA PD by the UA HR representative under ARS13-2907-01, misrepresentation of fact with intent to mislead a peace officer.  Officer Bermudez of UA PD took this complaint.

336. Dr. Bailey again presented his concerns to UA PD that UA PD were being enlisted in unlawful actions by senior UA officers including an AVP of Human Resources, as

recorded earlier by Officer Stevenson in the formal UA PD report.  He stated to the

officers that he was concerned about conflict of interest with UA PD and administration

based on previous events and evidence, he considered HR's action very dangerous, and

that he had also therefore reported the actions of HR to Federal agencies including DoJ in

an effort to ensure safety of himself and everyone else on campus from such abuse of law

enforcement by publicly-funded officials.

337. Despite Dr. Folks and Ms. Brennan having stated in writing on 28th April that the

adverse actions being enacted were "not a UA PD process," UA PD noted that the

"precautions" taken against Dr. Bailey including escalating exclusions were consistent

with managing "termination risk."

338. Dr. Bailey named President Robbins as a witness to this fraudulent callout of law

enforcement by HR.  Dr. Bailey stated his concern with COI and the role of UA PD in

this case where campus police were responding to powerful administrators engaged in

violation of rights.

339. On 18th May Dr. Deil-Amen wrote Dr. Bailey and stated: "Attached is your

Performance Improvement Plan (PIP) necessitated by the results of your Faculty Annual

Performance Review for the 2022 year.  Please sign and return to me." The system

timestamp on this email was 0616.

340. On 18th May Dr. Bailey received a Notice of Dismissal from Dr. Folks stating that

"This letter and the enclosed written recommendation to the President serve as notice to

you of my recommendation under Arizona Board of Regents Policy 6-201." However no cause was provided to Dr. Bailey either then, or subsequently.

341. The system timestamp on Dr. Folk's email was 1230. Therefore Dr. Bailey's formal dismissal notification was sent six hours and fourteen minutes after Dr. Deil-Amen's coercion to sign the unwarranted and retaliatory PIP. Dr. Deil-Amen's coercion was delivered six days after the deadline she herself had specified as 12th May.

342. The address used by Dr. Folks on this letter was Dr. Bailey's previous address that UA records confirm was changed in the systems some time before 14th March and that had appeared on other official documents since that time. This evidence was consistent with Dr. Bailey's belief that his dismissal was planned and orchestrated some time prior in a manner consistent with the previously-secret administration plan to remove "problematic faculty" who were known civil rights complainants as exposed by mistake in the Washington-White email. Dr. Bailey reported this to DoJ, EEOC, NSF OECR, journalists and other community members.

343. The timeframe between Dr. Bailey's denial of promotion and the dismissal notification was twenty days.

344. After being made aware of the Provost's dismissal letter on 18th May, Dean Berry sent an email to Dr. Bailey stating "Please follow up on the PIP process as no final determination has yet been made regarding the request for termination." This email had a system timestamp of 1708 on 18th May. This was four hours and thirty eight minutes