FILED   LODGED
RECEIVED   COPY

NOV 1 4 2024

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA TUCSON**

| | |
|---|---|
| KEIRON BAILEY<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY OF ARIZONA;<br>ARIZONA BOARD OF REGENTS;<br>ROBERT ROBBINS;<br>DIANE BRENNAN;<br>LIESL FOLKS;<br>ANDREA ROMERO;<br>REGINA DEIL-AMEN;<br>ROBERT Q. BERRY;<br>MELANIE BERTRAND;<br>and MARY BETH TUCKER in their<br>official and individual capacities<br><br>Defendants | Case No.: CV-23-00557-TUC-AMM<br>(LCK)<br><br>COMPLAINT FOR<br>COMPENSATORY DAMAGES and<br>PUNITIVE DAMAGES<br><br>  1. RETALIATION TITLE VII<br>  2. RETALIATION TITLE IX<br>  3. FREEDOM OF SPEECH<br>  4. DENIAL OF PROCESS<br><br>JURY TRIAL DEMANDED<br><br>Judge: Angela Martinez<br>Date Action filed:  14 November 2024 |

Plaintiff complains of Defendants and for causes of action alleges:

## AMENDED COMPLAINT AND JURY DEMAND

Plaintiff KEIRON BAILEY hereby files the following amended complaint for

discrimination and retaliation and violations of his constitutional rights in violation of

Title VII, 42 U.S.C. § 2000e-2; 42 U.S.C. § 1983; 20 U.S.C. § 1681; the Fourteenth

Amendment to the U.S. Constitution; Arizona Revised Statute § 41-1464.A; Arizona

Revised Statute §15-1864C; Arizona Revised Statute § 13-2907-01; and Arizona

Constitution Article 2 Section 4 against DEFENDANTS as captioned above.  Plaintiff

granted leave to do so by Court Order filed on 16th October 2024.

## INTRODUCTION

1

"At the University of Arizona, our values drive the way we work, study and teach and we are committed to freedom of expression, academic freedom, free speech and collaborative inquiry." Defendant Dr. Andrea Romero, UA Vice Provost for Faculty Affairs, 18th October 2024.

1. Dr. Keiron Bailey is a nationally recognized expert in Geographic Information Science studies and participatory systems including the Structured Public Involvement he co-innovated. He was employed at the University of Arizona since August 20033, first as Assistant Professor in the Department of Geography and Regional Development, earning promotion to the rank of Associate Professor with tenure in 2009, then transferring to the EDL program in the College of Education as Associate Professor with tenure between August 2020 and May 2023. He was dismissed from this post by former Provost Dr. Folks in May 2023 and following his Appeal of Dismissal was appointed to Research, Innovation and Impact in August 2023.

2. Dr. Bailey is an internationally-recognized researcher who has published more than sixty-five peer reviewed articles in national and international scholarly journals and a well-reviewed book; secured research funding from the National Science Foundation and other granting agencies including Federal Highway Administration and Federal Transit Administration and Arizona Board of Regents TRIF programs, as Primary Investigator and Co-Investigator; planned, developed, supported and implemented community-based collaborative research, partnerships and programming and student development opportunities with community stakeholders such as the Summer GIS Academy; authored

and co-authored numerous grant proposals, reports, delivered invited talks and workshops to researchers and planning professionals in more than twenty-five countries; directly supervised staff, consultants, undergraduate and graduate students; collaborated on outreach, research and grants with numerous faculty at UA, ASU and other institutions; served as reviewer for multiple national and international grant agencies. He has served on more than thirty graduate student committees and performed in various department and Faculty Senate service roles. He has designed, hosted and delivered more than three hundred public meetings for real-world projects in collaboration with Federal, State and local governments, private contractors and citizen groups with outstanding quality evaluations.

3. Dr. Bailey has taught seventy-seven classes at UA with consistently strong teaching evaluations and numerous post-graduation student testimonials to the real-world effectiveness of his classes. Dr. Bailey has spent the past year fighting off discrimination, harassment and targeting from multiple supervisors, going through complaint processes with the Arizona Board of Regents, the Department of Education's Office for Civil Rights ("OCR"), the Equal Employment Opportunity Commission ("EEOC'), and the National Science Foundation's Office of Equity and Civil Rights ("NSF OECR") to try to seek correction of the pattern of harassment of women that he reported and accountability for the retaliatory abuse he has suffered; and dealing with a coordinated and planned campaign of retaliation from his superiors at UA that included performance review targeting, denial of normal recourse, denial of service, denial of

promotion, ongoing false and defamatory characterization as "threat," multiple non-procedural three-week office exclusions premised on manufactured "threat" without UA PD support and characterized by HR as "not disciplinary," ejection from Faculty Senate meeting after summarizing the violations experienced by his family member and co-complainants, an office lock change enacted during the first three-week exclusion and performed without Facilities Management awareness; subjected to fraudulent UA PD callout by HR in front of President Robbins without cause and with the intent to harass and intimidate; enduring an immediate campus and all-facilities exclusion order issued by Dr. Folks and Ms. Brennan without required UA PD support and on the false premise of "disruption," followed by a pretextual dismissal served eight days later by Dr. Folks and enacted without cause being provided and using an old address that had been updated in UA official systems months prior.

4. Instead of protecting and supporting Dr. Bailey by respecting his rights to freedom from retaliation under Federal law, including 34 CFR §106.71, and their own relevant Rules and policies, Defendants subjected Dr. Bailey to a carefully-orchestrated and pre-planned litany of discrimination, and retaliation by removal from his workplace and normal access to systems and facilities; repeatedly failed to respect their own and Board policies on harassment and retaliation against him and women co-complainants; denied him promotion; delivered deliberate indifference then false testimony about OIE conformance in the egregious and damaging harassment of his wife and other harassment victims including employees and students, delivered repeated coercion regarding his

well-known civil rights complaints, excluded him from office and campus for almost half of the Spring 2023 semester on pretext, defamed him as "threat" without citation of rule or policy or cause under State law, fraudulently enlisted law enforcement as an agent of retaliation against Plaintiff without cause under State law, and then dismissed him pretextually even using his previous address changed months prior, No citation of Rule or policy was provided to Plaintiff in support of any of these adverse actions, all of which were premeditated, non-procedural and intended to retaliate against Plaintiff's well-known and acknowledged protected activity. Defendants violated Plaintiff's rights while covering up evidence of the administrative role, appointments, applications and job talks of publicly-funded officers colluding to violate his rights including Defendants Drs. Berry and Deil-Amen and even subsequently enlisting Defendant Dr. Tucker, President of TITLE IX, in covering up these violations and denying his right to freedom from retaliation.

## JURISDICTION AND VENUE

5. This Court has original jurisdiction over Plaintiff's federal claims under 29 U.S.C. § 626, 28 U.S.C. § 1343, and 28 U.S.C. § 1331.

6. The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C.§ 1367.

7. Pursuant to 28 U.S.C. § 1391(b), venue lies in the District of Arizona as the events giving rise to this action occurred in Tucson and Pima County, Arizona.

## PARTIES

8. Plaintiff Keiron Bailey is a resident of Pima County, Arizona, and has lived and worked continually in Pima county since August 2003. Plaintiff was an employee of the University of Arizona from Aug 2003 until May 2023 and then again from August 2023.

9. Defendant Arizona Board of Regents ("ABOR") is the governing body of UA. The Arizona Constitution established the twelve-member ABOR as the governing body for the state's public university system, including the University of Arizona, to provide management and direction to the state's higher education institutions.

10. Defendant University of Arizona ("UA") was at all relevant times and continues to be a public educational institution in Pima County, Arizona, organized and existing under the laws of the State of Arizona and being managed by ABOR.

11. Defendants UA and ABOR are hereinafter collectively referred to as "the UA Defendants."

12. UA receives federal funding and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681(a).

13. Between July 2017 and October 1, 2024, Defendant Robert Robbins M.D. served as the President of UA ("President Robbins"). The President is appointed, managed, and can be removed, by ABOR. Defendant Robert Robbins M.D, in his official capacity, worked within Pima County, State of Arizona, and was an agent and/or employee of UA, acting or failing to act within the scope, course, and authority of his employment and his employer.

14. Between August 2019 and May 2023 Defendant Dr. Liesl Folks served as Provost and Senior Vice President for Academic Affairs. Dr. Folks currently holds a Professor post in the College of Engineering. As Provost, Dr. Folks was the chief academic officer responsible for making administrative appointments, such as appointments of deans, Heads and for managing tenured faculty members including enacting dismissal. Accordingly, Plaintiff's faculty appointment was ultimately controlled by Dr. Folks. The Provost possesses power to request deployment of UA PD in their official capacity to secure campus.

15. Defendant Dr. Andrea Romero has served as the Vice Provost for Academic Affairs (VPFA) since January 2019 ("Dr. Romero.") She holds the post of Professor of Family Studies in the College of Agriculture and Life Sciences. The VPFA manages faculty, academic personnel and policies on behalf of the Provost. As VPFA, Dr. Romero is responsible for ongoing administration of faculty appointments including resolving conflicts between faculty and their line managers at unit level (i.e. Department Head) and at College level (i.e. Deans), managing performance review, addressing and resolving targeting complaints, and conducting her office under University Handbook for Appointed Personnel (UHAP) policies including UHAP 3.02 (review) and 7.01 (Professional Conduct).

16. Defendant Dr. Robert Q. Berry was appointed as Dean of the College of Education at UA in July 2022 ("Dean Berry"). He holds the post of Professor in the College of Education and manages the staff and faculty within the College over which he possesses

purview.  As Dean, Dr. Berry is responsible for managing workload and evaluation of faculty members in the College and for ensuring policies are followed by his reports including Heads of Department.  As Dean, Dr. Berry is responsible for and subject to the provisions of UHAP as well as Board Rules in managing his reports.  Plaintiff was subject to Dean Berry's management in the College of Education between July 2022 until May 2023.

17. Defendant Dr. Regina Deil-Amen is Professor in Higher Education in the College of Education ("Dr. Deil-Amen").  She was the Head of the Educational Policy Studies and Practice (EPSP) department from 2018 to now.  In July 2023 she was appointed Associate Dean for Faculty Affairs in the College of Education, and at one point between July 2022 and February 2023 she was announced as Associate Vice Provost for Faculty Affairs with a start date stated by Dr. Deil-Amen as 1 July 2023.  As Head, Dr. Deil-Amen is responsible for managing workload and evaluation of faculty members in the College and for ensuring policies are followed by her reports.  As Head, Dr. Deil-Amen is responsible for, and subject to, the provisions of UHAP as well as Board Rules.  Plaintiff was subject to Dr. Deil-Amen's management between January 2022 and May 2023.

18. Defendant Dr. Melanie Bertrand joined UA in August 2021 as Associate Professor in the Educational Leadership and Policy (EDL) department in the College of Education ("Dr. Bertrand").  She served as Head of the EDL program from January 2022 until April 2023.  As Head of EDL, Dr. Bertrand was responsible for managing workload and

evaluation of faculty members in the College. As Head, Dr. Bertrand was responsible for, and subject to, respecting the provisions of UHAP and Board Rules. Dr. Bailey reported to Dr. Bertrand in EDL prior to Dr. Deil-Amen assuming role of manager when EDL was moved under EPSP purview however Dr. Bertrand continued to participate in the management of Plaintiff from January 2022 until May 2023.

19. Defendant Ms. Diane Brennan served as Associate Vice President of Human Resources from 2017 to October 2024 ("Ms. Brennan"). Her CV also lists the tile of Senior Leadership Advisor – Internal Leadership and Executive Coach. In this capacity Ms. Brennan oversaw and managed staff and workplace policies pertaining to staff however her remit did not include faculty management because UA maintains a separate appointment and management structure for academic personnel versus classified staff and other employees. According to UA policies, and Defendant Ms. Brennan's own direct acknowledgment to Plaintiff on 19th October 2022, HR plays no role in faculty appointment, review, or management. These are under purview of the Provost. The VP of HR possesses power to request deployment of UA PD in their official capacity to secure campus.

20. Defendant Dr. Mary Beth Tucker serves as President of TITLE IX. As President of TITLE IX, Dr. Tucker's role is to manage the Office of Institutional Equity (OIE) that is charged with investigating complaints of sexual and sex-based harassment and discrimination. Dr. Tucker plays the principal oversight and adjudication role in TITLE VII and TITLE IX compliance at UA including managing relevant policies,

administering and supervising internal complaint processes, delivering policy and Rule

compliance with respect to Federal law, and supervising contracted legal investigation

consequent to complaints before integrating such findings into UA's determinations.

21. The President of TITLE IX, Vice President of Human Resources, Provost, VPFA,

Deans and UA PD Chief are appointed, serve, and may be removed, at the pleasure of the

President.

## APPLICABLE LAW AND POLICY

22. Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 (a),

states that:

No person in the United States shall, on the basis of sex, be excluded from participation
in, be denied the benefit of, or be subjected to discrimination under any education
program or activity receiving Federal financial assistance...

23. Title IX is implemented through the Code of Federal Regulations. See 34 C.F.R. Part

106.  25 C.F.R. § 106.8(b) provides:

...A recipient shall adopt and publish grievance procedures providing for prompt and
equitable resolution of student and employee complaints alleging any action which would
be prohibited by this part.

24. In Gebser v. Lago Vista Independent School District, 524 U.S. 274 (1988), the

United States Supreme Court recognized that a recipient of federal educational funds

intentionally violates Title IX, and is subject to a private damages action, where the recipient is "deliberately indifferent" to known acts of teacher-student discrimination.

25. In Davis v. Monroe County Board of Education, 526 U.S. 629 (1999), the Supreme Court extended the private damages action recognized in Gebser to cases where the harasser is a student, rather than a teacher.

26. Davis held that a complainant may prevail in a private Title IX damages action against a school district in cases of student-on-student harassment where the funding recipient is:

a) deliberately indifferent to sexual harassment of which the recipient has actual knowledge, and

8b) the harassment is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.

27. In Jackson v. Birmingham Board of Education, 544 U.S. 167 (2005), the Supreme Court held that retaliation against a person who complains about sex discrimination is itself a form of discrimination "on the basis of sex" forbidden by Title IX.

28. The First Amendment to the United States Constitution provides that Congress shall make no law "abridging the freedom of speech." U.S. Const. amend. I.

29. In Tinker v. Des Moines Independent Community School District, 393 U.S. 503 (1969), the Supreme Court held that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."

30. In Healy v. James, 408 U.S. 169 (1972), the Supreme Court held that the First Amendment applies with the same force at public universities as at other educational institutions.

31. The Fifth Amendment to the U.S. Constitution provides that "No person shall be...deprived of life, liberty, or property, without due process of law...." U.S. Const. Amend. V.9

32. The Fourteenth Amendment to the U.S. Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

33. Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 et seq., states that it shall be an unlawful employment practice for an employer:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

34. 42 U.S.C. § 2000e-2 Unlawful Employment Practices

35. Under Title VII, 42 U.S.C. § 2000e-2, the term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person.

36. Under Title VII, 42 U.S.C. § 2000e, the term "employee" means an individual employed by an employer.

37. Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a), provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by

38. § 106.71 Procedures. The procedural provisions applicable to title VI of the Civil Rights Act of 1964 are hereby adopted and incorporated herein by reference. These procedures may be found at 34 CFR §106.71

(a) Retaliation prohibited. No recipient or other person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by title IX or this part, or because the individual has made a report or

complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this part. Intimidation, threats, coercion, or discrimination, including charges against an individual for code of conduct violations that do not involve sex discrimination or sexual harassment, but arise out of the same facts or circumstances as a report or complaint of sex discrimination, or a report or formal complaint of sexual harassment, for the purpose of interfering with any right or privilege secured by title IX or this part, constitutes retaliation.

39. ARS § 41-1464.A   Other unlawful employment practices; opposition to unlawful practices; filing of charges; participation in proceedings; notices and advertisements for employment

"A. It is an unlawful employment practice for an employer to discriminate against any of the employer's employees or applicants for employment, for an employment agency or joint labor-management committee controlling apprenticeship or other training or retraining programs, including on-the-job training programs, to discriminate against any individual or for a labor organization to discriminate against any member or applicant for membership because the employee, the member, the applicant or the individual in an apprenticeship or other training or retraining program has opposed any practice that is an unlawful employment practice under this article or has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under article 6 of this chapter."

40. ARS § 15-1864C Students Right to Speak in a Public Forum

"C. A person who is lawfully present on a university or community college campus may engage in expressive activity, including a protest or demonstration, in any area where the person is lawfully present. Individual conduct that materially and substantially infringes on the rights of other persons to engage in or listen to expressive activity is not allowed and is subject to sanction."

41. ARS § 13-2907.01 False reporting to law enforcement agencies

"It is unlawful for a person to knowingly make to a law enforcement agency of either this state or a political subdivision of this state a false, fraudulent or unfounded report or statement or to knowingly misrepresent a fact for the purpose of interfering with the orderly operation of a law enforcement agency or misleading a peace officer."

42. Arizona Board of Regents Rule 1-119 Non-discrimination and anti-harassment

"C. 4. Retaliation.  Retaliation in the context of non-discrimination and anti-harassment occurs when an adverse action is taken against an individual for engaging in protected activity. Protected activity consists of: (1) opposing conduct reasonably believed to constitute discrimination, including harassment, which violates an employment or education discrimination statute or which board or university policy prohibits; or (2) filing a complaint about such practice; or (3) testifying, assisting, or participating in any manner in an investigation or other proceeding related to a discrimination complaint. Adverse actions that are reasonably likely to deter a complaining individual or others from engaging in protected activity are prohibited."

43. Arizona Board of Regents Rule 6-914.  Protection of employees from reprisal for

15

whistleblowing

Section D: "No adverse personnel action may be taken against a university employee in knowing retaliation for any lawful disclosure of information on a matter of public concern to a public body, including a designated university officer, which information the employee in good faith believes evidences: (1) a violation of any law, (2) mismanagement, (3) gross waste or misappropriation of public funds, (4) a substantial and specific danger to public health and safety; or (5) an abuse of authority, collectively referred to herein as alleged wrongful conduct.

"No supervisor, director, chair, dean, department head, or any other employee with authority to make or materially influence significant personnel decisions shall take or recommend an adverse personnel action against an employee in knowing retaliation for disclosing alleged wrongful conduct to a public body. Any employee found to have so violated this Policy shall be disciplined, up to and including termination, in accordance with existing university rules, policies, and procedures."

## FACTUAL ALLEGATIONS

44. Dr. Keiron Bailey is Associate Professor in Research, Innovation and Impact since August 2023. Previously Dr. Bailey was a faculty member at UA in the School of Geography, Development and Environment, holding posts of Assistant and then Associate Professor between August 2003 and August 2020 and then Associate Professor in the College of Education between August 2020 and May 2023.

45. Dr. Bailey's professional record and educational achievements are impressive.

46. Dr. Bailey holds a doctorate degree in Geography from University of Kentucky, a Master of Arts degree in Geography from University of Hawai'i, Bachelor of Engineering degrees and Geography and Mechanical Engineering from University of Birmingham.

47. Dr. Bailey's work has been acknowledged by research awards from bodies including the Transportation Research Board and Southeastern Division of the Association of American Geographers.

48. Dr. Bailey's work has been repeatedly referenced in trade publications and media as well as over 1,000 times in peer review research articles.

49. While pursuing his doctorate at University of Kentucky, Dr. Bailey twice won the Southeastern Division of the Association of American Geographers PhD Student award.

50. In addition to his academic credentials, Dr. Bailey has more than twenty five years of experience working directly with transportation, planning, GIS and resource management professionals.

51. Prior to his work at UA, Dr. Bailey worked as a Visiting Professor at Tokyo Jogakkan University, and as Teaching Assistant at University of Kentucky and University of Hawai'i where he taught GIS labs and classes as well as Geography classes.

52. During and after his undergraduate degrees, Dr. Bailey had worked in the commercial aviation industry and then the oil exploration business.

53. Throughout his career, Dr. Bailey has authored and co-authored numerous scholarly articles, a book, a number of book chapters, and professional and refereed reports in his area of expertise.

54. Dr. Bailey is well-known within his academic community, and regularly attends events and speaks at national and international conferences and delivers workshops, seminars and invited presentations on the Structured Public Involvement method he innovated as well as on Geographic Information Science more broadly.

55. In addition to his duties at UA, Dr. Bailey has participated in numerous committees both within and outside of UA ranging from Graduate Student Orientations for the College of Social and Behavioral Sciences, to University Undergraduate Council to the GIS Certificate and Geographic Information Science and Technology (GIS-T) Programs.

56. Dr. Bailey also serves as a referee and mentor for students at UA including numerous Honors student and scholarship winners.  He has supported an unusually large number of Outstanding Student nominees at undergraduate level with letters of support and directed studies.  He has provided several hundreds of students with professional support in the form of postgraduation references for employment and scholarship opportunities.  He has received numerous unsolicited testimonials from students years after their graduation thanking him for the quality of his classes, his ongoing support for their professional development and his assistance in realizing their goals.

*History of Civil Rights Complaints and concerns with campus safety*

57. Between 2004 and 2023 Dr. Bailey had demonstrated his commitment to make UA campus safer for students, staff and faculty by numerous actions including reporting concerns raised by staff and students who were too worried about retaliation to make their comp;aints while safeguarding their anonymity in the hope that timely information would enable a safer campus as well as seek UA PD intervention in situations that presented risk.

58. In the light of the appalling crimes enacted against former student-athlete Ms. Baillie Gibson by Coach Carter of UA, some of which were discharged in his campus office and that resulted in the eventual incarceration of Coach Carter, Dr. Bailey had grown increasingly concerned with UA risk management and civil rights violation reporting systems. He was particularly concerned with risk reporting that was subject to denial of process by Conflicts of Interest (COI), as implemented in gaslighting of complainants, mischaracterization of clear risk, and evident coverup during earlier complaint handling in Ms.Gibson's case as well as those of other student-athletes, students, and staff.

59. Beginning prior to 2010, Dr. Bailey raised process and workplace concerns and provided written, concrete and constructive suggestions to former Presidents Shelton and Weaver-Hart and President Robbins as well as former Interim Provost Goldberg for more reliable workplace and campus risk management systems, such as implementing an ombud appointed by a mechanism outside of administration control and influence and free of conflicts of interest and commitment, to canvass, survey, report on and

communicate safety and workplace risk concerns in a timely way with the goal of identifying issues before they escalated in ways damaging to everyone.

60. In 2015 Dr. Bailey stated in response to the Dean's Five Year Review survey that he declined to provide a commentary on Dean Jones on the grounds of Dean Jones' known and damaging capacity for abuse of office and retaliation. Dr. Bailey suggested UA follow a model of externally-appointed auditors for senior administration reviews where the administrators held significant power over the employees from whom these evaluations were being requested. There was no response.

61. Dr. Bailey's concern with, and commitment to, campus safety and compliance was well-known and well-demonstrated by 2017.

62. Over a period of years, he reported these same concerns and suggestions numerous times in response to surveys conducted by administration during searches for Provosts, Deans and other officers, including the search for Dean of the College of Education in 2022. There was no response from any administrator to any of these submissions.

63. In December 2017 Dr. Bailey's Dean, Dean Jones, invaded their home by electronic communication at 1am on a Sunday morning as Dr. Bailey and his family were sleeping and he delivered a series of extreme professional and personal threats to his wife Dr. C including threats to terminate her employment, to terminate the employment of co-workers, and to discharge lethal self-harm. This event was shocking, deeply violatory, frightening and profoundly distressing for all of his family. Dr. Bailey thought there had been a death in the family when he was woken by his wife in a condition of terror,

speechless and crying. This event initiated a profound fear of UA's management and their propensity to violate a woman in her family home at 1am in the name of "work."

64. Dr. Bailey and his wife immediately reported this severe harassment to President Robbins via his official web contact form, and to the former Provost Dr. Comrie, and Dr. Burd by email. No mandated reporting was performed, no OIE acknowledgment delivered, and no safeguarding undertaken then, or ever.

65. During the complaint followup meeting for Dr. C with former Provost Dr. Comrie, the first question that former Provost Dr. Comrie asked Dr. C was "Was he drunk?"

66. A letter of apology was authored by the harasser Dean Jones and sent to Dr. C with Drs. Burd and Comrie copied. This took place without the required mandated harassment reporting and safeguarding being performed and without OIE or other compliance actions. In this way the harasser took charge of his own complaint handling process and colluded with these other officers to classify this grossly violatory harassment as UA's "work," reinforcing his malevolent power and corruption of systems.

67. At this time Dr. Bailey worked in the School of Geography, Development and Environment (SGDE) in the College of Social and Behavioral Sciences (SBS) under the management of Dean Jones as well as higher ranking Full Professors including the Dean's domestic partner Dr. Marston and his friends Drs. Comrie and Liverman.

68. Dr. Comrie stepped down from the Provost post in February 2018 and returned to a position as Full Professor in SGDE. Later Dr. Comrie was appointed to the ABOR post of Chief Academic Officer.

69. Dr. Bailey was deeply concerned with the criminality of this action and the noncompliance that clearly facilitated and condoned it. Dr. Bailey sought to resolve COI and risk via a transfer of reporting away from the harasser and his enablers. He requested this transfer in the complaint sent to President Robbins hours after the event and repeated this numerous times afterwards to then–Vice Provost for Faculty Affairs (VPFA) Dr. Tom Miller, then-Provost Dr. Comrie, then-Interim Provost Dr. Goldberg, and then Defendants VPFA Dr. Romero (from February 2019) and former Provost Dr. Folks (from July 2019).

70. Dr. Bailey met with Dr. Miller on several occasions to follow up on transfer and safeguarding. Dr. Miller changed the title of his email from Harassment of My Family to Your Concerns about Your Annual Review. Dr. Bailey immediately responded and called out this gaslighting. Dr. Bailey stated to Dr. Miller that the problem was the Dean's severe criminal harassment and that the concerns extended far beyond the review process.

71. Dr. Miller then used the same classification of this harassment as "work" that had been used by Drs. Comrie, Burd and Jones himself, at the same time acknowledging this "work" was "distressing," to deny Dr. Bailey's transfer request.

72. Dr. Bailey informed his Department Head Dr. Staeheli and Acting Head Dr. Liverman by email of the harassment, its damaging consequences for him and his family, and his goal of securing transfer to reduce retaliation risk.

73. At the 2018 School graduation ceremony Dr. Liverman stated to Dr. Bailey "It's a shame about the drink," referring to Dr. Jones' alcohol abuse problem and his widely-known misconduct that was known to many on campus including administrators.

74. In April 2018 Dr. Bailey wrote Ms. Vaillancourt of HR and former Interim Provost Dr. Goldberg reiterating his desire for transfer and concerns about his Dean's actions as well as the validation of the egregious harassment as "work."

75. Dr. C was deeply frightened not only by the abusive and terroristic invasion of her home by this drunken and abusive and dangerous man but also by his power to cloak himself in his State-funded appointment to coverup and deny safeguarding by colluding with his enablers to subvert harassment handling procedures and reinforce his malevolent abusive power by characterizing his criminality as "work." She worked in continual fear of interacting with Dean Jones and his enablers for the remainder of her time at UA. This constant stress affected her life at home and her relationship with Dr. Bailey. She experienced ongoing episodic terror before driving to work, fear at workplace meetings involving the harasser, as well as sleep disturbance and loss of amenity in her home.

76. In October 2018 Dr. Bailey completed a UA Harassment Training module. This was a component of required Harassment Training for UA employees and consisted of a set of slides summarizing TITLE VII law and responsibilities to report discrimination and harassment as well as not engage in retaliation against complainants e.g. in this module President Robbins' image appeared next to the text stating "We do not tolerate any form of discrimination or harassment" (slide #1), "discrimination and harassment are against

the law," "employees who engage in discrimination and harassment will be subject to discipline" (slide #2), "Liability for Our Institution: How *you* deal with discrimination and harassment issues will be considered our *institution's response*" (slide #3, emphasis in original), "Supervisor responsibilites…Avoid retaliating against anyone who has made a good-faith complaint" (slide #4).

77. This training module also addressed institutional liability by stating: "Documenting employee actions. Employment actions that you take today could be called into question weeks, months, or maybe even years from now. Even though these actions seem perfectly reasonable now, they could look vastly different if circumstances change unforeseeably in the future. Proper documentation of your actions will also help you make better decisions, ensure clear communication with the employees you supervise, and perhaps make the difference between costly litigation for our institution and no litigation at all" (slide #16).

78. Dr. Andrea Romero assumed the post of Vice Provost for Faculty Affairs in 2019. Between December 2017 and July 2020, Dr. Bailey made strenuous efforts to secure a transfer of reporting to reduce the risk to himself, his family, and the institution from further criminal behavior from his Dean and the Dean's domestic partner, friends, and allies in the SGDE department. The previous VPFA Dr. Tom Miller and current VPFA Dr. Romero engaged in a charade of meetings and discussions during which various versions of the transfer proposal were presented to Heads of Departments and that were subject to change without Plaintiff's knowledge. Dr. Bailey interviewed and auditioned

with eight separate departments during this time, an arduous process necessitated by risk of retaliation. Repeated denials were premised on lack of fit or inconsistency in transfer funding undertakings. In 2019, in one instance, VPFA Dr. Romero falsely stated she would apprise a Department Head of the situation to facilitate transfer, however, Dr. Bailey discovered this had not happened. Dr. Romero apologized to Dr. Bailey for this bad faith, nevertheless, the situation did not improve. This burden affected Dr. Bailey's capacity.

79. Following the 2019 SBS Graduation Ceremony Dr. Bailey learned that Dean Jones had indulged and encouraged drunken misconduct by students, and that several women staff members were traumatized by his actions in egging on their disruptive and disturbing behavior at this function. Several women staff told this to Dr. Bailey and noted their fear of Dean Jones' well-known retaliatory impulses. Dr. Bailey reported their concerns to Dr. Goldberg and Defendant Dr. Romero in writing. There was no response.

80. By mid-2019 it became clear to Dr. Bailey that UA had no intention either of protecting and safeguarding his wife and other women on campus, nor of holding Dean Jones accountable in spite of his known history of alcohol abuse while working, widespread concern among women staff and faculty about his misconduct, and the pattern of discriminatory and harassing actions that dated back years including a sanction for sexual harassment at his previous institution the University of Kentucky and a pattern of behavior at UA that even continued after these complaints. Dr. Bailey developed

hypervigiliance with respect to UA and Board policies as a result of these flagrant violations and he spent considerable time researching, learning and documenting these policies and Rules and requesting compliance.

81. For the same reasons Dr. Bailey was developing the concern that the Office of General Counsel were aware of the actions and inactions of administration. At a meeting with Dr. Romero he asked her if she consulted with the Office of General Counsel and she acknowledged meeting with OGC each time after meeting with him.

82. Dr. Liesl Folks was appointed as Provost at UA in July 2019. She made a brief phone call to Dr. Bailey from a number flagged as "RESTRICTED" during which Dr. Bailey reiterated his concerns including the ongoing and uncorrected danger posed by Dean Jones as well as risk of retaliation against himself. Dr. Bailey wrote Dr. Folks on 15th August 2019 expressing his concerns about hostile working environment and the uncorrected risk presented by Dean Jones to women. There was no further communication of any kind from Dr. Folks until October 2022 despite Dr. Bailey reiterating his concerns in writing on a number of occasions during that time.

83. On 12th November 2019 Dr. Bailey sent certified mails to President Robbins, General Counsel Ms. Todd Johnson and ABOR under Rule 6-914 detailing the criminal nature of this harassment and its facilitation via systems intended to protect employees from harassment as well as from damaging consequences for reporting these violations. There was no response to any of these complaints from any of the UA officers to whom these were sent.

84. In December 2019 Dr. Bailey received a letter from ABOR's General Counsel acknowledging wrongful conduct pursuant to his Rule 6-914 disclosure. Dr. Bailey was informed he was entitled to seek legal reddress. The Board proposed no safeguarding actions and no correction for the abuse. The Board encouraged Dr. Bailey to continue to work with Dr. Romero to secure his transfer.

85. During this time both Dr. Bailey and his family experienced diminished amenity in their home. The redefintion of UA's "work" to include such invasive and destructive violatory harassment into the sacred space of their home at night caused Dr. Bailey and his family sleepless nights and ongoing stress.

86. The evident corruption of the mechanisms of oversight and safeguarding and indulgence of violation by administrators also became an increasing concern during the daytime. Dr. Bailey stated that he would not attend Faculty Meetings to avoid conflict with the abuser of his family and the enablers including former Provost Dr. Comrie who had returned to an appointment in SGDE. Drs. Liverman and Romero agreed. Dr. Bailey's professional care in proactively avoiding conflict and reducing workplace risk despite having no role in triggering this risk was not reciprocated by limitations on the conduct or liberty of the abuser and his allies.

87. Dr. Bailey was eligible to apply for promotion to Full Professor in 2017. The harassment and its validation by the Dean and his enablers in SGDE, including the actions of former Provost Dr. Comrie, caused him to believe no fair evaluation would be

delivered.  He therefore delayed this application until after his transfer to another

College.

88. In December 2019 Dr. Bailey met with Dr. Liverman and Dr. Romero to discuss his

efforts to transfer and establish ongoing risk reduction measures to avoid the damaging

and unnecessary consequences of retaliation.

89. In early 2020 Dr. Bailey learned from a former woman faculty member in his

department of her own retaliatory dismissal following complaints about Dean Jones and

his friends.  The pattern of violation of policies, evasion of accountability, and denial of

safeguarding leading to the termination of employee was similar to the situation his wife

experienced.  Dr. Bailey learned that Dean Jones was the author of her dismissal.  Dr.

Bailey informed Defendants Drs. Folks and Romero in writing of this new discovery and

the ongoing risk posed by Dean Jones.  There was no response, despite these Defendants'

mandated reporting and safeguarding responsibilities.

90. In January 2020 Dr. Bailey was appointed by Dr. Romero to the University's

Fostering A Respectful Workplace (FARW) Taskforce.  Dr. Bailey at first saw this as an

opportunity to address the numerous concerns shared by he and others at UA and deliver

improvement via stronger compliance.  He shared his Rule 6-914 complaint and the

Board's wrongful conduct response with the Taskforce.

91. A number of FARW participants wrote Dr. Bailey in private thanking him for taking

a courageous stand against harassers and abusers of office and sharing their own stories

of violations and coverup as well as ongoing fear of unchecked abuse of office by the

perpetrators.  Several described losing faith in internal processes because of their experiences of coverup of malfeasant actions, a failure to act and a failure to safeguard from further abuse and retaliation.

92. Dr. Bailey was called by Dr. Romero on his cellphone to discuss participation in FARW.  Dr. Bailey informed Dr. Romero that the Board had issued a wrongful conduct verdict and she expressed surprise, asking him to repeat.  Dr. Romero's earlier enthusiasm to engage Dr. Bailey in discussion and process vanished.  After this conversation Dr. Romero never talked with Dr. Bailey again despite her receiving a number of emails and notifications of abuse of process under her aegis as Vice Provost for Faculty Affairs.

93. The FARW taskforce wound down during the early covid period and the final output was steered by administrative representatives into a limited Powerpoint slide output process despite a number of participants expressing their disappointment that such a committee that could have had useful impact in safer workplace was being run as a sham. FARW members shared their disappointment with Dr. Bailey that more could not be done because of administrative resistance to addressing the core issues of risk, harassment and discrimination.  Dr. Bailey agreed with these participants.

94. In June 2020 Dr. Bailey and two women, former UA employees both of whom were nonrenewed following their own complaints against Dean Jones, filed a complaint with OCR (08-20-2275) about discrimination and criminal harassment and retaliations they had experienced and the damages consequent to these violations.  Dr. Bailey informed

former Provost Dr. Folks, Dr. Romero, Ms. Todd Johnson and President Robbins of this filing via their official emails. There was no response.

95. Dr. Bailey informed all SGDE faculty on the faculty mailing list of his concerns regarding TITLE IX violations and the criminal conduct of his Dean and the damaging effect this harassment and its coverup had on his family. He restated UA and Board policy on harassment reporting and retaliation as well as State Law on Harassment by Electronic Communication and the Board's wrongful conduct acknowledgment. Dr. Bailey used similar verbiage used by Dr. Liverman, Department Head who had expressed outrage at the civil rights violations inflicted on Mr. George Floyd and circulated to all faculty one day prior. Dr. Bailey was removed immediately from this mailing list for "inappropriate" use of the list. Dr. Liverman stated she "took advice" prior to enacting this removal.

96. The complaint OCR 08-20-2275 was evaluated and forwarded to EEOC in August 2020, however, when Dr. Bailey called Ms. Miner of EEOC Phoenix and explained the situation, he was informed that the events in the complaint were timed out and therefore the complaint would not be actionable. Complainants were denied justice and the violations enumerated in this OCR complaint remain unaddressed and unactioned to this day.

97. In August 2020 Dr. Bailey was transferred to the EDL department in the College of Education, initially under the management of Dean Bruce Johnson and Dr. Kris Bosworth who was then Head of EDL.

98. Dr. Bailey anticipated denial of promotion as one form of retaliation for his complaints. Prior to signing the transfer, he raised this concern with VPFA Dr. Romero and she responded in writing "You should have no problem with that." He signed the transfer on this basis.

99. Dr. Bailey started teaching and other duties in this new role in EDL in January 2021.

100. In April 2021 during a scheduled accreditation forum, Dr. Bailey complained to the accreditation officers of Higher Learning Commission (HLC) of the harassment, discrimination and retaliation enacted against the women co-complainants as well as the ongoing lack of process and safeguarding. Reviewer Dr. Das acknowledged that TITLE IX concerns were under HLC accreditation purview and invited Dr. Bailey to share his concerns in writing. Dr. Bailey did so.

101. Dr. Bailey worked under Dean Jones for the period 2015-2020. Deans are subject to Five Year Reviews. Later in 2021 Dr. Bailey presented a Five Year Review for Dean Jones to Defendants former Provost Dr. Folks and VPFA Dr. Romero in which he reiterated his long-running and well-documented concerns that Dean Jones was a "TITLE IX time bomb" and that women on campus needed to form their own collectives to ensure their safety from his known and facilitated abuse. There was no response.

102. In August 2021 Dr. Melanie Bertrand was hired and she assumed the Head of the EDL Department effective January 2022 after Dr. Bosworth stepped down.

103. Like many students, staff and faculty at UA, Dr. Bailey had great respect for the professionalism and integrity of Dr. Thomas Meixner of Hydrology with whom he had

collaborated.  On a number of occasions between 2020 and 2022 Dr. Bailey talked with

Dr. Meixner about the harassment of his family and his ongoing compliance concerns at

UA.  Although Dr. Meixner stated that he believed in UA's mission and regarded himself

as a dedicated and loyal researcher, Dr. Meixner found this shocking and he did not

understand why safeguarding was not performed according to UA and Board policies.

He asked if Dr. Bailey had informed VPFA Dr. Romero.  Dr. Bailey stated he had

informed three Provosts, two VPFA's including Defendant Dr. Romero, the OGC,

President Robbins, the Board, the HLC accreditors, OCR, EEOC, and DoJ Civil Rights

Division.  Dr. Meixner was deeply disturbed by this.  He agreed that the timing, location,

type of harassment and coverup were egregious and said if this were directed against his

family he would probably follow a similar course of action.

104. In early 2022 EDL faculty were informed that EDL would be integrated into the

EPSP department.  EPSP Head Dr. Regina Deil-Amen assumed responsibility for certain

management tasks while Dr. Bertrand continued to manage EDL's daily operations and

shared in these other responsibilities.

105. Dr. Bailey informed the incoming junior faculty in his unit (Drs. Demps, Nguyen

and Bertrand) so they were aware of the criminal harassment of his family and the lack of

safeguarding and civil rights compliance at UA.

106. In April 2022 Dr. Bailey attended the interviews for the post of Dean of the College

of Education.  Four finalists delivered job talks.  Dr. Bailey asked the same civil rights

and policy safeguarding questions of each of the four candidates.  Three candidates

demonstrated knowledge and awareness of mandated reporting in their responses. Dr. Berry did not.

107. Each of their job talks was recorded on Zoom and a reaction form was provided for faculty and staff to provide feedback. These links were shared with CoE faculty as Vision Talk recordings together survey data on each of the candidates by Ms. Rachel Barton of the College of Education in an email to the Coe-biz listserv dated 28th April 2022.

108. Several public records requests were made by different individuals for the CV's, application letters and job talks of finalists for the post of Dean of College of Education in 2022. These were each returned with the claim that "The University does not possess any records responsive to your request." (PR 2023-0090 and others). In the official response to these requests, each time Public Records Coordinator Ms. Kim Fassel stated on behalf of the Board that "In providing this information to you, your public records request is fulfilled and closed in accordance with Arizona public records laws."

109. A member of the public sought assistance from the Arizona legislature following the first denial of possession of responsive records in the belief that UA was violating its obligations under public records law. She received a response from Ms. Paula Gates at the Board of Regents that stated "We have shared your message with the university for their review. I understand they have responded that the university has no responsive records for one request as the university used a search firm to conduct the search for the college of education post you referenced." The stated rationale of use of a search firm to

shield such records from disclosure is inconsistent with responses delivered in other cases e.g. Exhibits furnished in the Abraham vs Board public records trial in Pima Superior Court in September 2023.

110. Dr. Robert Q Berry was selected for Deanship of the College of Education and began his appointment in July 2022.

111. Dr. Bailey filed his application for promotion to Full Professor in July 2022.

112. At this time Dr. Bailey learned of severe sexual harassment from a former SBS graduate student that was enacted by a report of Dean Jones. She stated she did not dare to complain because she would get fired. Dr. Bailey presented this complaint to Defendants Drs. Folks and Romero but again there was no acknowledgment or response.

113. Adverse actions by Defendants against Plaintiff began in July 2022 when Dr. Bailey received his 2021 Annual Performance Review from Dr. Deil-Amen. This review was delivered months later than normal, during non-contract time, and the review was targeted to deliver unwarranted low evaluation. Features of this review included total omission of 75 percent of his teaching from consideration, the selective use of only negative comments from one class without consideration of positive comments, wilful denial of research expectations as stated earlier by Dr. Deil-Amen to Dr. Bailey, personal commentary on Dr. Bailey's intelligence, and his "negative impact on workplace climate."

114. Prior to this review Dr. Bailey had received eighteen previous Annual Performance Reviews at UA which contained Meets or Exceeds Expectations or Truly Exceptional in

all categories of Teaching, Research and Service.

115. In this review Dr. Deil-Amen stated in writing that she did not agree with Dr. Bailey's appointment before it was enacted and that the Dean did not have full information.

116. Dr. Bailey met with Dr. Deil-Amen in July 2022 and expressed his concerns about the content of this review as well as the stated motivation. Dr. Deil-Amen acknowledged his point about her earlier statement of research expectations and changed the narrative in the review but she did not change the category accordingly.

117. Dr. Deil-Amen raised what she termed a problem that Dr. Bailey had a "hidden agenda" that was outside of, and in opposition to, his workplace duties. Dr. Bailey reminded Dr. Deil-Amen that compliance was everyone's job and that every employee at UA was mandated to respect and conform to civil rights protection rules by means of relevant UA policies and Board Rules including UA200, UHAP 7.01, Board Rule 1-119 and 34.CFR § 106.71 as stated in the terms of appointment and mandatory trainings.

118. Dr. Bailey stated to Dr. Deil-Amen that he believed this coercion was premised on his well-known civil rights complaints and protests of discrimination that constituted protected activity under 34.CFR § 106.71 and that such an "agenda" was therefore his and everyone's job. Dr. Bailey stated that his commitment to upholding civil rights was not in the least hidden because by this time almost every administrator and colleague and many on campus and outside as well as the accreditation body and civil rights agencies were aware.

119. Dr. Bailey asked if there was anything other than these civil rights complaints that she wanted to address. Dr. Deil-Amen stated that Dr. Bailey "inhabited the black skin" and that this was problematic for his workplace conduct. Dr. Deil-Amen did not define what she meant by "inhabiting the black skin" nor did she support this statement with reference to any UA policy or Board Rule.

120. Dr. Bailey admires and takes inspiration from the iconic stand of athletes Tommie Smith, Peter Norman and John Carlos. He regularly wears a shirt depicting their famous stand for civil rights on the 1968 Olympic 200m victory podium. He also uses this picture as his Zoom background and has their picture on his office door. This is the only imagery he displays and uses at UA and he has done so for years.

121. It is well known in the community that Dr. Bailey has followed the example of these athletes in image and deed for many years in many locations to protest discrimination including publicly protesting the threatened exclusion of aboriginal athlete Cathy Freeman by the Australian team manager Mr. Tunstall from the 1994 Commonwealth Games on the basis of her display of the aboriginal flag as well as having their poster on his bedroom wall when younger. He routinely wears this same T-shirt to high school and college track meets and Faculty Senate meetings as well as in the office and around campus and this imagery is frequently lauded by those he meets on and off campus.

122. Many other UA faculty in College of Education and across campus use and display civil rights imagery on apparel, Zoom backgrounds, office doors and in other locations on campus including noticeboards. They do so with approval and without discipline.

123. UA has no dress code for faculty

124. Between 2022 and 2023 Dr. Bailey's use of civil rights imagery, specifically and only the display of the imagery of Tommie Smith, Peter Norman and John Carlos, was used as a platform to support the adverse actions administered by Defendant Dr. Deil-Amen and validated by Dean Berry, Dr. Folks and Ms. Brennan, and manifested in racist stereotyping using skin color that violates State law, unwarranted negative performance review and baseless coercion during meetings as well as appearing in OGC-authored legal response to his allegations.

125. Dr. Bailey expressed concern to his EDL Head Dr. Bertrand about being targeted in a coordinated way for his protected activity and having managers enlisted to deliver these retaliations via coercion from the Head of EPSP or Provost's office. Dr. Bertrand failed to engage with his concerns and stated "Good luck with that."

126. Before filing his response to the 2021 APR, Dr. Bailey sought feedback on this review from multiple senior faculty outside the College of Education. They noted abnormal process and concern for targeting and retaliation.

127. Dr. Bailey appealed this review under UHAP 3.2.03 (rev June 2022) by writing a summary of targeting aspects and requesting corrective measures per policy. He sent this to Drs. Folks and Romero on 12th August.

128. UHAP 3.2.03 states: "The administrator reviewing the appeal will consider the facts in support of the appeal and develop any additional facts deemed necessary. The decision on the appeal will be completed in writing within 30 days, with copies provided to the

faculty member and the unit or other immediate administrative head involved in the initial annual performance review. This decision is final and not subject to further appeal." Despite this policy specification, there was no acknowledgment or response from Defendants Drs. Folks and Romero then, or ever.

129. On 14th September 2022 Dr. Bailey met with new Dean Robert Q. Berry for a scheduled management meeting. Dr. Bailey explained his concerns, noted that he was being targeted by his manager Dr. Deil-Amen, and requested that Dr. Berry familiarize himself with relevant UA and Board Rules including 1-119. During this conversation Dean Berry stated that he was new in the Dean's post, that he was not aware of the details of Dr. Bailey's transfer but only that he had heard some things. Dean Berry stated he had read Dr. Bailey's 2021 review which Dr. Bailey stated he believed was targeted and retaliatory. Dean Berry then demonstrated his profound unease with this situation by stating "Whoa.. this is big, right!" and then "I'm not sure I want to see that" when Dr. Bailey offered to provide background information about transfer.

130. Dr. Bailey specifically asked Dean Berry to reconsider Dr. Deil-Amen's role in his management because of the targeting concerns. This is normal procedure at UA in cases where there is COI or a manager is believed to be invested in targeting. This COI relief has been performed on numerous occasions, for example Dr. Bailey had such a review re-performed in 2019 at the direction of Dr. Romero and a former EPSP Head Dr. Rhoades stated that he had himself performed such COI relief and gave examples. Numerous other faculty stated this was normal practice and they had such experience.

131. Dr. Bailey explained to Dean Berry in writing his concerns about Dean Berry's enlistment in knowing violation of his rights including by means of administrative coercion using College resource allocations under Provost's purview or coercions directed at his own Deanship. Dr. Bailey suggested that Dean Berry take two weeks to review the applicable UA policies and Board Rules before meeting again and gave specific policy references. Dean Berry stated he would do so.

132. Dr. Bailey sent a reminder two weeks later. Dean Berry sent an acknowledgment of receipt to Dr. Bailey's followup but he never addressed these concerns despite his statement of "you deserve a response" on 14th September. Then he failed to respond to a number of followup emails sent by Dr. Bailey over the next eight months.

133. On 23rd September 2022 Dr. Bailey filed a complaint with OCR (08-22-2345) naming Drs. Folks, Romero and Deil-Amen as well as OGC for retaliation against his civil rights complaints. Dr. Bailey informed OCR he had not named Dean Berry as an author of violation at that moment and that he had given Dean Berry the opportunity and information needed to make an informed management decision to respect UA and Board policies on targeting civil rights complainants. In this complaint and his conversation with Dean Berry Dr. Bailey accurately anticipated the sequence of escalating retaliatory actions that were intended to deliver his removal from his tenured post.

134. On 23rd September Dr. Bailey filed a complaint with the Department of Justice Civil Rights Division and the National Science Foundation OECR that included the numerous unactioned harassments and stated his concern that a number of officers at UA were

engaged a conspiracy to violate rights by retaliating against him for raising these complaints. Dr. Bailey simultaneously copied this complaint to Defendants Dean Berry and former Provost Dr. Folks. There was no response from any of these administrators.

135. Between 23rd and 30th September Dr. Bailey and a number of women victims of unactioned discrimination and harassment at UA filed complaints with the Department of Education and Department of Justice Civil Rights Division about the numerous acts of discrimination, harassment, retaliation and the orchestrated coverup.

136. Dr. Bailey emailed Dean Berry reminding him of the previous agreement to meet again after researching policies and absorbing the information provided. Dean Berry acknowledged the email but never responded to this again, nor did he address any of the concerns raised nor did he set up another appointment to discuss any of these concerns. He never met with Dr. Bailey again.

137. In October 2022 it became clear that Dean Berry was deliberately refusing to address Dr. Bailey's concerns. Board Rule 6-914 E(2) prohibits: "An employment-related act or decision or a failure to take appropriate action by a supervisor or higher level authority which affects an employee negatively."

138. Dr. Bailey named Dean Berry to his OCR retaliation complaint (08-22-2345) following the Dean's failure to respond and deliver safeguarding from management retaliation enacted under his purview and with his knowledge. Dr. Bailey informed Dean Berry that his actions were referred to OCR.

engaged a conspiracy to violate rights by retaliating against him for raising these complaints. Dr. Bailey simultaneously copied this complaint to Defendants Dean Berry and former Provost Dr. Folks. There was no response from any of these administrators.

135. Between 23rd and 30th September Dr. Bailey and a number of women victims of unactioned discrimination and harassment at UA filed complaints with the Department of Education and Department of Justice Civil Rights Division about the numerous acts of discrimination, harassment, retaliation and the orchestrated coverup.

136. Dr. Bailey emailed Dean Berry reminding him of the previous agreement to meet again after researching policies and absorbing the information provided. Dean Berry acknowledged the email but never responded to this again, nor did he address any of the concerns raised nor did he set up another appointment to discuss any of these concerns. He never met with Dr. Bailey again.

137. In October 2022 it became clear that Dean Berry was deliberately refusing to address Dr. Bailey's concerns. Board Rule 6-914 E(2) prohibits: "An employment-related act or decision or a failure to take appropriate action by a supervisor or higher level authority which affects an employee negatively."

138. Dr. Bailey named Dean Berry to his OCR retaliation complaint (08-22-2345) following the Dean's failure to respond and deliver safeguarding from management retaliation enacted under his purview and with his knowledge. Dr. Bailey informed Dean Berry that his actions were referred to OCR.

139. In October 2022 Dr. Bailey filed a written complaint of violation of rights by Defendants with the Arizona Attorney General's office.  ABOR Rule 6-914 explicitly specifies the Attorney General's office as a "public body" to which complaints about abuse of office and unlawful conduct by UA officers can be filed.  He received a call back and was informed that AG could not investigate the complaint because of conflict on the grounds that UA was a state entity despite the fact that at this same time AG's office was investigating law enforcement abuses and civil rights violations including within Pima County.

140. On 5th October 2022 Dr. Bailey's friend and colleague Dr. Thomas Meixner was murdered in his campus office.  In the weeks that followed, UA and the larger community expressed anger, outrage and frustration at UA's lack of response to notifications of this risk that included numerous death threats sent to faculty and staff over a period of months prior.  Dr. Bailey joined the hundreds of people who expressed their outrage at this predictable and unnecessary lethal event by complaining to administration about negligent risk handling.

141. The General Faculty Committee on Campus Safety for All was commissioned by Chair of Faculty Senate Dr. Hudson in October 2022 to investigate the events leading up to the murder of Dr. Meixner and identify problem areas.  The Committee's interim report found that among other key issues one major concern across campus was "institutional neglect of a known chronic problem of distrust."

142. The General Faculty Committee on Campus Safety for All resigned en masse before

completing a final report in February 2023 stating their concerns about management stonewalling and for retaliation of "hard" and "soft" forms. AZPM reported that "Members chose to conclude the investigation due to fears of retribution and the inability to engage in in-depth discussions with relevant units and noting that the committee concludes its letter by saying, "there are no indications that any steps will be made to address the concerns outlined in the Interim Report…They raise meaningful concerns regarding the University leadership's attitudes toward safety, organizational culture, stakeholders, and accountability."

143. The Pax report subsequently commissioned by President Robbins found numerous safeguarding failures and called Dr. Meixner's death "foreseeable." One of the concerns elaborated in this report was fear of administrative retaliation against complainants, even those receiving death threats, creating a chilling climate for students, staff and faculty that inhibited campus safety.

144. Dr. Folks sent Dr. Bailey a "Professional Communications Directive" requiring that he limit his communications to matters related to work at hand. Dr. Bailey responded that he was finally appreciative of the opportunity to discuss the definition and nature of the "work" of the University of Arizona with Dr. Folks after three years and three months of silence on her part. Dr. Bailey again stated he desired to resolve the legal and policy contradictions in the prevailing definition of UA's "work." He asked Dr. Folks to clarify why the sex-based terms of harassment and threats to employment and persons as used against his wife in their home at 1am on a Sunday by Dean Jones constituted UA's

validated "work" yet were acknowledged by the Board as wrongful conduct under Rule 6-914 and without correction. There was no response.

145. On 13th October Dr. Bailey sent EDL Head Dr. Bertrand an email explaining his concerns about the management of Dean Berry and Dr. Deil-Amen, the targeted review, denial of recourse, the abnormal pattern of management and the concern about conspiracy to violate rights including the cooptation of Dean Berry into discharging these violations. Dr. Bertrand responded and stated: "Thanks very much for getting back to me. I appreciate it. Take care."

146. On 19th October Dr. Bailey and Dr. Matthew Abraham, another well-known civil rights complainant at UA, met remotely with Ms. Helena Rodrigues, President of HR and Ms. Diane Brennan, Associate Vice President of HR. Both Dr. Abraham and Dr. Bailey had direct experience with filing Rule 6-914 "whistleblower" complaints and they desired to address concerns with the handling of complaints via this channel of last recourse including lack of documentation of complaint handling channels and COI handling.

147. Ms. Brennan stated that UA took sexual harassment very seriously. Dr. Bailey indicated his disbelief of this claim considering the repeated events. Dr. Bailey again presented the graduate student's account of severe sexual harassment and highlighted this involved Dean Jones' friend and occurred under the purview of Dean Jones. Ms. Brennan stated that if the graduate student was a current student action should be taken. Dr. Bailey pointed out that the posted sexual harassment policy on HR's own website

specifically contained no statute of limitation on mandated reporting or safeguarding response. Ms. Brennan stated that Dr. Bailey knew the policies better than some of her own HR employees.

148. Neither Ms. Rodrigues nor Ms. Brennan addressed or responded to this harassment report. Neither Dr. Bailey who reported the harassment, nor the student who suffered from it, were ever contacted by OIE or any other UA officer. No followup of any kind was initiated.

149. Dr. Bailey stated that according to UHAP, the regulations governing faculty appointments, that HR had no purview over faculty appointment. Ms. Brennan acknowledged that HR have no purview.

150. Ms. Brennan invited Dr. Bailey to share the relevant documents although these had all been sent between 2017 and 2020 to numerous UA officers including President Robbins and the OGC as well as Ms. Vaillancourt who worked for HR at the time. Dr. Bailey again stated his belief to HR that UA was engaged in collusion to violate rights.

151. In October 2022 Dr. Bailey was informed by Dr. Bertrand that he would not continue to serve on EDL Faculty Search Committees. Dr. Bertrand informed him that this decision was taken by Dr. Deil-Amen on the grounds of his "lack of expertise."

152. This action contradicted Dr. Bailey's long-established, ongoing and effective service in this capacity since his appointment in the College of Education as well as his former Department Head's note of thanks for his service in this role, which included the search

for, interview and hiring of Drs. Bertrand, Nguyen, Demps and Mruczek to the EDL program in 2021.

153. In October 2022 Dr. Bailey put himself forward as a candidate for the College Safety Committee on the basis of his demonstrated and known record of working for a safer campus. Dean Berry had stated at the College Council that relevant experience would be privileged in making selections for this committee. Dr. Bailey also noted his previous experience in safety protocols and risk management operations in the commercial aviation and oil exploration industries. He was not appointed to this committee.

154. On 26th October Dr. Bailey signed a letter to the administration protesting the exclusion of a disabled black student from the Student Center and the deployment of the police against this student by an administrator. Several hundred faculty, staff and students signed this letter but many preferred to remain anonymous for fear of retaliation.

155. The origin of the police callout against this student was subject to public controversy. President Robbins denied that this callout was made by Ms. Maribel Alvarez but student groups alleged otherwise.

156. In October 2022 Dr. Bailey attended Active Shooter Training in the College of Education. UA PD officers presented the session. During the post-presentation discussion, Dr. Bailey stated to a UA PD officer that he was very concerned about risks of administration deliberate indifference to both civil rights and public safety matters. He informed UA PD that he had raised concerns with the Department of Justice and the PD

45

officer stated "We need people like yourself" because of issues with the "chain of command." This officer concurred with Dr. Bailey's concern with OGC advice and administration control over UA PD actions and inactions.

157. On 10th November 2022 the Foundation for Individual Rights and Expression (FIRE) published a letter to UA stating that "Records show the University of Arizona appears to be manipulating the academic freedom grievance process by excluding professors critical of the institution from the relevant review committee. The use of the words "problematic" and "hidden agenda" were used by various administrators to describe these professors as well as Dr. Bailey before and after this while enacting adverse actions against him. These same characterizations were also used against a number of other faculty who filed complaints and were subjected to retaliation.

158. In November OGC officer Mr. Art Lee, writing to the Foundation for Individual Rights and Expression (FIRE) on behalf of UA stated that: "To conclude, the University of Arizona is committed to academic freedom and shared governance as set out in applicable law, policies, and procedures. It always has been and will continue to be so committed."

159. In Dec 2022 Dean Berry notified Dr. Bailey in writing of his denial of Dr. Bailey's Application for Promotion.

160. Dr. Bailey reminded Dean Berry of the Niemoller principle and that as Dean he had responsibilities to perform safeguarding from managers engaged in targeting and retaliation including under Board Rules 1-119 and 6-914. There was no response.

161. In December 2022 the UA announced that it was seeking accreditation from the Western Association of Schools and Colleges (WSCUC). A number of faculty and staff, including Dr. Bailey, presented their written concerns to WSCUC about the prevalence of civil rights violations at UA, the chilled climate and the widespread retaliations enacted against complainants. Several faculty referred to the mode of operation at UA as the "Michigan State" model.

162. One of these complaints transmitted by another faculty member stated "..I would like to document how a pattern of administrative retaliation has emerged over a five-year period targeting whistleblowers and other complainants at the UArizona. The University is directly flouting and undermining the protections afforded civil rights complainants under 18 U.S.C, § 241 and 34 C.F.R. § 106.71."

163. In January 2023 the WSCUC accreditation panelists visited UA and hosted a series of forums including a faculty forum. Dr. Bailey attended the faculty forum and during the open commentary session he summarized his concerns about specific civil rights violations against women at UA, the unlawful harassment of his family, and the overall climate of noncompliance.

164. In late January Dr. Bailey learned from several of his colleagues in EDL during conversations in the College of Education building that he was to be "moved." Dr. Bailey was not informed by anyone of what this meant or why he was to be "moved."

165. On 31st January Dr. Bailey sent Dean Berry an email titled "ABoR Rule 6-914 Section 2 responsibilities and questions you can answer for EEOC civil rights

investigation" in which he again reminded Dean Berry of his responsibility under this Rule, enumerated violations of policy by other officers including Dr. Deil-Amen and asked what he would do to address these violations. There was no response.

166. On 3rd February Dr. Bailey was directed to attend a meeting with Dr. Folks and Ms. Brennan. Dr. Leila Hudson, Chair of Faculty Senate, attended as witness and was acknowledged in this role directly by Dr. Folks.

167. Dr. Bailey was required to attend this meeting in person in the administration tower. This meeting was not held remotely, as all the numerous other such meetings were, despite these officers stating their concerns about the "threats" they alleged Dr. Bailey presented. UA records all meetings hosted on its Zoom platform and participants are reminded and required to acknowledge this when a meeting begins.

168. Dr. Folks stated that she preferred the meeting was not recorded and when Dr. Bailey asked why, she stated "We can be more candid."

169. Dr. Folks with Ms. Brennan's assent presented the following assertions:

(I)     that the severe harassment of Dr. Bailey's wife could not be "relitigated" despite it not having been litigated

(II)    that the Provost's office engaged in close cooperation with the OGC and HR and this was "good management"

(III)   that Dr. Bailey's numerous complaints to the three Provosts, two Vice Provosts for Faculty Affairs, UA Compliance Officer, OGC and President Robbins between 2017 and 2021 had been either "lost in communication" or actioned "beyond

satisfaction." She did not specify which ones were lost and which had been actioned in this way.

(IV)    that civil rights complaints could only be filed outside of working hours of 9am to 5pm and not from UA systems, despite faculty having no defined working hours.

(V)    Dr. Bailey was directly warned by Dr. Folks to "think about your career" directly after this conditioning of timing and venue of civil rights complaints.

170. Dr. Folks with Ms. Brennan's assent stated that Dr. Bailey's colleagues had expressed concerns about his "threatening communications." Dr. Bailey asked for an example of such a communication and Dr. Folks refused to provide one. She stated "It's unclear what your threats mean." Dr. Bailey refused to agree with the false characterization that he represented a "threat" to any person or that he needed to take measures of his own volition to resolve these "concerns" which he regarded as unsupported and defamatory without exemplification.

171. Dr. Bailey asked Dr. Folks and Ms. Brennan about the post of Associate Vice Provost for Faculty Affairs and who held this post. Dr. Folks and Ms. Brennan denied such a post existed.

172. Dr. Bailey believed that the juxtaposition of unwarranted negative performance review, denial of normal recourse, false and defamatory characterization of Dr. Bailey as a "threat" and the direct connection of the destruction of his career prospects with Dr. Bailey's well-known civil rights complaints, in a meeting the administrators did not want recorded and for actions which HR officer Ms. Brennan had directly acknowledged no

purview under UHAP rules, was another part of a clearly pre-planned pathway intended to deliver his retaliatory removal as well as damage his reputation. He reported these concerns directly to a number of Faculty Senators over the following weeks.

173. After this meeting, Dr. Folks called Dr. Hudson and stated the meeting was "risky" and Dr. Hudson was instructed that she was not to share the meeting notes.

174. Despite believing the content of this meeting including the civil rights complaint conditioning and warning regarding his career to be unlawful Dr. Bailey followed the directive of Dr. Folks so he transmitted civil rights complaints before 9am or after 5pm and from non-UA systems. Dr. Bailey stated to the DoJ that he was filing such complaints after 5.01pm for this reason. Despite diligent searching and his expertise in UA policies and Board Rules that Ms. Brennan of HR had acknowledged was "better than some of our employees," Dr. Bailey was unable to find a specification of the approved times or venues for filing civil rights complaints in UHAP or any other regulations.

175. On 6th February early in the morning Dr. Bailey was issued with a three-week office exclusion order by Dr. Folks with Ms. Brennan copied. Dr. Bailey stated his disagreement with the premise of "threat" and raised his concern about the lack of policy, process and rule support for this action. He obeyed this order under written protest.

176. Dr. Bailey emailed UA PD to request police reports or actions against him. UA PD responded and confirmed Dr. Bailey had no record, no arrests, no citations and there was no violation of the threat statute but stated "administrative definitions may differ."

50

177. At the Faculty Senate meeting on 6ᵗʰ February 2023, President Robbins called on the Committee to make "a larger effort" and engage in "more in-depth discussions with the TAMT Committee, with UAPD, with Office of General Counsel, and others who have in-depth knowledge about the safety on the campus."

178. Dr. Bailey sent an email to Dr. Folks and Ms. Brennan and copied to the OGC, asking what his pathway was for participation in the EPSP review, how "threat" was defined against him and how his exclusion was supported under policy, what policy conditioned venue and timing of civil rights complaints, where Dean Jones' harassment was "litigated" as stated to him, and what was the status of the post of Associate Vice Provost for Faculty Affairs and who would assume this office. There was no response by any UA administrator or official including Defendants Drs. Folks and Romero, Dean Berry, Ms. Brennan, other HR or OGC to any of these questions at this time, or ever.

179. Dr. Bailey shared this information with Faculty Senate Committee of 11 (C-11) and was invited to address the C-11 meeting remotely on 17ᵗʰ February. During this same time, another faculty member read the email above and stated "Wow! I'm speechless."

180. On 17ᵗʰ February the Academic Program Review team held meetings with EPSP faculty on campus as part of their formal Academic Program Review. Dr. Bailey had been listed as an attendee for the Associate Professor's forum but was prevented from attending because of the prevailing office exclusion.

181. Dr. Bailey had asked Dr. Folks, Dean Berry, Dr. Deil-Amen and OGC in writing again if there was an alternative pathway for participation e.g. remote attendance, as

normally practiced for faculty meetings and business. There was no response from anyone at UA.

182. Dr. Bailey contacted the Chair of the Academic Program Review team Dr. Lori Patton Davis of The Ohio State University and made clear his concerns about abuse of civil rights in the form of retaliation by Dr. Folks, Dr. Deil-Amen and Dean Berry and his calculated exclusion from the Academic Program Review forum. Dr. Patton Davis stated "FYI. I just wanted to confirm I received this information which I will treat confidentially. Thank you for sharing your experiences."

183. The EPSP Self-Study document (p.136) that was authored and approved by the EPSP faculty under Dr.Deil-Amen's supervision and was presented to external accreditation reviewers including Dr. Patton Davis as part of formal EPSP department review contained a personnel inventory stating that a member of the College of Education held the post of Associate Vice Provost for Faculty Affairs.

184. At a subsequent faculty meeting that Dr. Bailey attended remotely, Dr. Deil-Amen was asked a number of questions by faculty about her promotion to the post of Associate Vice Provost for Faculty Affairs. Faculty asked why this promotion, which had been known to many of them for up to nine months, was not yet announced. Dr. Deil-Amen stated her appointment to this post was due to begin on 1st July but there was a problem.

185. Several public records requests were made by different individuals for the names of the finalists for the post of Associate Vice Provost for Faculty Affairs. These were each returned with the claim that "The University does not possess any records responsive to

your request." (PR 2023-0090 and others).  In the official response to these requests, each time Public Records Coordinator Ms. Kim Fassel stated on behalf of the Board that "In providing this information to you, your public records request is fulfilled and closed in accordance with Arizona public records laws."

186. On 22nd February 2023 Dr. Bailey attended a followup meeting with Dr. Folks and Ms. Brennan conducted remotely.  Dr. Bailey was again informed that his "threatening communications" were a concern for his "colleagues."

187. Dr. Bailey again asked for definition and exemplification of the "threat" that was reportedly alleged by colleagues but that was contradicted by UA PD's declared findings. Dr. Folks and Ms. Brennan gave the example of civil rights code being posted by Dr. Bailey in a chat window.  Dr. Bailey stated that the code he posted, 34.CFR § 106.71 was the Federal code governing prohibition of retaliation against civil rights complaints and that Dr. Deil-Amen had thanked him for this posting during the meeting.

188. Awareness of and respect for this Federal code is required for all UA employees. This awareness is implemented by HR themselves as a component of the mandated UA harassment training.  This code underpins UA policies and Board Rules including 1-119 and this code is specifically cited in the training module.  Dr. Bailey as well as thousands on campus are required to complete these trainings and refreshers and Dr. Bailey had done so most recently in October 2022.  Approval of these modules and specification of the training requirements are performed by HR including Defendant Ms. Brennan in her former capacity as EDGE Learning Coordinator for training.

189. Other than the civil rights code posting in the chat window stated verbally by Defendants Dr. Folks and Ms. Brennan, no definition or example was provided of "threat" by numerous UA administrators or the OGC despite multiple written requests presented by Dr. Bailey in numerous emails.

190. Dr. Bailey continued documenting the evident contradictions in the origins and nature of the false, defamatory and damaging "threat" concept as it evolved over time from Drs. Folks, Deil-Amen and Bertrand, before it completely vanished without explanation as soon as the former Provost Dr. Folks stepped down from her duties in May.

191. Dr. Bailey again noted his concerns about targeting and violation of process and noted the lack of rule or policy support for the exclusion order and Ms. Brennan stated to Dr. Bailey that the three week office exclusion was "not disciplinary."

192. On 27th February Dr. Bailey attended the Faculty Senate meeting remotely and delivered a two-minute Open Session presentation on civil rights violations.

193. Following this presentation, Dr. Bailey was ejected from the meeting. This ejection did not occur at the direction or with the permission of Faculty Senate representatives. The official minutes state that "Chair Hudson stated Keiron Bailey was expelled from the meeting by a host or co-host and requested that it be on the record."

194. Early in March, Dr. Gary Rhoades wrote to administration and copied numerous faculty: "President Robbins, Provost Folks, Faculty Senate, Safety for All Committee, College of Education colleagues, and all, It is an indicator of the toxic culture of a place

when a General Faculty Committee on University Safety for All disbands in protest & out of fear of administrative retaliation, & after having been publicly demeaned, gaslighted before the Faculty Senate by a president encouraging it to connect further with administrative offices, & then stonewalled by those offices. It is further gaslighting and confirmation of the problem when a public response to the committee's resignation comes from the university's Chief of Staff, Jon Dudas, not the President (see the link below) and is sent to the press not the committee and the university community. This continues to be an administrative exercise in how *not* to handle such situations."

195. Many faculty shared these concerns e.g. one faculty stated "I fully endorse Dr. Gary Rhoades's letter. The lack of transparency and engagement with the UArizona is unprecedented in my academic career at several university communities across the country…I have never felt as marginalized as a faculty member or even student as I have at Uarizona."

196. Following discussion, members of the Faculty Senate and C-11 drafted a letter to administration regarding "what appears to be coordinated retaliation that includes the Office of the President."

197. Following Dr. Bailey's intake interview with EEOC, a charge of discrimination (retaliation) was filed against UA on 16th March.

198. After Spring Break, the three-week office exclusion had expired.  Dr. Bailey returned to his office and discovered that his key no longer worked in his office lock although it did work in two other corridor doors as before.  Video and picture evidence

taken at that moment demonstrates from lock wear patterns that Dr. Bailey's office was the only one in the corridor that had the lock changed.

199. Dr. Bailey immediately called Facilities and when the locksmith arrived he noted that the lock had been changed to a high-security Medeco type. Dr. Bailey pointed out the lack of conformance to lock change policy and the locksmith called his manager at Facilities, who was also not able to locate a record of the lock change. During this conversation, an assistant rushed down the corridor to inform Dr. Bailey and the locksmith that the lock was changed. The departmental assistant had a key number that the locksmith did not have. This is outside of normal lock change policy and practice at UA in which all changes must be authorized and recorded by Facilities.

200. Dr. Bailey wrote Facilities later that week to raise these concerns and was later informed that, despite what he was told on the spot by both the locksmith and his manager in Facilities, that a "mistake" had been made. Dr. Bailey was issued a new key but there was additional delay in processing forms and he was unable to return to his office for another week.

201. Dr. Bailey again wrote OGC to ask for rule or policy support and note that the actions being taken against him were delivered without and had been categorized by HR as "nondisciplinary." Ms. Jennifer Bailey of the OGC responded to Dr. Bailey on 23rd March. This was the first and only communication Dr. Bailey received from OGC despite raising a number of previous complaints and concerns directly with OGC since 2019. Ms. Bailey stated that Ms. Todd Johnson had directed her to respond as follows:

"The Office of the General Counsel serves the University by providing legal advice to administrators. As such, we do not make decisions on behalf of the University, nor can we share the content of our advice, as it is attorney-client privileged. It appears that you are aware of and utilizing established resources, both internally and externally, to address your concerns, and we suggest that you continue to do so as you believe is necessary."

202. Dr. Bailey again emailed Ms. Laura Todd Johnson, Lead Counsel. He raised again his concerns with OGC's role in administrative actions and itemized numerous violations of UA harassment and retaliation policies and Rules against him and others by multiple officers. He raised Dr. Folks and Ms. Brennan's point that Provost's office and HR close cooperation was "good management" and stated this was only "good management" if the guidance and advice facilitated compliance by Defendants (Exhibit).

203. Dr. Bailey again stated again his concern about a "Michigan State" model of collusion to violate rights and that he believed UA defendants were engaging in conspiracy to violate rights. He questioned the quality of the legal advice that was being followed in this case where the Board had acknowledged in writing wrongful conduct by UA officers but multiple UA administrators at the same time had termed these unlawful actions "work" and failed to act to address the known risk. There was no response from OGC.

204. On 29th March the Faculty Senate passed a limited Vote of No Confidence in President Robbins, Provost Dr. Folks, Police Chief Ms. Balafas and CFO Ms. Rulney.

Many Faculty Senate members called for a global vote of no confidence during their presentations at this meeting.

205. Following this vote President Robbins stated publicly his desire to work closely with faculty and other community members to "rebuild trust" after Dr. Meixner's murder.

206. In a media article from 4th April President Robbins was also quoted as follows: "If you receive threats, I hope people would feel comfortable contacting (the University of Arizona Police Department), but I understand if you don't," Robbins said, before reciting his personal phone number twice. "If you've got a problem and you don't think you're getting resolution to that problem, text me or call me. If I can't help solve it I will try and find some resolution." Robbins said the university wants to hear about all instances of intimidation or retaliation on campus, and it doesn't have to be as serious as a death threat.

207. Dr. Bailey made numerous attempts to obtain this number from the media outlet where this was published to ask President Robbins to make good on his public commitment, but he was not successful. The journalist who reported the story was unable to produce the number referenced in the coverage.

208. The following week a faculty member received an email sent by Dean of Students Kendall Washington-White that stated: "Good Morning Friends, I had a conversation with Jon Dudas this week regarding the Cultural and Resource Centers including the behavior of the staff and other colleagues who are problematic [Faculty member A],

[Faculty Member B], and others. Jon Dudas and I agree that if we release employees

from the University, we will wait until after the end of the Spring semester (at the end of

May or June). The rationale is that if we make any removals, it will give people another

opportunity to create chaos. Of course, [Employee C] will continue to work with

[Employee D] regarding the Centers' staff. Helena, I appreciate your partnership.

Regarding [Employee E], I'm unsure about him – is he aligned with the Center

Directors? If not, I would move forward regarding his employment. If so, I think we do

the same at the end of the May or June."

209. The official UA webpage defines Mr. Dudas' duties as follows: "In this role, he is

the primary liaison for the Arizona Board of Regents, Arizona's other public universities,

and directly facilitates the many governance practices at the University."

210. At that time Ms. Kendall Washington-White's official UA web page displayed by

the Provost's office stated she held a PhD. Local media subsequently reported that this

representation of her credentials was false with one headline stating "U of Arizona

website falsely said dean of students has doctorate." After public and social media

uproar, these UA pages were subsequently modified to state that Ms. Washington-White

holds a Master's degree.

211. UA employment offers contain the following stipulation based on Board Rules:

"Misrepresentation of your qualifications may be grounds for offer

withdrawal or employment dismissal."

212. A named faculty member [B above] raised this secret administration plan to remove her with Faculty Senate and met with Faculty Senate representatives meeting to discuss this email and her shock that the President's office were aware of this carefully-coordinated removal plan directed at her and other named faculty members. She stated: "This level of intimidation and retaliation is unacceptable. And the fact that this is going on in full awareness of the President's Office? Wow! Unbelievable."

213. During Faculty Senate followup on this matter, Dr. Bailey pointed out to these Faculty Senate members that UA Defendants were following an identical course of action against him with the clear purpose of unlawful retaliatory removal. This email was sent to the Department of Justice Civil Rights Division by several faculty members concerned about conspiracy to violate rights.

214. The Coalition of Black Students and Allies (COBA) called for the resignation of Kendall Washington-White and drew attention to her "abuses of power and intimidation" and her role in enforcing what they termed "a culture of fear and silence throughout the institution."

215. Faculty member [B] subsequently reported her concerns about selective retaliation as well as denial of legal counsel during a hearing with the SBS Dean Dr. Poloni-Staudinger to the Faculty Senate Committee of Eleven who raised the case with administration.

216. Dr. Bailey's case was stated by a Faculty Senate member as a second such example of such concerning administration collusion to retaliate.

217. On 14th April, Dr. Deil-Amen stated: "Keiron, I would be more than pleased to speak with President Robbins. If he wants to discuss the three-week order, he will need to speak with the person who ordered that after meeting with you, and that was Provost Folks."

218. Dr. Bailey was contacted by his former EDL Head, Dr. Bertrand, out of the blue. She stated that she was concerned about being deposed or charged in a civil rights suit and that she was involved in this performance review, and that she believed that Dr. Bailey's 2021 performance review was fair.  This contradicted her position in 2022 when Dr. Bailey had raised his concerns with Dr. Bertrand about Dr. Deil-Amen's review and exemplified the targeting and stated his concerns about organized retaliation by admin via Dr. Deil-Amen but Dr. Bertrand had not acknowledged any role in this process and led Dr. Bailey to believe that Dr. Deil-Amen was the sole author of the targeted review.

219. Dr. Bertrand stated that she felt "physically threatened" by Dr. Bailey.  This was the first time Dr. Bailey had been presented with Dr. Bertrand's concern.  Dr. Bertrand produced to Dr. Bailey no example or evidence of such threat, nor of any specific action or statement that led her believe so, nor of any specific action or statement allegedly made against others that led her to believe so.

220. Dr. Bailey has never been notified of an OIE investigation into his actions either at UA or in his career prior to working at UA.

221. Dr. Bertrand's statement contradicted her long-term behavior and conduct around Dr. Bailey in the office area.  The previous week Dr. Bertrand had invited all faculty

including Dr. Bailey to a social event at her house.  Dr. Bailey had attended several

previous EDL social events that Dr. Bertrand had organized and to which she had invited

attendance.  Since her appointment in August 2021 she had regularly stopped to converse

with him about student and program matters in the shared office corridor.  She had

voiced no concern to Dr. Bailey until this email.

222. In his response to Dr. Bertrand, Dr. Bailey pointed out that Dr. Deil-Amen was not

regarded as "fair" by all because she had been the subject of formal graduate student

complaints for her capricious and abusive behavior as doctoral Committee Chair.  Dr.

Bailey was aware of this because one of these students had been his longtime neighbor.

Dr. Bailey again explained why there was major risk from UA noncompliance and stated

that he agreed with Dr. Bertrand in that he did not have a favorable impression of

administrators who discharged and validated the criminal harassment of his family.  He

added he was disappointed to learn that Dr. Bertrand had not been forthright with him

about her role in his evaluation and stated he wished for a better campus for all.  He

stated the best way to avoid any legal concerns was to respect the law.

223. On 17th and 20th April Dr. Bailey again emailed President Robbins detailing his

concerns about retaliatory management.  He copied the second email to the EEOC

investigator.  There was no response from President Robbins but the EEOC investigator

responded to this same email and requested Dr. Bailey load the evidence into the EEOC

portal.

224. On 22nd April Dr. Bailey received an email from Dr. Folks and Ms. Brennan that was sent at noon on Saturday, outside of UA work scope and in contradiction to the UA system-advised and flagged practice of delaying sending of emails to working hours after 8am on weekdays to reduce workplace stress intrusion on family time. This email stated that he was subjected to a further three week office exclusion on the grounds of his "anger, outbursts" and what Dr. Folks termed "threats of legal action."

225. Dr. Bailey has never raised his voice against any UA officer or employee and this claim has never been raised by anyone other than Defendants Dr. Folks and Ms. Brennan.

226. Again no rule or policy was cited in support of this adverse action and no specific threat or example of threatening behavior was provided. Dr. Bailey had not spoken to anyone in the college for almost three months and had not said a word during any Faculty meeting or other function since his first office exclusion started on 6th February. Other than with Dr. Deil-Amen, the only exchange with any faculty member was in writing with Dr. Bertrand following Dr. Bertrand's email in which she initiated the contact with him.

227. In this email, Dr. Folks with Ms. Brennan's assent wrote: "If you need to come into your office for any reason, you must coordinate it with Rachel Barton beforehand."

228. Dr. Bailey received a 2022 annual performance review in the UAVitae system that contained the EPSP Department Committee evaluation. This text contained categories of Meets Expectations and Needs Improvement. The original review committee text made no reference to threats or negative impact on workplace climate or any other synonymous

allegations as presented repeatedly by Defendants Dr. Deil-Amen, Dr. Folks and Ms.

Brennan. At some point over the following month this review was then substantially

modified and added to by Dr. Deil-Amen to deliver a review that rated his performance

"Unsatisfactory" in all categories. Dr. Deil-Amen again employed numerous selective

and targeted criteria to deliver unwarranted low evaluation, for example low enrolment in

some of Dr. Bailey's classes. Dr. Bailey captured enrolment statistics from the UA

system for classes taught by other instructors in the College of Education showing that a

number of them also had the same or fewer students enrolled.

229. On 25th April Dr. Bailey met with incoming Interim Head of EPSP, Dr. Rhoades to

discuss teaching and adaptation plans at an off-campus cafe. Dr. Rhoades had asked if

the prevailing exclusion was a campus exclusion and Dr. Bailey stated it was not,

repeating the words of the former Provost and Ms. Brennan that it was an office

exclusion. During this meeting Dr. Rhoades did not make any statement regarding any

perception of "threat" from Dr. Bailey. He stated he did not agree with nonprocedural

exclusions being directed at Dr. Bailey and that he believed in due process. Dr. Rhoades

stated he could not understand why a manager who had stated in writing that she did not

agree with his appointment before it was enacted was left in charge of Dr. Bailey and that

various COI relief processes existed and had been used by himself and others in the

College of Education previously.

230. Dr. Bailey again raised the COI problem and requested review by managers outside

the College of Education. Dr. Deil-Amen later addressed this request and asked for a list

of nominees.  Dr. Bailey considered some faculty and sent a list of four to her as requested.  Dr. Deil-Amen then immediately denied this request despite having initiated it.

231. Dr. Bailey realized that the accelerating pattern of retaliation, involving coordinated, nonprocedural and total exclusion from the workplace, rapidly deteriorating performance review using the same information, and the continued failure by all managers to exercise good faith or follow policies including UA200, UHAP 7.01, Board Rules 1-119 and 6-914, was intended to deliver his pretextual removal by the end of the semester.  He stated this to Faculty Senators and some expressed doubt that administration would take such action.  Dr. Bailey pointed out the litany of policy and Rule violations and the large and coordinated investment in lawbreaking across multiple UA offices and asked these Senators where they thought the malfeasance would stop.  They had no answer.

232. On 28th April Dr. Folks and Ms. Brennan again required a meeting with Dr. Bailey.  Dr. Hudson was an audio witness and Dr. Bailey had another witness during the Zoom meeting.  Dr. Folks with Ms. Brennan's assent stated at the meeting and then in writing that "This [the office exclusion order] is not a UA PD process."

233. At a Faculty Meeting later in April Dr. Bertrand announced that she was stepping down from her role as Head of EDL with immediate effect and with no replacement named.  This is a very unusual move prior to the end of a semester and it took faculty by surprise.  Dr. Bertrand stated she could not talk about this matter.

234. On 28th April Dr. Bailey received a formal denial of promotion from the former Provost Dr. Folks.

235. On 1st May President Robbins announced a series of management changes including that Dr. Folks was stepping down from the post of Provost and that UA PD Chief Ms. Paula Balafas was stepping down with immediate effect. President Robbins announced that HR would report directly to him. President Robbins stated in this communication that "Building on the strong foundation it has established in recent years within Business Affairs, Human Resources will continue to engage colleagues across the University's campuses and within its colleges to foster a culture consistent with our shared values."

236. Dr. Bailey stated he would not attend a performance review meeting with Dr. Deil-Amen until he had spoken with President Robbins. Dr. Bailey had stated this in several emails to President Robbins but without response to that moment.

237. Dr. Folks issued an order to meet with Dr. Deil-Amen. Dean Berry was absent from these events despite being Dr. Deil-Amen's manager and being aware of Dr. Bailey's targeting concerns for months prior.

238. Dr. Bailey attended a performance review meeting with Dr. Deil-Amen. He clarified to Dr. Deil-Amen he would not sign what was clearly an unwarranted and retaliatory review that had suddenly and inexplicably deteriorated from the previous categories of Meets Expectations and Needs Improvement, to multiple "Unsatisfactory" ratings warranting a Performance Improvement Plan under UHAP policy and opening the pathway for dismissal of a tenured faculty member. The intent to enlist Dr. Bailey in his

own unlawful removal via this abusive process was clear. Dr. Bailey reiterated his

revulsion at the coercion as well as his refusal to sign the fraudulent document.

239. Dr. Bailey again contested the "threat" concept being used against him and sourced

by his "colleagues." Dr. Deil-Amen suggested he talk to the Provost's office about the

origin of this concept. Dr. Folks and Ms. Brennan had repeatedly asserted that the source

of this concern was his "colleagues." With the exception of Dr. Bertrand's email, sent

more than two months after the first office exclusion, none of his colleagues had ever

communicated such concerns to Dr. Bailey.

240. Dr. Bailey re-stated to Dr. Deil-Amen he would not sign any review authored by her

and would await the result of discussions with President Robbins.

241. Directly following this meeting Dr. Deil-Amen emailed Dr. Folks and Ms. Brennan

with the following: "Provost Folks, I met with Dr. Bailey this morning. At this meeting,

he verbalized that he has chosen not to respond to the annual review documents in any

way until he meets with President Robbins because he believes this review is part of a

targeted effort to remove him. He is currently waiting for a response from President

Robbins regarding this and we, therefore, did not discuss any of the content of the annual

performance review, including my evaluation and the peer review committee's comments

and ratings. Dr. Bailey has formally requested that the review and department head

evaluation for both this year and last year be conducted by "managers" outside the

current College of Education, including removal of Dean Berry from the process as well.

I asked Dr. Bailey if he had a preference for any particular person to perform that review,

and he has not identified a specific preference at this point.  Now that I have relayed Dr.

Bailey's request, I will await further direction on how we should proceed."

242. Dr. Bailey stated "Regina is correct about that.  However, the Provost's impending

removal does not erase or change the catalog of retaliatory actions and damages that I am

experiencing.  I will discuss these with President Robbins, as stated in my 6-914, with the

focus on restoring compliance."

243.  Dr. Folks then wrote to Dr. Bailey: "Dear Keiron, The process for APRs is set out

in UHAP policy 3.2.01, and the meeting with your department head on Monday, May

1st was a required part of the process. I have asked Dr. Deil-Amen to finalize your APR

and issue it to you via email, so that you have the final written evaluation.  Per UHAP

policy, you may provide comments to the written APR, and must sign the document and

return it to your department head, Dr. Deil-Amen, within 10 calendar days of the

meeting, i.e., by May 11, 2023.  You may not delay the APR process merely because you

have a disagreement with some people or because you wish to speak with the President.

I note that Section 3.2.03 provides a mechanism for appeal, which you are entitled to

utilize.  Regards, Liesl"

244. This reference to UHAP appeal policy contrasts with the total failure by both Dr.

Folks and Dr. Romero to address or even acknowledge Dr. Bailey's appeal of the 2021

APR presented on 12th August 2022 under the same policy being cited here.

245. Ms. Brennan was again cc:d on this email despite HR having no role in APR

process and with Ms. Brennan herself having acknowledged that HR have no purview

over faculty appointment on 19th October 2022.

246. On 1st May Dr. Bailey filed a complaint under Board Rule 6-914 with designated

public bodies President Robbins and the Board of Regents alleging abuse of office by Dr.

Folks, Ms. Brennan, Dean Berry, Drs. Deil-Amen and Romero.  Dr. Bailey copied this

complaint to the DoJ Civil Rights Division, the Department of Education and NSF

OECR.

247. This complaint was forwarded by the Board to Mr. Henderson at UA.  Mr.

Henderson forwarded this complaint to a subject of complaint, Dr. Folks.  Board Rule 6-

914 contains no public specification of how such complaints should be handled nor are

there COI provisions for those reporting the Provost or direct reports in the Provost's

office who are vulnerable to direct retaliation from those officers named.

248. Dr. Folks recused herself from handling this complaint.  She did not recuse herself

from further management actions with respect to Dr. Bailey.

249.  Dr. Bailey reported this to Faculty Senate members.  One of the Faculty Senate

members stated "Even [President] Robbins knew that 6-914 complaints don't go to Liesl

when I talked to him one on one a few weeks ago.  Maybe the only thing that will get

their attention is a lawsuit?  Unbelievable." Another faculty member stated "He sent it to

someone named in the complaint? Wtf??"

250. At this time, President Robbins had not responded to any of Dr. Bailey's numerous

written communications that included emails to both of his official UA email addresses

"rcr@arizona.edu" and "president@arizona.edu" as well as the earlier certified mail, nor

69

had President Robbins responded to outreach from a member of Faculty Senate who possessed his personal cellphone number despite his publicized invitation for UA employees to use his personal number to report any form of retaliations as stated to the press two weeks prior.

251. On 4ᵗʰ May Dr. Bailey attended the Open Staff Safety Forum hosted by President Robbins and Mr. Patterson in the Music Auditorium. He screenshot the announcement of the Staff Safety forum noting the forum was an "open" forum with a scheduled open mic session to address President Robbins.

252. Dr. Bailey attended and during the Open Session, he took the mic and addressed President Robbins on the stage, raising staff safety concerns that he had relayed without acknowledgment in 2018 and on other occasions as well as re-proposing solutions he had raised before including an ombud to identify employee concerns in an environment free from coercion and retaliation. President Robbins stated that he thought this was a good idea.

253. Following his delivery several others also presented. President Robbins immediately came over with his assistant Ms. Castro to where Dr. Bailey was sitting and they each introduced themselves and began scheduling a meeting with Dr. Bailey.

254. Ms. Brennan of HR accosted Dr. Bailey while President Robbins was talking with Dr. Bailey. She knowingly and falsely asserted that Dr. Bailey was obligated to inform Ms. Barton in the College of Education office prior to attending this event. Dr. Bailey reminded her of her own written and verbal clarification statement issued six days earlier

had President Robbins responded to outreach from a member of Faculty Senate who possessed his personal cellphone number despite his publicized invitation for UA employees to use his personal number to report any form of retaliations as stated to the press two weeks prior.

251. On 4th May Dr. Bailey attended the Open Staff Safety Forum hosted by President Robbins and Mr. Patterson in the Music Auditorium. He screenshot the announcement of the Staff Safety forum noting the forum was an "open" forum with a scheduled open mic session to address President Robbins.

252. Dr. Bailey attended and during the Open Session, he took the mic and addressed President Robbins on the stage, raising staff safety concerns that he had relayed without acknowledgment in 2018 and on other occasions as well as re-proposing solutions he had raised before including an ombud to identify employee concerns in an environment free from coercion and retaliation. President Robbins stated that he thought this was a good idea.

253. Following his delivery several others also presented. President Robbins immediately came over with his assistant Ms. Castro to where Dr. Bailey was sitting and they each introduced themselves and began scheduling a meeting with Dr. Bailey.

254. Ms. Brennan of HR accosted Dr. Bailey while President Robbins was talking with Dr. Bailey. She knowingly and falsely asserted that Dr. Bailey was obligated to inform Ms. Barton in the College of Education office prior to attending this event. Dr. Bailey reminded her of her own written and verbal clarification statement issued six days earlier

in which she and Dr. Folks stated with emphasis that the prevailing office exclusion order was not a campus exclusion order and should not be represented as such. President Robbins waved away Ms. Brennan and continued to discuss meeting times.

255. Dr. Bailey knew the policy and had never represented the exclusion order as anything except an office exclusion as stated by HR and the Provost. According to Google Map the location of the music auditorium is seven hundred meters from Dr. Bailey's office in the College of Education from which he was excluded.

256. Dr. Bailey left the forum with other participants in a normal and orderly way however he was then subjected to a formal UA PD stop. He cooperated with Officer Stevenson and after confirming his identity and address he determined that he was not being subjected to arrest, citation, warning or other violation. He asked who called out the police and was informed that HR originated the callout.

257. The formal UA PD summary posted online revealed that the callout was logged at 12.55pm, as Dr. Bailey was addressing the forum. The code used was 6101 "miscellaneous" and not a code used for a trespass or public order callout.

258. The same afternoon Dr. Bailey wrote UA PD Chief Brei and Chief Sommerfield, summarized the callout and expressed his concern about abuse of UA PD by administrators vested in an agenda of retaliation. There was no response.

259. Dr. Bailey wrote Chief Brei again on 12th May to follow up, and again on 18th May with new information and copied this second email to Mr. Henderson and Dr. Hudson.

There was no response to these from UA PD, Mr. Henderson, or anyone in UA administration.

260. A public records request for the UA PD callout was made and the report was obtained in October.  The reason given to UA PD by HR for this callout was that Dr. Bailey was "not welcome" at the forum.  This reason has no legal basis under State law nor under UA HR or Provost's authority as stated to Dr. Bailey by these officers.

261. UA PD stated in their report that HR should clarify in writing the geographic extent of the exclusion order.  Dr. Folks and Ms. Brennan had already done so to Dr. Bailey with witnesses during the 28th April 2023 meeting and followed up in writing.  It is not clear why UA administrators chose not to share this information with UA PD before enacting the callout nor why Ms. Brennan knowingly and falsely stated to Dr. Bailey he needed Ms. Barton's permission to attend this forum being held seven hundred meters from his office and not under College of Education purview.

262. The HR officer who called out UA PD chose to remain anonymous by requesting anonymity despite the normal redactions being performed.  It is not clear from this report why a senior UA administrator discharging the official business of the State by formally involving law enforcement took such precautions to remain anonymous.

263. The UA PD report stated that "The [HR] representative informed me that there were additional concerns coming from the Bailey's office about his presence at the Spring 2023 UA Commencement."

72

264. Dr. Bailey had no intention of attending the Commencement. He made no statement to anyone at UA or any other person regarding an intention to attend the Commencement. He had never attended any Commencement. He did not attend or attempt to attend this Commencement. He was unaware of such "concerns" from his office until he obtained a copy of the UA PD report months later. In the report UA PD noted "There were no specific concerns regarding this."

265. On 8th May 2023 Dr. Bailey attended a meeting with President Robbins and Mr. Craig Henderson. Dr. Hudson, Chair of Faculty Senate, attended as a witness. President Robbins discussed potential other appointment units including Research Innovation and Impact and expressed appreciation for the valuable work Dr. Bailey had delivered.

266. President Robbins apologized to Dr. Bailey for the abuses he had endured. He stated that he had read all Dr. Bailey's emails and that these were a tour de force. He also stated that he should have intervened two years ago. Dr. Bailey agreed.

267. President Robbins stated he was surprised that Dr. Bailey still wanted to work at UA. Dr. Bailey had already complained to EEOC that the tactics being used to make his workplace intolerable and deny functionality including denial of promotion, denial of service, nonprocedural office lock change, multiple lengthy office exclusions without reference to policy or rule, and unsupported defamation as "threat" etc. were strongly consistent with the definition of constructive dismissal. Nevertheless Dr. Bailey reiterated his ongoing desire to deliver his quality research, teaching and service, as he had done for twenty years at UA.